UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 -------------------------------------------------------------------------------X
JENNIFER BERKELEY-CARR,

                            *Plaintiff*,

            -against-

NEW YORK CITY TRANIST TA, DAVID CHAN AND MARVA BROWN

                       *Defendants.*

     -------------------------------------------------------------------------------X

**16-CV-09957
(DAB)**

**STATEMENT OF
MATERIAL
FACTS
PURSUANT TO
RULE 56.1**

        Defendants New York City Transit Authority, Marva Brown and David Chan (together "Defendants"), by their attorneys, James B. Henly, General Counsel, Mariel A. Thompson, Executive Agency Counsel, of Counsel, submit the following statement of material facts pursuant to Local Court Rule 56.1 of the Southern and Eastern Districts of New York:

**STATEMENT OF THE MATERIAL UNDISPUTED FACTS**

        1.Plaintiff Jennifer Berkeley-Carr ("Plaintiff") commenced this action on or about December 27, 2016 against Defendants New York City Transit Authority ("TA"), Marva Brown ("Brown") and David Chan ("Chan"), pursuant to the ADEA, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sections 2000e et seq., ("Title VII"), and 42 U.S.C. Sections 1981 and 1983 et seq.  *See* Plaintiff's Amended Complaint, Exhibit ("Ex") A.

        2.There are no State or City Law Claims asserted in this action.  *Id.*

**I.**      **THE PARTIES**

        3.      The TA is a public benefit corporation created by the New York State Legislature (Public Authorities Law ["PAL"] §1200-1221) for the purpose of operating the subway and bus systems, and its "facilities" within the City of New York.

4.      Plaintiff is currently a 63 year-old (born 1955) African-American female of Caribbean descent, currently employed by the TA in the title of Director, Telecommunications & Systems within the TA's Division of Capital Programs, Department of Subways (hereafter "Capital Programs").  *See* Ex A, ¶4; *see* relevant portions of Plaintiff's deposition transcript ("Pl Dep."), Ex B at 10.

5.      Plaintiff has been with the TA since 2000, and has been in Capital Programs since 2004.  Ex A, ¶14; Ex L.

6.      Defendant Brown was born in 1959 and is a 59 year-old African-American female of Caribbean descent, currently in the title of Vice President & Chief Officer, Capital Programs. *See* relevant portions of Brown's deposition transcript ("Brown Dep."), Ex C at 7, 12-13.

7.      Brown has been with the TA since July 5, 1988 and has been in her current title of Vice President and Chief Officer since August 1, 2011 and prior to that was in this role since around August 2010 in an acting capacity (Ex C at 12-13; Ex M).

8.      Defendant Chan was born in 1963 and is a 55 year-old Asian male, currently in the title of Senior Director, Program Management & Analysis ("PMA") in Capital Programs.  *See* relevant portions of Chan's deposition transcript ("Chan Dep."), Ex D at 8.

9.      Defendant Chan has been with the TA since July 28, 1987, and has been in his current title of Senior Director, PMA in Capital programs since October 13, 2014.  *Id.* at 11; Ex N

## II.      PLAINTIFF'S ALLEGATIONS

10.      In this action, Plaintiff alleges that Defendants Brown and the TA subjected her to discrimination on the basis of her age, race and gender by not selecting her for two positions for which she applied in 2013 and 2014 respectively.  *See* Ex A; Ex B at 200-202; *see also*, Ex E, pp.12-11, Interrogatory No.'s 14-16).

11.     The first position Plaintiff applied for in 2013 was the position of Senior Director, Program Management & Oversight, and was offered to Joseph DiLorenzo (54 year-old male [born 1964); self-identifies as "Other"). Ex A ¶21-23; Ex's Q-S, Ex Z, TA 3738-9.

12.     The second position Plaintiff applied for in 2014 was the position of Senior Director, Program Management & Analysis and was offered to Defendant David Chan (55 year-old Asian male). Ex A, ¶25-27; Ex's W-Y.

13.      Since the filing of her complaint, Plaintiff has clarified that her failure to promote claims against Brown and the TA are based on "age" discrimination rather than race and gender. Pl. Dep. Ex B at 81, 361; *see* Docket No. 45 ("Although Plaintiff has a strong age discrimination claim under a disparate treatment theory…").

14.     Plaintiff's claims of "age" discrimination and/or or to the extent she alleges race or gender discrimination, are not raised against Defendant Chan. *See* Ex E, pp.12-11, Interrogatory No.'s 14-16; Pl. Dep, Ex B at 200-201.

15.     Plaintiff also alleges in this action that shortly after she filed a complaint with the TA's Department of Equal Employment Opportunity & Diversity ("EEO") on September 29, 2014 against Brown (*see* Ex's F and G), she was subjected to retaliation by Defendants TA, Brown, and Defendant David Chan, who became Plaintiff's new supervisor upon appointment to the PMA position on October 13, 2014. *See generally*, Ex A; Pl. Dep. Ex B at 225:12-25; 226:1-7.

## III.     PRIOR EEOC CHARGE & RIGHT TO SUE LETTER

16.     On October 22, 2015, the TA received a Notice of Charge of Discrimination from the Equal Employment Opportunity Commission ("EEOC") dated October 15, 2015, with an EEOC Charge signed by Plaintiff dated August 7, 2015, sworn to on August 13, 2015. *See* Ex H (Notice of Charge, Charge, and related Law Dept. records); *see* Pl. Dep., Ex B at 148-149.

17.     Plaintiff alleges and provides records showing that she completed an intake questionnaire and submitted a complaint to the EEOC on May 11, 2015 and amended that complaint on May 27, 2015, but Defendants did not receive copies of these complaints.1  *See* Ex J.

18.     The TA responded to the August 7, 2015 Charge on or about March 14, 2016, and the EEOC issued a Dismissal & Right to Sue Letter dated October 31, 2016.  *See* Ex's J, H.

## IV.     CAPITAL PROGRAMS, SUBWAYS

19.     Briefly, Capital Programs is responsible for managing the planning and development of the TA's Capital Program on behalf of Subways' Operating and Maintenance Divisions, and supports the execution of each 5-year Capital Improvement Plan, providing project oversight and support, fiscal and budget management, estimating, planning, and reporting.   Ex B, 41-44; Ex O; Ex C  .

20.     As Vice President and Chief Officer of Capital Programs, Brown is responsible for the supervision of approximately 30-40 budgeted positions, including the Senior managers directly reporting to her in the following titles: (i) Lower Manhattan Infrastructure Improvements; (ii) Program Management & Analysis; (iii) the Security Program; (iv)Strategic & Long-Range Planning; (v) 7 Line Extension & Signals; and (vi) Program Management & Oversight.  *Id.,* O.

21.     Each area is run by a Senior Director or Assistant Chief, and Chan is the Senior Director of the area of Program Management & Analysis.  *Id.*

---

1 Plaintiff produced a copy of a "Notice of Charge" dated May 18, 2015 addressed to the TA apparently contained in the EEOC's file, indicating "No Action Required" and containing no underlying Charge of Discrimination by Plaintiff.  *See* Ex K.  However, the TA has not been able to locate this record.  *See* Ex H, related records.  The Notice of Charge received on October 22, 2015 with Charge dated August 7, 2015, is the only EEOC Charge by Plaintiff on file, and the TA responded to that Charge.

22.     As Senior Director, Chan oversees the Communications and Elevators & Escalators and Tunnel lighting areas and is responsible for making sure "capital projects are funded" in the capital program" and are "constructed so that it can benefit New York City Transit."  Ex D at 176; 129.

23.     Chan reports directly to Brown, and Plaintiff reports directly to Chan as Director, Telecommunications & Systems in his group.  Ex A, ¶15.

## V.   IN FEBRUARY 2012, BROWN HAD ADVANCED PLAINTIFF INTO HER CURRENT POSITION OF DIRECTOR, TELECOMMUNICATIONS & SYSTEMS BY CREATING THIS TITLE FOR HER AND GIVING HER A 12% RAISE

24.     In 2011, Brown recommended the consolidation of two positions to create a new position for Plaintiff entitled "Director, Telecommunications & Systems".  Ex P.

25.     At that time, Plaintiff was in the position of Director, Acceptance & Engineering in Capital Programs in a lower managerial Hay Grade (Level "E" ["A" is highest]).  *See* Ex L.

26.     Brown obtained a "re-hay" of Plaintiff's existing Grade Level to a higher Grade Level ("C") and a 12% salary increase for her. Ex B at 53, 87-88; Ex C, at 7: 20-25; 93-94.

27.     Plaintiff's salary went from $88,152 to $98,730.  Ex 1.

28.     In this new role as Director, Telecommunications & Systems Plaintiff became responsible for, among other things, analyzing, coordinating, prioritizing, developing and updating the Telecommunications Program area for the Department of Subways.   Ex P (TA 1700).

29.     The position requires interaction with Capital Program managers who are, in turn, overseeing the strategic capital planning for specific Operating Divisions within Subways, and the position is responsible for overseeing complex communications projects, and anticipating long range plans for inclusion of new technologies within the Capital Programs.  *Id.*

## VI.   AMY KAUFMAN SUPERVISES PLAINTIFF FROM SEPTEMBER 2012 – MAY 2014

30.     From about September 4, 2012 until around May 2014, Plaintiff reported to Amy Kaufman ("Kaufman"), Senior Director, Program Management & Analysis ("PMA").  *See* Ex B at 68-69; Ex C at 130:21-25; Declaration of Amy V. Kaufman ("Kaufman Dec.") ¶3.

31.     In the position of Senior Director, PMA, Kaufman was responsible for, among other things, oversight of the Communications and Stations areas in Capital Programs.  *Id*. ¶4.

32.     According to Plaintiff, Amy supervised Plaintiff "[in name only]" because "she saw no need to supervise Plaintiff".  Ex A ¶24.

33.     According to Kaufman, when Kaufman introduced herself and told Plaintiff that she "wanted to come up to speed with what was happening in the department" Plaintiff responded "I don't need to be supervised".  Kaufman Dec. ¶8. Ex G (TA 874).

34.     When Kaufman said, "It's not about supervision it's about working together," she testified that Plaintiff responded, "I know how to do my job, you don't need to tell me what to do." Id. ¶10.  Ex G (TA 874).

35.     Kaufman said that Plaintiff generally performed her job well, but Plaintiff "rarely came to her to speak".  Kaufman Dec. ¶12-13.  Ex G (TA 875).

## VII.   PLAINTIFF APPLIES FOR AND IS INTERVIEWED FOR THE POSITION OF PROGRAM MANAGEMENT & OVERSIGHT ("PMO")

36.     On or about October 9, 2013, Plaintiff applied for a more senior level position that was posted in Capital Programs – Senior Director, Program Management & Oversight (the "PMO" position).  Ex 1, ¶20.  Ex B at 64-65; Ex Q.

37.     According to the job posting, the PMO position would be, *inter alia* "primarily responsible for managing and coordinating the planning and development of a comprehensive

Capital Program for Tunnel Lighting, Line Structures and Line Equipment from project inception to completion..."  *See* Ex Q.

38.     In terms of qualifications, the position required a "BA in Business Administration, Economics, or Engineering and a minimum of 15 years of related experience..."  *Id.*

39.     In terms of "Desired Skills", the position sought, among other things, knowledge of the Capital Program, "strong problem solving/conflict resolution skills" and a "strong analytical background in the field of engineering, construction activities and inspection process." *Id.*

40.     The selected candidate would be reporting directly to Brown.  *See* Ex R.

## VIII.   AN INTERVIEW PANEL CONDUCTS INTERVIEWS FOR THE PMO POSITION

41.     An interview panel was established to interview candidates for the PMO position, and was comprised of Kaufman, Plaintiff's supervisor at the time, two other Senior Directors at the time in Capital Programs, Robert Levine (Senior Director, Security) and Tim Forker (Senior Director, Strategic & Long-Range Planning, along with a Manager from Human Resources, Renalda Goodall.  *See* Ex A ¶20; Ex R.

42.     Plaintiff was deemed qualified for the position, along with a number of other candidates, including internal candidates Joseph DiLorenzo (54 year-old male [self-identifies as "Other"]), David Chan (55 year-old Asian male), and Franz Polycarpe (61 year-old African-American male).  *See* R; Ex Z, TA 3738-9.

43.     Out of 52 resumes received, seven applicants were interviewed. *See* Ex's R, S.

44.     Brown asked the panelists to refer "three or so candidates who performed the best in the interview".   Ex C at 34:22-25; 35:1; *see* Kaufman Dec. ¶18.

45.     Plaintiff was interviewed for this position on or about October 9, 2013.  Ex A, ¶20.

46.     The panel asked each of the candidates the same questions at their interviews. Kaufman Dec. ¶19; Ex C at 216:23-25, 217:1-15.

47.     Kaufman testified her observation was that Plaintiff did "well" at the interview, but she was a bit "confrontational and unenthusiastic".  Kaufman Dec. ¶22; *See* Ex G (TA 873-877).

48.     DiLorenzo was Kaufman's first choice, and Kaufman did not recall Plaintiff being anyone's first choice.[2]  *Id*. ¶26.

49.     Plaintiff, however, was one of the top four candidates that was referred to Brown by the panel, along with internal candidates Joseph DiLorenzo, David Chan and Franz Polycarpe (Ex C at 35: 42:1-7; 52:6-12 Errata Sheet correction; Kaufman Dec. ¶27).

## IX.     BROWN SELECTS JOSEPH DILORENZO FOR THE POSITION BECAUSE HE WAS THE BEST CANDIDATE FOR THE JOB

50.     Brown conducted second interviews with Plaintiff, DiLorenzo, Chan and Franz Polycarpe.  *See* Ex C at 35:15; 42:4 (Errata Sheet corrections).

51.     Brown ultimately selected DiLorenzo for the position, and the remaining candidates, including Plaintiff, were deemed qualified but not the best candidate.  *See* Ex's R, S.

52.     DiLorenzo has a Bachelor of Architecture from the New York Institute of Technology and a Masters of Business Administration in Corporate Finance from Fordham University.  *See* Resume, Ex S.

53.     DiLorenzo has been with the TA since 1989, beginning as an Assistant Architect, and was promoted a number of times thereafter, eventually into the title of Director of Stations and Facility Programs/Acceptance and Engineering Review, wherein he was responsible for, among other things, developing and administering a comprehensive program for all station component,

---

[2] According to a report issued by the TA's Department of Equal Opportunity & Diversity regarding its investigation into this hiring decision, Robert Levine's first choice was Franz Polycarpe, and Tim Forker's first choice was DiLorenzo.  *See* Ex G, TA 877-878.

station renewal and employee facility projects for the 5-year capital program (totaling $1.1 Billion), and later overseeing the rehabilitation of 15,000 station components throughout the TA. Ex S, TA 1698.

54.     DiLorenzo had reported directly to Brown when Brown was a Senior Director in Capital Programs (Ex C at 26-27).

55.     When asked why Brown selected Joe DiLorenzo, Brown testified, among other things (Ex C at 26-27).

> When I joined – when I was promoted to vice president in capital programs, part of what I wanted to do was take the unit in a different direction. I wanted just to have more technical staff on board, and so when the opportunity came to promote someone into this position, because stations and the infrastructure program area you require some technical expertise. If you're going to make decisions on a program area, I feel that having someone in a technical area makes a lot of sense. So I made certain changes in the unit, and my requirements, what I was looking for, was someone who had a technical background…

56.     Plaintiff does not have a technical background. Pl. Dep., Ex B at 83:9-10.

57.     Brown testified that "the combination of" Dilorenzo's "experience, and his technical background, and his interview made him the best candidate for this job." (*Id.* at 27).

58.     Brown testified (Ex C at 37: 7-15):

Q. Now, you said that you didn't take age into consideration, why not?
A. Because it's not something that I judge people on.
Q. Did you take race into consideration?
A. Absolutely not.
Q. And what about gender?
A. Absolutely not.

## X.     PLAINTIFF'S CLAIMS AND TESTIMONY REGARDING THE PMO DECISION

59.     Plaintiff was informed that she was not selected for the PMO position by Brown on February 3, 2014 (Ex A, ¶21; Ex B at 73: 1-7).

60.     Plaintiff claims Brown told her words to the effect of: "It's not the right fit for you" and that she was "not ready for the next level" (Pl. Dep., Ex B at 73-74).

61.     Plaintiff stated that she is using the first promotional decision "to show a pattern of discrimination because of her age". *See* Pl. Dep., Ex B at 79-81.

> Q.  Is the answer that No, it is not a claim, but you are using it as background
> A.  It is a claim of pattern that occurs in the Division of Capital Programs.
> Q.  And is your claim that you were discriminated against because of your age?
> A.  Yes.
> Q.  Is that the only reason you believe you were discriminated against?
> A.  My race and sex.
> Q.   And you believe that in being denied this promotion, you were discriminated against for all those reasons?
> A.  Yes, and there are several reasons why I believe that, and I would –
> Q.  Okay Let's start with age, okay?  On what basis do you believe you were denied this promotion because of your age?
> A.  Because Joe DeLorenzo is a white male who is younger than I am.
> Q.  Is that the only reason?
> A.  Yes, I do believe so.

62.     Plaintiff testified that "they [the panel] had to refer several candidates to her [Brown].  I'm not sure how many they referred, and I was not told the way I ranked.  But that's what I was told, that "I was one of – one of the top two – one of the top candidates – one of the top two candidates referred to Marva for the position."

63.     Plaintiff did not know if she was one of Amy Kaufman's, Tim Forker's, or Renalda Goodall's top two candidates.  Ex B at 77.

64.     Plaintiff testified "I do believe that Frantz Polycarpe was more qualified than I am for that position." Ex B at 83:1-4.

65.     Plaintiff testified (*id.* at 67):

> A. My belief is that I was qualified for the position.
> Q. But do you believe that you were more qualified than him?
> A. I -- I haven't managed Joe. I haven't supervised Joe's work. I don't know what his qualifications are. So I -- I know what my qualifications are, and I know I was qualified for that position.

66.     Plaintiff testified that she never heard Brown or witnessed Brown say anything derogatory about hers or anyone else's race, gender or age.  Ex B at 83: 15-20.

67.     Plaintiff further testified (Ex B at 94):

Q. Why do you believe you were discriminated against because of your race?
A. Because I have seen a pattern of promotion. There's no one that -- of my age, my gender, my race, whose been promoted to a level of senior Director and as a direct report to Marva Brown.
Q. Even though we just listed a number of older female African-American employees who Marva has promoted?
A. I mentioned two who are close friends with Marva Brown and even in their professional capacity. I am talking about the senior Director title as a direct report to Marva Brown who is African-American, 62 years old, a woman, I have not seen one promoted to that title, man or woman
A. I would correct you. I did not say that I believe she doesn't. I have not seen her promote any African-American female, age 62, and a female. I have not seen that.
Q. Age 62.
A. Sixty-two. I'm sorry.
Q. No, I mean, I believe you said, "Age 62."
A. Sixty-two. Yes
Q. So that's your basis for believing that this was because of your age, race and gender?
A. That is my basis.

### XI.    FOLLOWING DILORENZO'S APPOINTMENT, KAUFMAN OBSERVES THAT PLAINTIFF IS INCREASINGLY HOSTILE TOWARDS HER AND BROWN

68.     Kaufman testified that following the appointment of DiLorenzo to the PMO position in around February 2014, Plaintiff became more "hostile" towards her and "openly hostile to Marva Brown".  Kaufman Dec. ¶32.

69.     Kaufman testified that Plaintiff "refused to put her work and documents on a shared drive on the computer" so that she could have access to them and that she frequently asked other people for information she "should have been getting" from Plaintiff  *Id.* at ¶34-35.

70.     Further, Kaufman testified that at her Monday staff meetings, "Jennifer's attitude was very resentful, and other analysts would adopt her attitude."  *Id.* at ¶37.

71.     Kaufman testified about an incident in March 2014 in which Plaintiff "became enraged" and "yelled" at her that she (Plaintiff) was not consulted directly about vacation days, when those days had been scheduled well in advance and posted on two calendars. *Id.* at ¶36.

72.     In an e-mail relating to this exchange, Ex T, Plaintiff e-mailed Brown, Kaufman's boss, and said "Amy scheduled her vacation five months ago without affording me the basic common courtesy of providing me with a copy of her vacation schedule and without inquiring if I had plans of my own outside of this office" and "I too have a life outside this office".  *See* Ex T.

73.     Plaintiff acknowledges that they "clashed" over this incident. *See* Ex B at 61-62.

## XII. ANONYMOUS COMPLAINT OF AGE DISCRIMINATION IS MADE REGARDING PMO APPOINTMENT ON APRIL 21, 2014 AND NO <u>REASONABLE CAUSE FINDING</u>

74.     On April 21, 2014, the MTA Office of the Inspector General (MTA OIG) received an anonymous hotline complaint concerning an allegation of age discrimination within Capital Programs, and referred the complaint to EEO for review.  Ex U.

75.     The TA's Department of EEO handles and resolves internal complaints brought by employees and applicants who believe that they have been subjected to employment discrimination and/or retaliation.  *See* Ex 11, EEO Policies, P/I 1.11.1. [3]

76.     The anonymous complaint to MTA OIG alleged that in the hiring process for the PMO position, "other employees of higher director levels" than the selected candidate "were deemed unqualified for the position."  Ex U.

---

[3] The TA's Respectful Workplace and EEO policies prohibit discrimination, including race, age, and gender discrimination, and retaliation, or any forms of discriminatory or retaliatory harassment in all phases of employment, including but not limited to hiring and promotions.  *See* Ex V.  Ex B at 36.  There is, *inter alia*, mandatory annual EEO training in this regard for all employees, and bulletins and letters are posted and distributed to employees regarding these policies.  *Id.*

77.     Further, the complainant alleged "a noticeable trend of younger employees receiving promotions when older employees were more qualified for the position". *Id.*

78.     On June 19, 2014, a Report was issued finding "no reasonable cause" on this Complaint.  Among its conclusions, the Report stated (*Id.*):

- Brown was interviewed and provided age-neutral, nondiscriminatory business reasons.
- The position was filled in accordance with policies and procedures: the position was posted, 54 applications were collected, and a hiring panel comprised of three senior directors interviewed and rated seven candidates; of four top candidates recommended, the median age was 54;
- The allegation that higher level directors were "deemed unqualified" was refuted by the hiring records
- Review of records included information on thirteen employees who were selected for promotion within the past two years and showed that 62% (8 out of 13) of the promoted employees were forty-five or above; and 38% (5 out of 13) of the promoted employees were age fifty-two and above.

79.     Plaintiff does not discuss this Complaint or the resulting finding in this action.

## XIII.   PLAINTIFF APPLIES FOR THE POSITION OF PROGRAM MANAGEMENT & ANALYSIS ("PMA") AFTER KAUFMAN RESIGNS

80.     When Kaufman left the TA in May 2014 for another opportunity, the Program Management & Analysis position became vacant, and the position was posted (Ex W).

81.      According to the job posting for this position:

The Senior Director is part of a managerial team that is responsible for the overall coordination of the Department of Subways' (DOS) 5-year Capital Program, and ensures that Subways receives an adequate level of funding to rebuild its assets and infrastructure in the most cost-effective manner possible.  The Senior Director is also charged with overseeing all analysis for the Communications & Systems, and Elevators & Escalators program areas.  He/she works with Infrastructure Capital Construction to maintain the correct balance of staff required for in-house managed construction projects.  The Senior Director is the lead person responsible for analyzing, coordinating and prioritizing the Communications & Systems, and Elevators & Escalators capital programs. The incumbent handles preparation and review of budget modification and procurement staff summaries, facilitates the development of Project Profiles, Master Plans including the preparation of Operating Budget Impacts, cost benefit analyses and concepts of operation, etc.

82.     The panel of interviewers for this position included Brown, as Chief Officer, Deborah Chin, Program Manager, Engineering, Communications within Capital Program Management (44 year-old Asian female), and Jennifer Franceschini, Director, Client Services in Human Resources (47 year-old Caucasian female).  Ex X; *see* Declarations of Deborah Chin ("Chin Dec.") and Jennifer Franceschini ("Franceschini Dec.).

83.     Brown asked Chin to be a part of the interview panel because Chin would be interacting frequently with the selected candidate, and the person needed to be someone she could "communicate with".  Ex C at 219:21-25; Chin Dec. ¶8-9.

84.     Ten candidates were interviewed and asked the same questions.  *See* Ex's X, Y.

85.     Plaintiff applied for this position, was deemed qualified, and interviewed for this position on or about July 30, 2014.  Ex A ¶25.

## XIV.   THE INTERVIEW PANELISTS RANK DAVID CHAN AS THEIR FIRST CHOICE

86.     According to Brown, Chin and Franceschini, there was a consensus on the top two candidates – Chan and another candidate who worked at MetroNorth, Steven Brusca – but Chan came out on top.   Ex G (TA 878-881)*;* Chin Dec. ¶29-30; Franceschini Dec. ¶16.

87.     Chan majored in Electronic Engineering at DeVry Technical Institute, has a Bachelor of Science in Electrical Engineering from Pratt Institute, and a Masters in Business Administration (Banking & Finance) at Dowling College.  *See* Ex's N, Y.

88.      Chan has been with the TA since 1987, beginning as an Associate Engineering Tech II, and was promoted thereafter a number of times.  *Id.*

89.     In October 2004, he was promoted into the title of Director of Capital Budget, in the Division of Operations Support, Administration & Finance (Car Equipment), where he was

responsible for managing the overall development, control and reporting of Car Equipment's Capital Budget and 5-year Capital Program.  *Id.*

90.     Brown stated that Chan's experience in Car Equipment was "relevant" experience for the PMA position.  *See* Ex C at 73.

91.     Franceschini recalls Chan performing very well at his interview, as did Chin. Franceschini Dec. ¶13-14; Chin Dec. at ¶20; *see also* Ex G (TA 878-881).

92.     Regarding Plaintiff's interview, Chin said Plaintiff came in with "a sense of entitlement to the job" and proclaimed things like "I do everything by myself without help, without guidance." Chin Dec ¶17-18.  Ex G.

93.     Franceschini testified that Plaintiff lacked "enthusiasm" during the interview and that her interview was "average".  *See* Franceschini Dec. ¶15; *see* Ex G.

94.     Further, Chin had daily contact with Plaintiff for about two years given the close working relationship of Capital Programs and Capital Program Management. Chin Dec. ¶13; Pl. Dep., Ex B at 105-106. Ex G.

95.     Chin testified that there were negative elements of Plaintiff's work style, including "pitting departments against each other as opposed to facilitating between departments (operating and capital side)." Chin Dec. ¶24. *See* Ex G.

96.     Chin did not believe, based on her work-related experience with Plaintiff, that Plaintiff had the right "temperament for the job" or that they "would work well together".  *Id.* ¶26.

## XV.    BROWN SELECTS DAVID CHAN BECAUSE HE WAS THE BEST CANDIDATE FOR THE JOB

97.     Brown ultimately selected Chan for the PMA position, and 6 of the other candidates, including Plaintiff, were deemed "qualified", but not the best candidates for the job. Ex Y.

98.     Brown testified that "the combination of his [Chan's] interview, his resume, and the references that I got from him made him the best candidate for the position" (Ex C at 28: 3-25; 29:1-20; 20-25).

99.     Further, in selecting Chan, Brown explained that there "are lots of technical aspects in the area" and having someone who "has an electrical background, who would be able to understand drawings, who would be able to understand, you know, specifications of an electrical program area" and "someone who can speak the same language as – as the engineers in the engineering department" was "important" to her.  Ex C at 28-29.

100.    Brown told EEO during the course of the investigation into this hiring decision, that Chan's technical background would complement her and other skillsets in her department and that he could work "well and smoothly" with Chin and her group.  Ex G, TA 880.

101.    She also told EEO that she did not think Plaintiff was ready to make the transition to senior director given: how she handles her current functions; her people skills "fall short"; she did not always interact well with Chin, with whom she would have to interact almost exclusively; and, although about ten years ago when she came into the department Brown recommended to her that she get to know other areas in the department, she stayed to herself and never connect with peers or tried to understand the rest of the organization (Ex G TA 881).

102.    Brown did not question that Jennifer was "qualified", but explained that "tenure in a position is not the driving force for a promotion" and that "there are people who have been in positions for multiple years who have never made that transition for one reason or another."  (Ex C at 181:16-25; 182: 1-10)

XVI.  **PLAINTIFF'S CLAIMS/TESTIMONY CONCERNING THE PMA DECISION**

103.    Plaintiff testified: (Ex B at 117-121):

Q. Do you know if David Chan was qualified for the job?
A. I do not know that, but based on the job posting, I know that I was qualified for the job.

***

Q. So my question is not whether you were qualified, but do you believe that you were more qualified than David?
A. I believe that I have been doing the job managing the overall responsibilities of the Communications area with excellent evaluation. I have never been told that I was not doing a good job, and as a result, yes, I do.
Q. But you've stated that you weren't aware of David's background and experience and work performance; is that right?
A. I stated that I do know that David Chan had not managed the overall responsibilities of the Communications area in the Division of Capital Programs in the Department of Subways.
Q. So on what basis are you challenging – you stated, I believe -- let me just ask the question again. And apologize if it was answered already. On what basis are you challenging this decision as unlawful?
A. I am challenging the decision to hire David Chan in that position because I have the experience, the records, the evaluations, performance evaluations in managing the Communications area.
Q. And is there any other reason that you're challenging this decision?
A. I believe I answered that question. That David Chan is an Asian male younger than I am.

## XVII.  COMPOSITION IN BROWN'S GROUP

104.    Since Brown's appointment as Vice President, who between August 2010-early 2018 oversaw between approximately 32 to 38 budgeted positions each year (Ex O), she has either appointed, re-appointed, promoted, or helped obtain salary increases for approximately 14 African-American employees, approximately 16 employees 50+, five (5) listed as 60+, and approximately 33 female employees, including Plaintiff herself.  *See* Franceschini Dec., Ex Z (report generated by TA business service center based on People Soft records listing promotions/appointments/re-hires/lateral transfers since Brown's appointment as Acting Vice President & Chief Officer in August 11, 2010 until January 31, 2018).

105.     Among others, Brown obtained a re-hay and salary increase for Titus Byaruhanga, an African-American, born in 1952 (66 year-old male) from a Director into a Senior Director role in 2013.  *See* Ex Z.

106.     Subsequently, in 2016, Brown advanced Mr. Byaruhanga into his current position of Assistant Chief.  *See* Ex C at 193-194; *See* Ex Z.

107.     Among others, Brown has promoted Wanda Minton (born 1955), a 63-year old Hispanic woman in 2013, and in 2016 into current title of "Manager" and as her direct report.  *Id.* Ex C at 197.

108.     Among others, Brown has promoted Renee Jackson, a 58-year-old African-American female, from an Analyst position to a Director position in 2016.  *Id.*  Ex C at 197-198.

## XVIII. BROWN NOTIFIES PLAINTIFF THAT SHE WAS NOT SELECTED FOR THE PMA POSITION, AND RECOMMENDS HER FOR A LEADERSHIP INSTITUTE PROGRAM

109.     Brown told Plaintiff she was not selected for the PMA position on or about August 20, 2014, and said words to the effect of "I want to take Communications in another direction" Ex A; *see* Ex C at 72:1-7.

110.     Plaintiff responded that she was going to Brown's boss Joe Leader (Senior Vice President, Department of Subways), and requesting a transfer.  *See* Ex A ¶29; Ex B at 74:1.

111.     Brown testified that she may have had a conversation with Jennifer afterwards, wherein she "instructed her about the policy and the procedure.  If you're unhappy with a promotional decision, going to my boss is not going to change my mind."  Ex C at 75.

112.     On August 20, 2014, that same day she notified Plaintiff about this decision, Brown recommended Plaintiff for a Leadership Institute Program.  *See* Ex AA; Ex B at 116-117.

113.    Brown also told Plaintiff that they should work on a development plan for her, but Plaintiff did not want any part of it and told her she did not want to work there anymore.  Ex G, TA 881.

114.    Brown testified that when the Leadership Institute Program ends, there is a presentation that's made where the manager who was recommended invites their boss to come and to be recognized, "but that was not offered by Jennifer" (Ex C at 280-81).

115.    While the PMA position was vacant, between May and October, Plaintiff reported directly to Brown.  *Id.* at 131:1-2.

## XIX.    <u>PLAINTIFF'S SEPTEMBER 29, 2014 COMPLAINT TO EEO & DIVERSITY</u>

116.    On or about September 2, 2014, Plaintiff raised complaints against Brown with the EEO and a formal complaint was filed on September 29, 2014.  *See* Ex F.

117.    In her EEO complaint, Plaintiff alleged that Brown discriminated against her based on race, color, ethnicity and gender when Brown offered the positions to "younger males".  *Id.*

118.    Records show that Brown was notified on or about September 29, 2014 that Plaintiff had an appointment with EEO and was interviewed about the complaint on February 24, 2015 (Ex G), though she does not recall exactly when she learned the details. Ex C at 120-121.

119.    Plaintiff asked EEO if Chan would still be appointed based on the filing of her complaint of discrimination, and was informed that they do not "routinely stop hires or promotions that are the subject of allegations of discrimination."  *See* Ex CC.

## XX.    <u>CHAN INTRODUCES HIMSELF TO PLAINTIFF ON OR ABOUT SEPTEMBER 8, 2014, AND PLAINTIFF SAYS "DON'T WORRY I WON'T BE HERE WHEN YOU GET HERE"</u>

120.    On or about September 8, 2014, following a meeting at which Chan and Plaintiff were present, Chan introduced himself to her as her new boss.  Ex B at 134-135.

121.    Plaintiff said Chan told her that he was "impressed by the way I handled the meeting and how well I know Communications issues and hope that we can work together in the future." Pl. Dep., Ex B at 135:1-11; *see also* Ex F, PL000147.

122.    Plaintiff said she was "shocked" and said, among other things: "Don't worry I won't be here when you get here" (Ex B at 136, L1-3; Ex D at 17: 6-21).

123.    Regarding this conversation, Chan testified that he was "taken aback" in an "unpleasant" kind of way and was "kind of shocked."  Ex D at 18:11-17.

124.    Chan was appointed to the position effective October 13, 2014.  Ex N.

## XXI.   PLAINTIFF CONTINUES TO SEEK A TRANSFER OUT OF HER DIVISION AND CORRESPONDS WITH EEO

125.    On September 18, 2014, Plaintiff met with Subways Vice President, Operations Support, Sally Librera and Labor Relations representative Evette Vargas, seeking a lateral move out of her division. *See* Pl. Dep., Ex B at 127-128.

126.    Plaintiff was told that she has to go through the application process.  *Id.*

127.    In an e-mail dated October 15, 2014, to EEO, Plaintiff complained that Brown's introduction of Chan, along with her allegation that Brown has not spoken with her personally about the selection of Mr. Chan, was "retaliation" for filing her EEO complaint and requesting a lateral transfer from Joe Leader.  *See* Ex CC.

128.    Plaintiff also stated: "I am working in this environment that I believe could only get worst [SIC], I feel isolated and I am not sure how long I can continue to work in this environment."  *Id.*

129.    Plaintiff testified (Pl. Dep., Ex B at 137:4-12):

A  I have been running the Communications area for a long time. Marva told me she hired a person from outside. Marva had never called me into a meeting to let me know who she had hired.  I cannot recall where she disclosed to me that I would be reporting to David

Chan and that she had hired David Chan. And I felt that created a sense of hostility because I don't believe that that has been ever been done with anyone else.

## XXII. CHAN AND KAUFMAN'S DISCUSSION ABOUT PLAINTIFF'S UNCOOPERATIVENESS

130.    Chan and Kaufman had a number of conversations following Chan's assignment about the duties and responsibilities of the position Chan took over.   Kaufman Dec. ¶40.  *See also*, Ex D at 22:4-7; 75-76.

131.    Chan told Kaufman Plaintiff was "less than cordial" with him, and that he was having difficulty communicating with her and getting information from her.  *Id.* ¶41.

132.    He told Kaufman that Plaintiff would forward him e-mails without providing any background or context, often catching him off guard, and that Plaintiff would leave staff summaries on his desk, without having assigned buckslip writing or follow-up research to the analyst reporting to her.  *Id.* ¶41, 42.

133.    Chan told Kaufman that when he would ask Plaintiff to handle the processing of the staff summary, Plaintiff would reply "'well what should I do? You're the boss'", "despite being responsible for the same work for the past several years."  *Id.* ¶43.

134.    Kaufman told Chan that that she was "not surprised", and that Plaintiff had become progressively "uncooperative" with her in 2014.  *Id*. ¶w44

## XXIII. PLAINTIFF FORWARDS WORK-RELATED E-MAILS BY CHAN TO EEO AND SAYS THEY ARE RETALIATION FOR GOING TO JOE LEADER AND FILING HER SEPTEMBER 2014 COMPLAINT, IN VIOLATION OF RESPECTFUL WORKPLACE POLICIES

135.    In or around February 2015, Plaintiff began forwarding e-mails to EEO claiming that Chan's e-mails were "retaliation" for filing her September 2014 complaint and in violation of the TA's Respectful Workplace Violence Policies.  *See* Ex EE.

136.     However, Plaintiff does not know whether Chan was informed about the EEO complaint against Brown, and neither Plaintiff nor Brown ever discussed such complaint with Chan, nor was Chan a witness or part of EEO's investigation (Ex D 14-16; 162:15-25; *see generally*, Ex G).

137.     As examples, Plaintiff said Chan "talks down" to her, said things like "Come see me" rather than, "Can you come and see me please?", and that she felt his "tone" was disrespectful. Ex EE.

138.     EEO explained that the concerns she raised did not establish a potential violation of the TA's EEO policies but may relate to the TA's Respectful Workplace policies, and could be handled by someone in her Department, and did not have to be Brown.  *Id.*

139.     While Plaintiff appeared to have sent an e-mail to Senior Vice President, Subways, Joseph Leader about these concerns on one occasion, she testified that she did not follow up with him or Human Resources or Labor Relations, nor did she speak with Brown.  *See* Ex EE (TA 659); Pl. Dep., Ex B at 143-144.

## XXIV. ON APRIL 24, 2015, EEO ISSUES A "NO REASONABLE CAUSE" FINDING

140.     After a full investigation of Plaintiff's September 29, 2014 Complaint, on April 24, 2015, EEO issued a "No reasonable cause" finding, concluding that Brown provided "neutral, business-related reasons for the hiring decision she made, which were supported by other witnesses, records pertaining to the hirings, and even Berkeley-Carr's statement that she initially "trusted her [Brown's] decision" regarding DiLorenzo", noting that "Brown did promote Berkeley-Carr approximately two years before she field her EEO complaint."  Ex G.

141.     Further, the Report addressed Plaintiff's various claims that she was subject to "harassment" and "retaliation" by Brown in that Brown did not notify her of Chan's selection as

the new Senior Director, and that Brown and Chan had communicated with her "disrespectfully", concluding that "these subsequent allegations did not provide a sufficient basis to establish a potential violation of NYCT's EEO policies, and, therefore, were not accepted for investigation." Ex G, TA 873, fn5.

142.    Plaintiff was notified about EEO's decision, as well as Brown.  Ex G.

## XXV.   ON APRIL 27, 2015 PLAINTIFF IS APPOINTED TO THE NON-COMPETITIVE CIVIL SERVICE TITLE OF SUPERINTENDENT

143.    Effective April 2015, Plaintiff was moved from the "provisional" title of "Administrative Manager", into the non-competitive civil service title of Superintendent (for Maintenance of Way).  *See* Franceschini Dec.; Ex L.

144.    The reason for this personnel action was that a civil service examination was being administered by the NYC Department of Citywide Administrative Services ("DCAS") for "Administrative Manager", the title Plaintiff had been provisionally placed in. Franceschini Dec. ¶21-25.

145.    Plaintiff, along with other provisional employees, were vulnerable to being displaced by individuals who took and passed the examination and could be reached for appointment.  *See* Franceschini Dec. ¶25; *see* Personnel Rules and Regulations of the City of New York 3.2.1.

146.    In February 2015, Plaintiff was asked by management to take that civil service exam, along with the exam for "Administrative Staff Analyst", which she later did and passed.  *Id.* ¶28; Pl. Dep., Ex B at 239: 14-18.

147.    Since the Superintendent title is a "non-competitive" title, there is no civil service examination associated with it and she would not have been at risk for displacement by a civil service list.  *Id.* ¶33.

### XXVI. ON MAY 20, 2015, PLAITNIFF RECEIVES AN OVERALL "GOOD" MANAGERIAL PERFORMANCE REVIEW FOR THE YEAR 2014

148.    As a manager, plaintiff was evaluated annually based on her performance for the preceding year, and the written evaluation was by way of a document known as a Managerial Performance Review ("MPR").  *See* Ex FF.

149.    Plaintiff received an MPR from Chan on May 20, 2015, for the preceding year, 2014.  Ex FF.

150.    Plaintiff's review was an overall "Good" with five areas rated "Good" (e.g., in "Diversity Management", "Budget Control") and two rated "Marginal" – in the areas of "Team and Interpersonal skills" and "Problem Solving and Decision Making".  Ex FF.

151.    Plaintiff claims this review was retaliatory (Ex A, ¶35; Pl. Dep. Ex B 226).

152.    Plaintiff testified that she has "no proof of that", but what she "surmised" was that Chan was informed that she "filed a EEO complaint" against Brown.  *Id.* at 226-227.

153.    Chan prepared the review based on his "experience while supervising Jennifer and also based on conversations with Amy Kaufman, her previous manager."  Ex D at 29: 4-7; 300-301.  *See also*, Ex C at 131: 13-23; 132:10-23; Pl. Dep. Ex B, 150:20-25.

154.    In particular, in around March 2015, Kaufman and Chan had a telephone conversation in which Kaufman discussed the difficulties she experienced with Plaintiff, such as the fact that her withholding information was counter-productive for the unit.  Kaufman Dec. ¶45.

155.    When Chan prepared the review, he did not know what Plaintiff received on prior MPRs.  Ex D at 47.

156.    Chan testified (Ex D at 30-31):

The process was I did the MPR with Amy Kaufman's input.  I submit it as a draft for Marva to review and to provide her update for the time period that Jennifer was working at capital programs before I got there"

157.    Brown did not participate in drafting Jennifer's evaluation.  Ex C at 133.

158.    Chan printed out a draft on May 15, 2015 for Brown's review (Ex GG – e-mail and series of drafts) which contained the following language:

By December 31, 2014, I had only supervised this manager for 2 ½ months.  During this period she required an enormous amount of direction for a Director, interactions was less than cordial; however, the work was completed, hence an overall rating of "G" for this manager.

159.    Brown recommended the following language upon review (*id*., TA 3197):

Jennifer's overall rating is Good.  Based on my supervision of 2 ½ months and with input from her previous manager Jennifer is not functioning at the level of her current position.

160.    The previous manager Brown was referring to in this comment was Kaufman.  Ex D at 30-31; Ex C at 161:18-21.

161.    Brown also suggested that one of his proposed "Marginal" ratings as it relates to "customer service skills" be changed to "Good" which Chan ultimately changed.  *See* Ex GG (TA 3197); Ex GG; *see* Ex C at 162:1-5; Ex D at 35:19-25; 36:1-5.

162.    Brown also suggested by e-mail dated May 20, 2015, that Chan implemented:  "I will continue us to work with Jennifer to further develop her management skills increase product knowledge of the overall projects in the comms and elevator and escalator program areas."  Ex HH.

163.    Pursuant to an Agency-wide policy concerning eligibility for General Wage Increases ("GWI's"), Plaintiff received a GWI on July 1, 2015 as a result of having satisfactory performance during the time period (*see* Ex NN, TA 3653 ["Employees must have satisfactory performance"]).  *See also* Ex L (salary increased from $104,733 to $106, 828).

## XXVII. PLAINTIFF ALLEGES THAT THE 2014 MPR WAS IN RETALIATION FOR FILING HER SEPTEMBER 2014 COMPLAINT

164.     Plaintiff wrote a memorandum to Joseph Leader dated May 27, 2015, alleging that this MPR was in retaliation for her September 2014 EEO complaint, and such memo was forwarded to the Office of EEO for handling.  *See* Ex EEO Pre-Complaint Form and memo (PL000255)d, Ex II.

165.     Plaintiff was invited to meet with EEO to discuss her allegation and file a retaliation complaint with the office, but she did not respond to the invitation or make any further complaint.  *See* Ex II (e-mail dated June 2, 2015, TA 637).

## XXVIII. ON JUNE 4, 2014, PLAINTIFF OBJECTS TO THE 2014 REVIEW AND INFORMS CHAN FOR THE FIRST TIME THAT SHE INTENDS TO FILE A COMPLAINT WITH EEO AGAINST HIM

166.     On June 4, 2015, Plaintiff submitted a memorandum to Chan that stated the following (Ex JJ):

> I received a response from New York City Transit's Office of Equal Employment Opportunity (EEO) offering me the opportunity to file a complaint with their office regarding the use of the attached 2014 Managerial Performance Review as retaliation.  While I do intend to file a complaint with EEO, in addition, this is my written request to appeal the attached 2014 Managerial Performance Review.  The reasons for this appeal are outlined in my attached response which you also received on Wednesday, May 27, 2015.

167.     Plaintiff testified regarding this memorandum (Pl. Dep, Ex B at 162:15-25):

> Q. And do you recall any other time prior to this that you told David of an intent to file a Complaint against him with EEO?
> A. No, I don't believe I have ever told David that.

## XXIX. CHAN CONFERS WITH KAUFMAN ABOUT THE 2014 REVIEW TO MAKE SURE THEY ARE ON THE SAME PAGE AND THEY ARE

168.     On June 4, 2015, Chan had a telephone conversation with Amy Kaufman as a result of Plaintiff's objection (*see* Ex KK).  Kaufman Dec. ¶46.

169.    Chan followed up with her by e-mail dated June 5th to confirm what Kaufman relayed (*Id*. at Ex KK):

- Jennifer would complete her assignments but not update her Senior Director (you)
- Does not provide information on upcoming issues that she is aware of – even at the weekly staff meetings
- In turn, when you went to meetings, you were caught off-guard
- No sense of team when dealing with  Jennifer
- 2013 evaluation – mostly "G" and overall was a "G"

170.    Kaufman responded: "You pretty much captured my review of her 2014 work (January through May).  You're kind to give her a G as it sounds like she was purposely difficult your first 2+ months in your job."  *Id*. ¶KK.

171.    Kaufman testified that at no point during any of her discussions with Chan did they discuss a complaint of discrimination or retaliation by Plaintiff.  *Id*. ¶49.

## XXX. PLAINTIFF WITHDRAWS FROM THE MPR APPEAL PROCESS AND DECLINES A MEETING WITH CHAN REGARDING HER REVIEW

172.    In her complaint, Plaintiff alleges that she "attempted to exercise the NYCTA evaluation appeal process, but was blocked from doing so by defendants David Chan and Marva Brown."  Ex A, ¶39.

173.    Chan offered to have Plaintiff meet with him in the next step of the appeals process, but was guided by the Department of Labor Relations to have a witness present. *See* Ex LL; Ex D at 65:1-9.

174.    Plaintiff declined the meeting requests and withdrew from the appeal process, and the MPR was not changed.  *See* Ex LL; Pl. Dep., Ex B at 165-166; Ex D at 64-66; *see also* Ex NN – "Resolution to Managerial Performance Review."

## XXXI. PLAINTIFF'S 2015 MPR IS ANOTHER OVERALL "GOOD" REVIEW

175.    Plaintiff received her 2015 MPR on or about April 1, 2016, which was an overall "Good", with 4 "Goods" and three "Marginals" in the areas of "Problem Solving and Decision Making", "Organizing and Planning Skills" and "Team and Interpersonal skills". *See* Ex OO.

176.    This review was prepared by Chan, her manager for the year 2015. *Id.*

177.    In the Reviewer's comments Chan provided:

Jennifer has been responsible for the oversight of the communications Capital Program area for DOS for several years. Jennifer's involvement and productivity is not at the expected level. Her output is not consistent with the expected level for her current "C Grade" position. She has to pay closer attention to deadlines, as she has missed deadlines for several assignments. She was required to attend a course on respectful workplace. Jennifer has the ability to perform at a higher level if she chooses. Recommend that she attend managerial development courses as available and do more to further expand her knowledge base.

178.    Plaintiff objected to this review and alleges in her Complaint that the "evaluation did not put forth any concrete examples of issues or incidents that Plaintiff was deficient in the year 2015." Ex A, ¶41.

179.    However, Plaintiff had received, among other things, a memorandum on December 31, 2015, documenting her lack of progress on a work assignment she had been given on May 11, 2015. Ex PP.

180.    Brown testified that Plaintiff was asked to "take a lead in revamping the Operating Budget Impact ("OBI") document, which is a form used by both Subways and Buses to assess the impact on the operating budget when we make a capital investment in a project." (Ex C at 284).

181.    In the memorandum, Chan stated (Ex PP):

The re-evaluation and revamping of the OBI process has taken far too long. This assignment was initiated on May 11, 2015 and as of today [December 31, 2015], it is still not completed. The following are still some of the outstanding issues:
- Minutes of meetings for the three presentations/meetings held on October 16th and October 23rd have not been issued.

- All comments from the December 14th Department of Buses (DOB) meeting have yet to be incorporated.  (Based on the attachments to your December 28th email to John Decker)
- The deliverables of this task, the OBI Template and Instruction Manual have not been finalized.

182.    In addition, the memorandum stated (*id.*):

On December 11th, both Marva and I instructed you to have the finalized package (OBI form and instruction manual) concurred by DOB and sent out to CP&B before your scheduled vacation of December 18th.  You assured us that you will accomplish this task at the latest by Wednesday, December 16th.  You have missed both deadlines.

183.    Plaintiff disputed that she had missed her deadline, stating that she had reached out but had not received concurrence from the Department of Buses. *See* Ex PP (TA 2453).

184.    Brown testified that "that is totally inappropriate for a C-Grade director.  If you have an assignment, you are supposed to make it your business – if you call and leave message and someone doesn't respond to you, to me the responsible thing to do is you should go over there and see that person."  Ex C at 228-229.

185.    Plaintiff was given until January 7, 2016 to complete the assignment, and the assignment was completed by that date.  *Id.*, PL000520.

186.    In further explanation of her 2015 MPR, Chan explained at the deposition, *inter alia* (*id*. At 47-48; *see also* 300):

The level of work that comes out, the quality of work that comes out, the path in which the document is processed.  It should be more seamless, but it takes a lot of iterations and revisions to get a document completed, the buck slip done, to be submitted to Marva for her signature

Well, for 2015 there was a few task; for instance, there were D4s, those are reimbursable budget requests for manpower that need to be processed.  We had get it back up to capital planning and budget and OMB in a certain timeframe.  Those were late.  We got calls from the maintenance department that submitted the budget requests asking for the status. Where are they? Why is it taking so long?
Q. Is there anything else that she was late on?
A. Master plans that needed to be processed, needs to be moved.  They were not.

187.    When asked what he meant by "Jennifer has the ability to perform at a higher level

if she chooses", he explained (Ex D at 50:3-16):

> A. I have seen Jennifer take projects and move them and fight for the maintenance folks
> even against another department.  I have seen that she has the ability.
> Q. When did you see that?
> A. And I have seen Jennifer do good work.  I praised her on doing good work as well.
> Q. You saw that in 2015?
> A. I saw glimpses of it in 2015, yes.

188.    Plaintiff received a GWI on July 1, 2016 as a result of obtaining a satisfactory

review for 2015.  Ex L; *see* Ex NN.

## XXXII. ON MAY 10, 2016, BROWN SEEKS GUIDANCE FROM EEO AND LABOR RELATIONS REGARDING ESCALATING ISSUES BETWEEN CHAN AND PLAINTIFF, AND INFORMS PLAINTIFF OF HER RIGHTS UNDER TA'S EEO POLICIES

189.    Brown e-mailed Evette Vargas, Senior Director of Labor Relations, Field

Operations, and Joel Andrews, Chief Officer, EEO, on May 10, 2016.  *See* Ex QQ:

The purpose of this email is to obtain your assistance in an office matter that has come to a point
that I feel needs your input.  Jennifer Berkeley-Carr is a Director who works in Capital Programs.
She reports to David Chan, Sr. Director.  David started in the unit a little over a year ago.  The
relationship did not start well and it has gotten progressively worse.  David has been patient and
has done as much as he could to work with Jennifer.  From my observation, she has not been
cooperative and is not producing to the level that is expected.  Last week David came in to inform
me that he had a conversation with Jennifer about an assignment that was given to her and she
accused him of harassing her and that this is a hostile work environment.  David told me that this
is not the first time she said this.  I spoke to both of them last week.  She reiterated her claim in a
very aggressive manner.  She raised her voice and she was being very hostile.  I do not want this
to get further out of hand.  I asked how we could resolve this matter.  David said he does not have
a problem working with Jennifer, and shows her respect in their interactions.  Jennifer said she
wants me to reassign her.  I received the memo from Evette about respectful work place and have
a meeting calendared for 2pm to meet with her.  I need your direction in dealing with this matter.

190.    At a follow up meeting on May 10, 2016, at which another Manager Wanda Minton

was present, Brown gave Plaintiff the policy and told her that "I spoke to LR and EEO and

informed her of her right to do so.  I told her that I was concerned at the seriousness of the claims.

She took it and had no comment."  *See* Ex QQ.

## XXXIII. CHAN'S MAY 31, 2016 MEMORANDUM TO BROWN REGARDING PLAINTIFF'S WORK PERFORMANCE

191.    Chan wrote a Memorandum to Brown on May 31, 2016 (Ex RR):

This memorandum is to express my continued concern for Jennifer Berkeley Carr's poor work performance and offensive defaming accusations.  I was supposed to have given this to you much earlier; however, I wanted to take the time to go over in my mind about this and past incidents with Jennifer.  Basically, by putting myself in her shoes to see if there was anything I could've done to mitigate these situations.  I've tried and tried and came to the same conclusion, the only way to avoid this was to do all the work myself and not assign it to Jennifer, which would be next to impossible since the unit was just me and her.  In addition, as you know, I am temporarily overseeing the Signals and Track areas as well.

192.    This memorandum also discussed a "Priority" level assignment Plaintiff was given

of "assembling a matrix of critical projects for Livingston Plaza, RCC and PCC for discussion the

following day", which Plaintiff did not complete before she left that day, and which Chan had to

complete.  *Id.*

193.    Plaintiff had raised her voice after he approached her regarding the assignment,

accusing him of, among other things, "hiding behind emails and buckslips", "harassing" her" and

"creating a hostile work environment", calling him "passive aggressive". *Id.*

## XXXIV: PLAINTIFF'S 2016 REVIEW BASED ON NEW MANAGEMENT SYSTEM: PLAINTIFF GIVEN AN OVERALL "NEEDS IMPROVEMENT"

194.    For the year 2016, there was a new managerial performance review system.  Ex TT.

195.    All that was required from Managers was an "overall rating" but not specific

evaluations (Ex C at 228:19-25; 229)

196.    Instead of "Excellent", "Good", etc. the ratings were "Exceptional Performance",

Exceeds expectations", "Meets Expectations", "Needs Improvement".  *Id.*

197.    Plaintiff received a "Needs Improvement", administered on or about April 4, 2017, which is defined in the new policy as "the quality and timeliness of the Manager's work does not meet expectations and established targets."  *See* Ex SS.

198.    As an explanation, the "Overall Rating Summary" stated the following, which was based on Plaintiff's work performance in 2016 (*id.*):

> Jennifer has been a member of the Capital Program team for over 10 years.  Her performance is not at the expected level for a Director overseeing the communications area in Capital Programs.  Assigned work still has its challenges in the area of completeness and timeliness. Assignments still requires an overabundance of direction, follow-up with no sense of urgency. Many assignments require intervention for resolution.  Multiple revisions are requirement before the assignment could be completed.   Jennifer continues inappropriate and unprofessional conduct, and has been reinstructed on more than one occasion.

199.    Plaintiff did not receive a GWI for the year 2017.  *See* Ex L.

## XXXV: PLAINTIFF RECEIVES A MEMORANDUM AND LETTER OF REINSTRUCTION ON FEBRUARY 27, 2017 BASED ON WORK PERFORMANCE AND INAPPROPRIATE CONDUCT

200.    On or about March 23, 2017, Plaintiff was issued a letter of Reinstruction dated February 27, 2017, regarding her "failure to properly and timely complete assignments and inappropriate comments."  *See* Ex TT.

201.    The LOI discussed an assignment Plaintiff received on February 1, 2017 in which Plaintiff was instructed to "prepare a write up on a specific technology including what it does, what we need, how much is funded and the overall strategy going forward."  *Id.*

202.    After several emails requesting further explanation of what was being requested, Plaintiff submitted information that was not on point with the requested write up and as of that date (February 27th) had failed to complete the assignment.  *Id.*

203.    Further, Chan stated that on February 6, 2017, Plaintiff entered his office in a loud and unprofessional tone complaining that his emails regarding this assignment were "harassing and abusive".  *Id.*

204.    The memorandum referenced similar prior conduct by Plaintiff in response to questions about work assignments.  *Id.*

205.    The memorandum also discussed the staff meeting held that day, where Plaintiff became "disruptive, argumentative using an unprofessional and loud when questioned about work assignments that were overdue and/or submitted with numerous errors" including making a derogatory comment about Chan's ability to manage. *See* Ex TT, statements from the Analysts.

206.    Plaintiff was warned that her "inappropriate conduct and behavior as well as her "disregard for providing accurate and timely assignments is unacceptable", and she was advised that "if any future incidents of this nature occur" she will be "subject to further action including disciplinary action" Ex TT.

## XXXVI: PLAINTIFF'S 2017 MPR IS A "NEEDS IMPROVEMENT" AS A RESULT OF HER WORK PERFORMANCE AND CONDUCT

207.    In Plaintiff's 2017 MPR, administered to her on or about January 17, 2018, Plaintiff received an overall "Needs Improvement" as a result of her work performance and conduct.  Ex UU.

208.    As an example, in the Reviewer's comments section for Goal #1, it stated, among others, "minimal work has been done in the further development of the communication investment strategy."  *Id.*

209.    A Goal was established for Plaintiff, which included: "develop a communication investment strategy which outlines an overall plan of capital investments necessary to keep telecommunication infrastructure and network systems in a state of good repair". *Id.* at ta 3595.

210.    As another example, in regard to Goal #3, Chan wrote that "Jennifer has been receiving monthly cost control reports for projects that she oversees", but that "[i]t is unsure whether any comparisons have been made against the force account and if any meetings were held with CPM on potential and/or current overruns".  *Id.*

211.    As an objective, the review states: "Develop a process to evaluate the progress and financial impacts of projects during the construction phase in order to ensure that Force Account charges are in line with the project's completion schedule."  *Id.*

212.    Pursuant to the Agency-wide policy in effect for GWI's, Plaintiff was not eligible for and did not receive a GWI in 2018.  *See* Ex L; Ex C at 188-189.

## XXXVII: PLAINTIFF'S MISCALLANEOUS ALLEGATIONS OF RETALIATION

213.    Plaintiff alleges that "since plaintiff filed her internal charge of discrimination in September 2014 and her external Charges of discrimination in May 2015 defendants Marva Brown and David Chan have denied Plaintiff the help of support staff and have assigned her unattainable tasks with unrealistic deadlines", "implementing rules which only apply to Plaintiff", "denying her vacation requests", and generally "disrespected and harassed Plaintiff in the workplace".  Ex A, ¶44-45.

### i.    Plaintiff complains about the Operating Budget Impact Task

214.    As an example of an "unrealistic deadline" she was given, Plaintiff referenced the OBI assignment referred to in ¶183-187, which she was given on May 11, 2015, and for which Plaintiff testified she was "not assigned a deadline". Pl. Dep, Ex B at 184-185:1-4.

215.    Brown explained that these assignments weren't "necessarily related to communications or related to strategic and long-range planning [Forker's area], but "there were things that needed to be done and they were assigned to different areas." Ex C at 285-287.

216.    At the same time Brown gave this assignment to Plaintiff, Brown gave a similar assignment of "updating the capital project profile document" to Tim Forker, Senior Director.  Ex C at 285:4-18.

217.    Plaintiff objected to this assignment because she "has no affiliation with the Department of Buses."  Ex A, ¶56.

218.    Plaintiff claims that "Brown and Chan threatened to deny Plaintiff her earned vacation time unless she completed this assignment without the help of an Analyst or support staff."  Ex A, ¶46.

219.    According to Plaintiff, she completed the assignment in "six, eight months" said David and Marva "approved it and praised it", and she was able to take her vacation (Pl. Dep., Ex B at 186):

220.     The assignment was completed on or about January 7, 2017, for a total of 8 months (Ex PP, PL 00520).

221.    Plaintiff testified she had the assistance of Andrew Zsoldos and Franz Polycarpe on this project. Pl. Dep. Ex B, 185: 5-10

**i.   Plaintiff complains about developing a Communications Strategy**

222.    As an example of "harassment", Plaintiff discusses a "Communications Strategy" that she states "required systems engineering expertise".  Ex A, ¶46, 56.

223.    Plaintiff was given this assignment in August 2016. Ex VV (PL000297).

224.    She repeatedly objected to this assignment as "requiring technical expertise" (e.g., PL00298).

225.    At Brown's deposition, she was asked (246:23-25; 245:1-21):

Q.  Does a communication strategy, does it require engineering expertise?

A.  Absolutely not. We write strategies for different components in the program…Jennifer has participated in authoring some of those or co-authoring some of those strategy documents…I didn't ask for an engineering assessment.  All I asked for was a strategy, which is data collected from the program areas, laying out what's in the area, laying out the life cycle, and laying out a plan for what we're going to do.  If we need to replace PS land, we need to do it ten units at a time.  That's what a strategy consists of.

226.    Plaintiff still had not completed this assignment at the time of Brown's deposition on November 21, 2017, over one year later.  Ex C at 249-250.

ii.    **Plaintiff complains about a task to update a training manual for Capital Programs**

227.    Plaintiff alleges that as "harassment" she was asked to develop a "new employee training manual for the CPM Division with no assigned help, even though Ana Maria Perdomo, Renee Jackson and Wanda Minton are the assigned Human Resources reps for the Division and have a total of six analysts and support staff at their disposal."  Ex A, ¶57.

228.    Brown and Chan explained that the document had nothing to do with Human Resources, and was it was originally started by Kaufman (Ex C at 299-303; Ex D at 73-77).

229.    The training manual was meant to be a "reference guide" for employees working in Capital Programs, almost nothing was "created afresh", and was a compilation of documents already in use by the division" that she [Plaintiff] herself have worked on", and was "just a matter of compiling information and having it reside in one place." Ex C at 299, 305; Ex D at 77.

230.    Plaintiff testified that "there were no deadlines given to me" in connection with this project (Pl. Dep. 207:17-19; *see also*, Ex D at 77.) and that it "probably took eight, nine months" (208:8-9).

231.    Plaintiff testified that she got "glowing reviews" from Brown and Chan (Ex B at 238:10-13).

232.    Plaintiff also testified that she obtained assistance in connection with this assignment.  Ex B at 209:22-25; *see also*, Ex D at 77:13-23.

### iii.    Plaintiff complains she was assigned "Analyst" work

233.    Plaintiff complains as harassment that she is "required to complete work normally done by an analysts in addition to her regular work assignments" and that "David Chan treats Plaintiff as if she is an analyst".  Ex A, ¶48.

234.    However, every supervisor and manager in Brown's Department, including Brown and Chan themselves, must perform administrative tasks (which can be considered "Analyst" work) when needed.  Ex C at 268:1-25, 269 ("I make copies, I'm a vice president."); Ex D at 150: 12-20; 182:1-8 ("I make my own copies", "I review master plan", "I analyze projects to make sure there is sufficient funding in the project," "so we are all doing part of analyst work.").

235.    Further, every manager under Brown is given work outside their basic duties and functions, based on the demands as they arise.  Ex C at 282-283; 299-306.

236.    Plaintiff does not know what Brown assigns others in the Division.  Pl. Dep. Ex B at 212:17-23.

### iv.    Plaintiff complains that she was "Denied Support Staff"

237.    Plaintiff also claims that she was denied support staff as an example of retaliation. Ex A, ¶44.

238.    Plaintiff had an analyst, Earl Jackson, assigned as a direct report to her until March 2015 when Earl Jackson resigned from the TA.  Pl. Dep., Ex B (209:10-12); Ex D at 80-81.

239.    Plaintiff's counsel asked and Chan responded (Ex D at 79-80; 300):

Q.  Now, sir, what is the reason why Jennifer has not had a direct report since Earl Jackson left?
A.  So while Earl was still here working for Jennifer, I was not getting information from the unit.  All I heard was Jennifer was overloaded.  So I decided, after hiring up

to staff, I had decided to flatten my organization so that it works better for me, this way I get a better sense of what each is doing, if they're not too overloaded to be distributed(SIC) of work."

Q.  Can you describe what you mean by "flatten"?

A.  By having my whole entire staff directly report to me.  So therefore – my unit consists of four people, myself, Jennifer and two analysts.

240.     Regarding Analyst support, Plaintiff testified, Ex B at 168-9:1-3:

Q. Did they ever assist you with any of your assignments?
A. They have, yes.

241.     She testified (183:4-10):

Q. You had stated earlier that you did receive help at times from some of the other analysts with the approval of David; is that right?
A. David assigned those tasks. For example, the Critical Issues Report. The Critical Issues Report, David had said to me, "They are only helping you. It's your job."

242.     She was offered the help of a high school intern as well at one point but refused (206-207).

243.     When questioned again, Plaintiff testified (Ex B at 209-210):

Q. So you didn't -- you didn't receive any assistance from Richard or Earl, when he was here, or –
A. Earl reported to me.
Q. Right.
A. So he assisted.
Q. Well, Richard is still here. So you don't ever receive assistance from Richard?
A. Yes, I go to Richard to -- I will ask him to proofread my work for me. Like, if I do a budget mod, I will do -- he will assist me. I wouldn't assign him, like -- if I get a budget modification to do anything related to Communications, normally I would assign it to an analyst. I wouldn't assign it to him. And I am sure that I have asked for his help.  Laura assisted me in creating the cover and things like that for the training and -- for the employee training manual.  So I am sure I have interacted, and they have  supported me. Not because they were assigned to me as my direct report to assist me in my work.
Q. Right. They're not your direct reports, but they have assisted you.
A. Let's say yes.

244.     Chan testified (Ex D at 82-82; 91-92; 176 and *see also* Pl. Dep. at 206:10-12):

…My instructions to staff, Andrew and Laura and Richard is, "If work – you report directly to me.  So I would give you the work that I need to be done.  Jennifer is a director.  If she gives you work you cannot refuse.  She has a higher title than you, but

what I would ask is that you come back to let me know because I need to know the distribution of work is not overloading you."

**v.     Plaintiff complains that she was "Excluded on Certain Projects"**

245.    Plaintiff alleges as an example of harassment by Chan, that she was "excluded" from certain meetings and certain projects such as the Beacon Project (Ex 1 ¶Ex B at 215).  Id.

246.    When asked whether she ever asked to attend those meetings or work on those projects she conceded she did not, saying "Why do I need to ask if I should attend a meeting?" *See id.* at 215-216.

247.    Chan "never precluded Jennifer from going to any meetings" and said "she never asked to be involved in the Beacon project or "to be involved or continue to be involved in the Help Point projects", pointing out that "all projects are open". (Ex D at 179-180):

**vi.     Plaintiff complains about being denied vacation requests**

248.    Plaintiff complains about being denied vacation requests in her complaint, despite acknowledging Brown's "strict policy that two managers should be in the unit at the same time….she doesn't want two directors out at the same time."  Ex B at 61; Ex C at 306-310.

249.    Plaintiff's complaints about Brown's vacation policy pre-date her September 2014 complaint.  *See* March e-mail, Ex T.

250.    A number of people in Brown's group have been denied vacation based on this policy, not just Plaintiff.  Ex C at 309.

251.    Chan testified (Ex D at 106: 8-17) that when Plaintiff "submits it [vacation request] and there is coverage in the unit, there is no problem to approve it, but if I have already approved vacation and I'm going to be out at that time, I cannot approve that vacation it will be going against policy."

252.    Chan has approved Plaintiff for vacation numerous times, and Plaintiff took 504 hours of vacation between October 1, 2014 and June 30, 2017 (the equivalent of approximately 72 days)(Ex XX (last page); Pl Dep; Ex B at 218)

**vii.    Plaintiff's alleges that Andrew Zsoldos was fired because of her**

253.    Plaintiff claims that Andrew Zsoldos, an Analyst in the group was fired because he "sought Plaintiff's help in completing his job duties".  Ex A¶52.

254.    In fact, Zsoldos's probationary employment was terminated for poor performance, and his 6-month "Marginal" review reflects issues such as being "caught asleep at his desk, texting on his personal phone at his desk and meetings" and having "incomplete/inaccurate work requiring multiple revisions".  *See* Ex ZZ.

**viii.    Plaintiff alleges that she is the only Director "assigned a lunch time"**

255.    Plaintiff alleges that she is the only Director who was assigned a lunch time in the Unit.  Ex A, ¶59; Ex B at 214-215.

256.    However, Brown has asked every employee in Capital Programs to designate a lunch hour for coverage purposes, and she maintains a list as such.  Ex YY; Ex D at 88-89

257.    Plaintiff has never been reprimanded or penalized in connection with taking her lunch hour nor has never been denied the ability to take lunch.  Ex B at 214-215.

**ix.    Plaintiff's complains that she sits in a "cubicle"**

258.    Plaintiff complains that Brown removed her from her office into a "cubicle".

259.    C Level Directors like Plaintiff are not entitled to Offices, but to "Managers' Bays", which is where Plaintiff currently sits.  Pl. Dep., Ex B at 89:17-21; Ex C at 380-82; 388-89.

260.    Though Plaintiff was permitted to temporarily occupy an office in 2011 when it became vacant following the retirement of a former senior director, she was asked to vacate it in April 2014, following DiLorenzo's promotion to Senior Director.  *Id.*

261.    Plaintiff testified (Pl. Dep., Ex B at  89:17-21):

Q. Okay.  To your knowledge, do directors typically get offices? Are they entitled to offices?
A. C-level directors, I was told, are not – when I -- when I came into the division, I was told B-levels and above get offices. Okay.  So I was removed from that office for Joe DeLorenzo.
Q. Who became a senior Director, correct?
A. Who became a B-level senior Director.
Q. Okay.
A. Okay.
Q. So he was in a higher title and a higher grade level, right?
A. Yes. I would assume.
Q. So wouldn't you say that that person would have seniority over somebody in your title and grade level in terms of office space?
A. Yes.

**x.    Plaintiff complains that she no longer sits in for Chan when he is absent**

262.    Plaintiff claims that she no longer sits in for Chan when he is out of the office, and apparently alleges that this action was retaliatory.  Ex B at 227; Ex D at 97-98.

263.    Plaintiff, however, continued to sit in for Chan following her September 2014 Complaint, until in or around July 2015, after an incident in which Brown recalled Plaintiff gave her incorrect information about a project and did not go directly to see her, and that such incident was not the first time (310-316; *see* TA 1740-45 related to this incident).

264.    Further, Brown was told by Chan and other employees that Plaintiff said she does not speak to Brown (Ex C at 310-316).

265.    Brown testified (313-314):

I don't require that you speak to me, but when it comes to my job, you're talking about my livelihood. I'm not asking you to speak to me personally; professionally, I have exchanges with Jennifer all the time. Personally, she doesn't speak to me,

she'll pass me in the hallway and won't say a word to me. That's fine. That's her choice, but when it comes to my job, if you're going to now compromise my job by not giving me information because you feel like you don't speak to me, that is a problem. And at that point I advised David that she should no longer sit in for him. She still has the responsibility of the communications area, but she's not going to sit in for him if she's not going to provide me information that is helpful in me getting my job done.

### xi.    **Plaintiff's claims about excessive scrutiny and "harassing" work e-mails**

266.    Chan responded to questions regarding his e-mails and responses to Plaintiff

regarding work. *See* Ex D at 161-162.

> Q. But you give her e-mails every day that are work-related, correct?
> A. All my e-mails to my staff would be work-related, it would not be anything else.
> Q. But you just said that you weren't pushing her.
> A. I'm not.
> Q. Well, sir, that's just a conclusion because you are giving her e-mails of stuff to do, you want it done on time, correct
> A. Yes, that is the reason for accepting assignment, to have it done on time.
> Q. And she has more than one project going on at any given time, correct?
> A. We all have more than one project going on at any given time, yes.
> ***
> Q. I see in the e-mails where you push Jennifer.  Are you denying that?
> MS THOMPSON: Objection.
> A.  I don't know what you are classifying as pushing Jennifer.  If you mean assigning work to Jennifer, or have her look at a specific task within a project, yes, that is all the cost of doing work.
> Q. Within a specific time frame, correct?
> A. Certain times are time sensitive, and there would be certain time frames associated with.
> Q. And you have been relatively inflexible with her about those times, haven't you?
> A. In terms of projects that are time sensitive, it is inflexible to me.

267.    Chan testified (Ex D at 224):

> A.  Module three is "Rail traffic management system," not "traffic management system," and it's on and on.
> Q. So this is just and example sir, of you holding Jennifer to a high degree of accuracy, correct?
> A.  I'm holding Jennifer to providing accurate documents.  Because if I am to provide this to my vice president, it will be my issue, and if it is incorrect, I feel the need to at least let her know that it's incorrect so that she knows that it is incorrect.

268.    Plaintiff testified (Ex B at 188; 196-197; 217):

42

Q. Do you know if David sends similar buck slips and emails to his other employees?
A. I do not know that.

***

Q. Do you feel that -- do you feel that his tone the different with other employees who work for him, or do  those employees say that he uses the same tone to them?
A. I don't -- I don't know
Q. Do you know the tone that he uses with other employees?
A. No

***

Q. Do you know if he marks up other people's work?
A. I do not know. I can only speak for me.

269.   Plaintiff has not been suspended, demoted or subject to a reduction of pay or benefits throughout her employment, and continues to perform in the role of Director, Telecommunications & Systems (Pl. Dep, Ex B, 229).

Dated: March 7, 2019
          Brooklyn, New York

Respectfully submitted,
**JAMES B. HENLY**
Vice President & General Counsel
New York City Transit TA
*Attorney for Defendants*
130 Livingston Street, Room 1212
Brooklyn, NY 11201
(718) 694-3893

**By:**   ***/s/Mariel A. Thompson***
**MARIEL A. THOMPSON**
*Executive Agency Counsel*

To:    Gregory G. Smith, Esq.
         Attorney for the Plaintiff
         81 Prospect Street
         Brooklyn, New York 11201
         (917) 748-2623
         gsmith225@aol.com