**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

JENNIFER BERKELEY CARR                                    16-CV-09957 (DAB)
                              Plaintiff,                  **RESPONSE TO STATEMENT**
                                                          **OF MATERIAL FACTS**
              -against-                                   **PURSUANT TO RULE 56.1**

NEW YORK CITY TRANSIT AUTHORITY,
DAVID CHAN AND MARVA BROWN,

                              Defendants.
---------------------------------------------------------X

         Plaintiff Jennifer Berkeley-Carr, by her attorney Gregory G. Smith, respectfully submits

this response in opposition to Defendants' submission of material facts pursuant to Rule 56.1 of

the Local Rules of this Court, and state that many of the following material facts are in dispute.


                    **STATEMENT OF THE MATERIAL DISPUTED FACTS**


         1.      Plaintiff Jennifer Berkeley-Carr ("Plaintiff") commenced this action on or about

December 27, 2016 against Defendants New York City Transit Authority ("TA"), Marva

Brown ("Brown") and David Chan ("Chan"), pursuant to the ADEA, Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. Sections 2000e et seq., ("Title VII"), and 42

U.S.C. Sections 1981 and 1983 et seq.  *See* Plaintiff's Amended Complaint, Exhibit ("Ex")

A.


              **DISPUTE**

**The above statement does not fully state the causes of action in this lawsuit and the**
**wrongs endured by Plaintiff as a result of the actions of Defendants.  In addition to the**
Title VII discrimination and retaliation wrongs**, Plaintiff complained of conduct that**
**resulted in: violations of the** ADEA, 29 U.S.C. Sec. 621 et. seq; a hostile work
environment, 29 U.S.C. Sec. 621 et. seq.; retaliation under the ADEA, 29 U.S.C. § 626, et.
seq.   Exhibit 2 ("Exh.") Amended Complaint ("AC") at Paragraphs ("¶¶") 2, 64, 72, 76.

         2.      There are no State or City Law Claims asserted in this action.  *Id.*

**ADMIT**

**I.**     **THE PARTIES**

3.     The TA is a public benefit corporation created by the New York State Legislature (Public Authorities Law ["PAL"] §1200-1221) for the purpose of operating the subway and bus systems, and its "facilities" within the City of New York.

**ADMIT**

4.     Plaintiff is currently a 63 year-old (born 1955) African-American female of Caribbean descent, currently employed by the TA in the title of Director, Telecommunications & Systems within the TA's Division of Capital Programs, Department of Subways (hereafter "Capital Programs"). *See* Ex A, ¶4; *see* relevant portions of Plaintiff's deposition transcript ("Pl Dep."), Ex B at 10.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**Plaintiff was hired by the New York City Transit Authority in 2000 as a Manager in Budget Administration, MetroCard Operations because of her qualifications. As stated by Defendant Marva Brown, prior to this lawsuit being filed: "The communications area is a challenging and developing area ... being an effective leader are all attributes required for effective change management.  Jennifer is a valuable member of the management team in the communications area."  Plaintiff's education includes an advanced MPA degree in Finance, New York University earned in May, 1992 and a BA degree in Economics from Brooklyn College earned in June 1990.  Her prior employment included the position of Budget Administrator an MTA Long Island Railroad.  Her new position at the TA in 2004 was that of Director, Capital Planning.  In 2006 she held the position of Director, Acceptance and Engineering Review at the TA. She currently serves at the position of Director, Telecommunications and Systems at the TA.  See Carr Decl ¶¶ 1-3, Exh. 2 (AC) ¶**

4, 5; Exh. 44 (resume) Exh. 11 (NYC Leadership Institute) at PL0875-881 Exh. 8 Pl. Tr. pp. 35-42

4.      Plaintiff has been with the TA since 2000, and has been in Capital Programs since 2004. Ex A, ¶14; Ex L.

**ADMIT**

5.      Defendant Brown was born in 1959 and is a 59 year-old African-American female of Caribbean descent, currently in the title of Vice President & Chief Officer, Capital Programs. See relevant portions of Brown 's deposition transcript ("Brown Dep."), Ex C at 7, 12-13.

**ADMIT**

7.      Brown has been with the TA since July 5, 1988 and has been in her current title of Vice President and Chief Officer since August 1, 2011 and prior to that was in this role since around August 2010 in an acting capacity (Ex C at 12-13; Ex M).

**ADMIT**

8.      Defendant Chan was born in 1963 and is a 55 year-old Asian male, currently in the title of Senior Director, Program Management & Analysis ("PMA") in Capital Programs. *See* relevant portions of Chan's deposition transcript ("Chan Dep."), Ex D at 8.

**ADMIT**

9.      Defendant Chan has been with the TA since July 28, 1987, and has been in his current title of Senior Director, PMA in Capital programs since October 13, 2014. *Id*. at **11;** Ex N

**ADMIT**

## II.    PLAINTIFF'S ALLEGATIONS

6.    In this action, Plaintiff alleges that Defendants Brown and the TA subjected her to discrimination on the basis of her age, race and gender by not selecting her for two positions for which she applied in 2013 and 2014 respectively. *See* Ex A; Ex B at 200-202; *see also,* Ex E, pp. 12-11, Interrogatory No.'s 14-16).

**ADMIT**

11.    The first position Plaintiff applied for in 2013 was the position of Senior Director, Program Management & Oversight, and was offered to Joseph DiLorenzo (54 year-old male [born 1964]); self-identifies as "Other"). Ex A ¶21-23; Ex's Q-S, Ex Z, TA 3738-9.

**DISPUTE**

**Admit that Joseph Dilorenzo was offered the position of Senior Director Program Manager & Oversight in 2014, but deny that he was 54 years old at that time. In 2013 when he and Plaintiff interviewed for the job DiLorenzo was 49 years old and Plaintiff was 58 years old (born 1955) DiLorenzo was identified as a white male.** Exh. 49 at TA 3616 and 3738.  Exh. 9 Brown Tr. 22:12-14

12.    The second position Plaintiff applied for in 2014 was the position of Senior Director, Program Management & Analysis and was offered to Defendant David Chan (55 year old Asian male). Ex A, ¶25-27; Ex's W-Y.

**DISPUTE**

**Plaintiff did not apply in 2014 for a second position.  Plaintiff made only one application in 2014 and that was for the position of Senior Director, Program**

**Management & Analysis. David Chan in 2014 was 51 years old (born 1963)** Exh. 49 at TA 3712 **and Plaintiff was 59 years old (born 1955) in 2014.** Id.

13.     Since the filing of her complaint, Plaintiff has clarified that her failure to promote claims against Brown and the TA are based on "age" discrimination rather than race and gender. Pl. Dep. Ex B at 81, 361; *see* Docket No. 45 ("Although Plaintiff has a strong age discrimination claim under a disparate treatment theory...").

## DISPUTE

**Plaintiff claims age, race and gender discrimination, but to the extent possible will focus her arguments on age discrimination.** See Exh. 2 (AC) ¶ 1.

14.     Plaintiff s claims of "age" discrimination and/or to the extent she alleges race or gender discrimination, are not raised against Defendant Chan. *See* Ex E, pp.12-11, Interrogatory No.'s 14-16; Pl. Dep, Ex B at 200-201.

## DISPUTE

**Plaintiff alleges age, race and gender discrimination as against Defendant Chan.** Exh. 2 AC at ¶¶64, 66, 85, 88, 91, 115-116, 127.

15.     Plaintiff also alleges in this action that shortly after she filed a complaint with the TA's Department of Equal Employment Opportunity & Diversity ("EEO") on September 29, 2014 against Brown *(see* Ex's F and G), she was subjected to retaliation by Defendants TA, Brown, and Defendant David Chan, who became Plaintiff's new supervisor upon appointment to the PMA position on October 13, 2014. *See generally,* Ex A; PL Dep. Ex B at 225:12-25; 226: 1-7.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**Admitted as understood to state that, in addition to the preceding discriminatory conduct, Plaintiff was subjected to discriminatory retaliation by Defendants shortly following her filing of a complaint with the TA's EEO (summary of complaint received on September 3, 2014 and her EEOC complaint was filed and dated on dated September 23, 2014.** See Exh. Exh. 15 TA 763, PL0141

### III.   PRIOR EEOC CHARGE & RIGHT TO SUE LETTER

16.     On October 22, 2015, the TA received a Notice of Charge of Discrimination from the Equal Employment Opportunity Commission ("EEOC") dated October 15, 2015, with an EEOC Charge signed by Plaintiff dated August 7, 2015, sworn to on August 13, 2015. *See* Ex H (Notice of Charge, Charge, and related Law Dept. records); *see* Pl. Dep., Ex B at 148-149.

**DISPUTE**

**Plaintiff filed her charge with the United States EEOC on May 11, 2015 bearing EEOC Charge No. 520-2015-02377. The Notice of Charge of Discrimination was sent to the Executive General Counsel for Defendant TA dated May 18, 2015. Plaintiff filed an Amendment to her EEOC Complaint on May 27, 2015 based upon a subsequently received 2014 Performance Review and the improper presence of Timothy Forker at that review. Plaintiff filed an additional Charge of Discrimination with EEOC dated August 7, 2015 under the same charge number. A Notice of Charge of Discrimination was sent to the Executive General Counsel for Defendant TA dated October 15, 2015.** Ex. 8 Pl. Tr. pp. 145-149; Carr Decl. ¶¶ 20-24; Exhibit 16 (EEOC) at pp. PL0111, 0112-0116 and attachments.

17.     Plaintiff alleges and provides records showing that she completed an intake questionnaire and submitted a complaint to the EEOC on May 11, 2015 and amended

that complaint on May 27, 2015, but Defendants did not receive copies of these complaints. [1]

*See* Ex J.

### DISPUTE

**Plaintiff admits that she provided records to Defendants and submitted an intake questionnaire and complaint to the EEOC on May 11, 2015 and amended that complaint on May 27, 2015.  Plaintiff denies that Defendant did not receive copies of the complaint that was sent specifically to Eamon Foley-Executive General Counsel to the NYC Transit Authority at the same address as provided by Defendant on their Answer to the Amended Complaint. [Furthermore, in their footnote 1 Defendants state that the May 18, 2015 Notice of Charge of Discrimination has the box checked for no action is required, they omit the provide the entire statement which reads: "No action required by you <u>at this time.</u>"** See Exh. 16 (EEOC) at pp. PL000111 and 00016 (emphasis added); also see Exh. 3 (Answer to AC ) p. 13

18.     The TA responded to the August 7, 2015 Charge on or about March 14, 2016, and the EEOC issued a Dismissal & Right to Sue Letter dated October 31, 2016. *See* Ex's J, H.

### DISPUTE

**The evidence demonstrates that the charge number given ("520-2015-02377") did not change, it remained the same for all of Plaintiff's complaints of discrimination against the TA indicating that the all charges were received and acknowledged by the EEOC and conveyed to the TA.** Please compare Plaintiff's Exh. 16 at PL00016 with Defendants' Ex H at TA 3422.

### IV.  CAPITAL PROGRAMS, SUBWAYS

19.     Briefly, Capital Programs is responsible for managing the planning and development of the TA's Capital Program on behalf of Subways' Operating and Maintenance Divisions, and supports the execution of each 5-year Capital Improvement Plan,

---

[1] Plaintiff produced a copy of a "Notice of Charge" dated May 18, 2015 addressed to the TA apparently contained in the EEOC's file, indicating "No Action Required" and containing no underlying Charge of Discrimination by Plaintiff. See Ex K. However, the TA has not been able to locate this record. See Ex H, related records. The Notice of Charge received on October 22, 2015 with Charge dated August 7, 2015, is the only EEOC Charge by Plaintiff on file, and the TA responded to that Charge.

7

providing project oversight and support, fiscal and budget management, estimating, planning, and reporting.  Ex B, 41-44; Ex O; Ex C.

### DISPUTE

**Capital Programs develops the 20 year needs assessment for the operating divisions based upon condition surveys and from that assessment develops a five year capital plan allocating capital money to upgrade the assets of the Department of Subways.** Exh.8 Pl. Tr. pp.145-148.

20.     As Vice President and Chief Officer of Capital Programs, Brown is responsible for the supervision of approximately 30-40 budgeted positions, including the Senior managers directly reporting to her in the following titles: (i) Lower Manhattan Infrastructure Improvements; (ii) Program Management & Analysis; (iii) the Security Program; (iv) Strategic & Long-Range Planning; (v) 7 Line Extension & Signals; and (vi) Program Management & Oversight. *Id,*0.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered**

**OBJECTION**
**The statement does not identify the time period referred to and the number of direct reports and indirect reports vary at different time periods.  Without waiving this objection Plaintiff states:**
**ADMIT**

21.     Each area is run by a Senior Director or Assistant Chief, and Chan is the Senior Director of the area of Program Management & Analysis. *Id*

**ADMIT**

22.     As Senior Director, Chan oversees the Communications and Elevators & Escalators and Tunnel lighting areas and is responsible for making sure "capital projects are funded" in the capital program" and are "constructed so that it can benefit New York City Transit." Ex D at 176; 129.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**Chan has the position of Senior Director, Program Management & Analysis. "The Senior Director is part of a managerial team that is responsible for the overall coordination of the Department of Subways' (DOS) 5-year Capital Program and ensures that Subways receives an adequate level of funding to rebuild its assets and infrastructure I the most cost-effective manner possible.  The Senior Director is charged with overseeing all analysis for the Communications & Systems, and Elevators & Escalators program areas.  He/she works with infrastructure Capital Construction to maintain the correct balance of staff required for in-house managed construction projects.  The Senior Director is the lead person responsible for analyzing, coordinating and prioritizing the Communications & Systems, and Elevators & Escalators capital programs.  The incumbent handles preparation and review of budget modification and procurement staff summaries, facilitates the development of Project Profiles, Master Plans including the preparation of Operating Budget impacts, cost benefit analyses and concepts of operation etc."  Moreover, Chan testified that as Senior Director Program Management and Analysis he oversees the Communications area and that it takes the largest percentage of his time. Chan estimated about forty ("40 %") percent of his time was spent on Communications. However, almost all of Plaintiff's core duties and responsibilities as Director Communications are in the Communications area.** See Exh. 43, PL0098; Exh. 10 Chan Tr. pp. 8-9; see also Exh. 41(consolidation of the Senior Director and Director jobs) at TA 1656.

23.     Chan reports directly to Brown, and Plaintiff reports directly to Chan as Director, Telecommunications & Systems in his group.  Ex A, ¶15.

ADMIT

## V.    IN FEBRUARY 2012, BROWN HAD ADVANCED PLAINTIFF INTO HER CURRENT POSITION OF DIRECTOR, TELECOMMUNICATIONS & SYSTEMS BY CREATING THIS TITLE <u>FOR HER AND GIVING HER A 12% RAISE</u>

**OBJECTION.  This is an unnumbered statement of fact.**

24.    In 2011, Brown recommended the consolidation of two positions to create a new position for Plaintiff entitled "Director, Telecommunications & Systems". Ex P.

### DISPUTE

**Defendant Brown had three positions for which she eliminated one budget line, reallocated the responsibilities of the job and upgraded the Hay evaluation to give a promotion in place ("PIP") to Plaintiff who was continuously pushed under whichever manager was available to supervise her, even though they had no prior experience or knowledge of the Communications Unit. When no one was available, the Vice President and Chief Officer Wynton Habersham and then Marva Brown would supervise until someone was found.  In the 2010 while Plaintiff was involved in handling communications matters, the Capital Program Division was going through leadership changes; Because staffing was short in the Communications Unit and in recognition of Plaintiff's increased responsibilities, Marva Brown re-hayed her position.** See Exh. 41 and Defendants' Exh. P at TA 1702 at ¶¶ 3-4; Exh. 9 Brown Tr. at pp 204-205; Carr Decl. at ¶¶ 6-11.

25.    At that time, Plaintiff was in the position of Director, Acceptance & Engineering in Capital Programs in a lower managerial Hay Grade (Level "E" ["A" is highest]). *See* Ex L.

### DISPUTE

**After waiting a year from the August 15, 2011 recognition that Plaintiff's increased duties required a re-haying of her position, Plaintiff was doing the work of the Senior Director, but didn't get promoted to the actual job. Plaintiff's salary went to $98,730 in 2012. Plaintiff has not had a [merit] increase raise since 2012 because of Defendants'**

retaliatory Needs Improvement ("NI") low MPR ratings given for her 2016 and 2017 performance evaluations.  See Exh. 8 Pl. Tr. pp. 87-88, 237-238; Exh. 41; Carr Decl. at ¶29.

26.    Brown obtained a "re-hay" of Plaintiff's existing Grade Level to a higher Grade Level ("C") and a 12% salary increase for her. Ex B at 53, 87-88; Ex C, at 7: 20-25; 93-94.

**DISPUTE**

**After it took a year to accomplish, the re-haying of Plaintiff's position resulted in her grade level being changed to a C Level, but without the corresponding rise in her reporting level in the organizational structure.** See Exh. 8 Pl. Tr. pp. 87-88**;** Exh. 9 at pp 204-205; Carr Decl. at ¶¶7-8. Also see response to 24 above.  Pl. Tr. pp. 53, 88.

27.    Plaintiff s salary went from $88,152 to $98,730.  Ex 1.

**DISPUTE**

**The above merit increase was Plaintiff's last merit increase because of retaliation.** Exh. 8 Pl.Tr. pp. 237-238; Exh. 13 (2016 and 2017 "NI" MPR's); Exh. 32 (GWI memo).

28.    In this new role as Director, Telecommunications & Systems Plaintiff became responsible for, among other things, analyzing, coordinating, prioritizing, developing and updating the Telecommunications Program area for the Department of Subways.   Ex P (TA 1700).

**DISPUTE**

**Admit that in the re-hayed position Plaintiff was responsible for, among other things, the above-described responsibilities.  Deny this was a "new role." This re-hayed position was a recognition of the "expanded duties" Plaintiff was already required to do because the Senior Director Telecommunications & Systems (Grade B) vacancy was not filled. The Senior Director functions were consolidated with Plaintiff's function as Director Acceptance and Engineering resulting in increased duties in the re-hayed position.** Pl. Tr. pp. 87-88; Exhibit 41, p. TA 1655; Exhibit 47, p. TA 1686 (2011 Capital Programs

hierarchical structure chart), p. TA 1687 (2012 Capital Programs hierarchical structure chart-minus Telecommunications & Systems Senior Director).

29.     The position requires interaction with Capital Program managers who are, in turn, overseeing the strategic capital planning for specific Operating Divisions within Subways, and the position is responsible for overseeing complex communications projects, and anticipating long range plans for inclusion of new technologies within the Capital Programs. *Id.*

**DISPUTE**

**The statement provides only a partial statement of the responsibilities.** See Exh. 41 p. TA 1656

## VI.   AMY KAUFMAN SUPERVISES PLAINTIFF FROM SEPTEMBER 2012 - MAY 2014

30.     From about September 4, 2012 until around May 2014, Plaintiff reported to Amy Kaufman ("Kaufman"), Senior Director, Program Management & Analysis ("PMA"). *See* Ex B at 68-69; Ex C at 130:21-25; Declaration of Amy V. Kaufman ("Kaufman Dec.") ¶3.

**DISPUTE**

**In June 2012 Plaintiff's then supervisor Joan Newbold left her title as Telecommunications & Systems Senior Director. Marva Brown informed Plaintiff that she would be reporting to Amy Kaufman who was a newly hired B Level Senior Director in the Stations Program Area. She was reassigned to supervise Plaintiff because Joe DiLorenzo had complained to Marva Brown about Amy Kaufman's lack of leadership.** See Exh. 47 (org chart) at TA 1687; Exh. 8 Pl. Tr. pp 58-59; Carr Decl. at ¶¶ 7-8.

31.     In the position of Senior Director, PMA, Kaufman was responsible for, among other things, oversight of the Communications and Stations areas in Capital Programs. *Id. ¶4.*

**DISPUTE**

**Amy Kaufman was hired to oversee the Stations Program area.** See Exh. 8 Pl. Tr. p. 57; Brown Tr. pp. 46-47

32.     According to Plaintiff, Amy supervised Plaintiff "[in name only]" because "she saw no need to supervise Plaintiff". Ex A ¶ 24.

### ADMIT

33.     According to Kaufman, when Kaufman introduced herself and told Plaintiff that she "wanted to come up to speed with what was happening in the department" Plaintiff responded "I don't need to be supervised". Kaufman Dec. ¶8. Ex G (TA 874).

### DISPUTE

**This statement is in Kaufman's Declaration and not subject to cross examination however, when Plaintiff was produced to Defendants for their deposition of her she denied telling Kaufman she did not need to be supervised and testified that Kaufman allowed Plaintiff to manage her work because Plaintiff knew her job and responsibilities. Consistent with this, Kaufman gave Plaintiff Excellent rating on her ("MPR") Managerial Performance Review. Exh. 9 Pl. Tr.** Tr. pp 60-61; Exhibit 12, TA 1025

34.     When Kaufman said, "It's not about supervision it's about working together," she testified that Plaintiff responded, "I know how to do my job, you don't need to tell me what to do." *Id.* 10. Ex G (TA 874).

### DISPUTE

**See Response to ¶ 33 above.**

35.     Kaufman said that Plaintiff generally performed her job well, but Plaintiff "rarely came to her to speak". Kaufman Dec. 12-13. Ex G (TA 875).

### DISPUTE

**See Response to ¶ 33 above.**

## VII.   PLAINTIFF APPLIES FOR AND IS INTERVIEWED FOR THE
##          POSITION OF PROGRAM MANAGEMENT & OVERSIGHT ("PMO")

36.      On or about October 9, 2013, Plaintiff applied for a more senior level position

that was posted in Capital Programs -Senior Director, Program Management & Oversight (the

"PMO" position).  Ex 1 ¶ 20.  Ex B at 64-65; Ex Q.

### DISPUTE

**A "B" Level vacancy was created in the position of Senior Director Communications
when Ken Pearce retired. Plaintiff had been working as a manager/director in the
Communications unit since 2004.  In her manager position Plaintiff develops five-year
capital plans to fund Department of Subways assets (e.g., subway cars) from the 20 year
needs assessments plan that she also develops and she manages communications assets in
her management position. Plaintiff had more experience and familiarity with the issues
and problems with the Communications unit than even her prior supervisor Donald
Tsang.  She was much respected by and received positive reviews from Mr. Tsang and he
described her as a professional and a team player.  Because of vacancies in the
Communications unit Plaintiff served as the sole manager for many years.  She received a
vast majority of Excellent performance review ratings from her supervisors, including
Marva Brown and Amy Kaplan in her management role in Communications.   On or
about October 9, 2013 Plaintiff was interviewed for the Senior Director, Program
Management & Oversight position.**  See Carr Decl. ¶ 2, Exh 2 AC at  ¶19; Pl's Tr. at pp 41-44;
Tsang Affidavit at ¶¶  5, 7; Pl's Exh 12 PL0269, TA 1026, TA 1025;  Exh.5 (Defendants' Objections
and Response to Plaintiff's First Request for Admissions), Response to  ¶ 6 (p. 4);

37.        According to the job posting, the PMO position would be, *inter alia*

"primarily responsible for managing and coordinating the planning and development of a

comprehensive Capital Program for Tunnel Lighting, Line Structures and Line Equipment from

project inception to completion…" *See* Ex Q.

### DISPUTE

**Defendants do not provide the complete quoted sentence.  It reads: "The Senior Director
will be primarily responsible for managing and coordinating the planning and
development of a comprehensive Capital Program for Tunnel Lighting, Line Structures**

and Line Equipment from project inception to completion <u>valued at approximately $1 billion for the 5-Year Capital Program.</u> Manage and oversee the Force Account area." (Emphasis added to highlight the omitted language).

38.     In terms of qualifications, the position required a "BA in Business Administration, Economics, or Engineering and a minimum of 15 years of related experience ..." *Id.*

### DISPUTE

**Admit to the cited material above and add the "or" language: or "A satisfactory equivalent of Education and experience."**

39.     In terms of "Desired Skills", the position sought, among other things, knowledge of the Capital Program, "strong problem solving/conflict resolution skills" and a "strong analytical background in the field of engineering, construction activities and inspection process." *Id.*

### DISPUTE

**Defendants do not provide the complete statement of the Desired Skills description. It reads:**
**1. "<u>Knowledge of NYCT Capital Program.</u>**
**2. <u>Knowledge of the Department of Subways' operating and maintenance requirements.</u>**
**3. <u>Strong written and verbal communication skills.</u>**
**4. <u>Strong computer skills, financial analysis, budget and project management experience.</u>**
**5. Strong problem solving/conflict resolution skills.**
**6. Strong analytical background in the field of engineering, construction activities and inspection process." (**Emphasis added to highlight the omitted language).

40.     The selected candidate would be reporting directly to Brown. *See* Ex R.

### ADMIT

## VIII.   AN INTERVIEW PANEL CONDUCTS INTERVIEWS FOR THE PMO POSITION

41.     An interview panel was established to interview candidates for the PMO position, and was comprised of Kaufman, Plaintiff's supervisor at the time, two other Senior

Directors at the time in Capital Programs, Robert Levine (Senior Director, Security) and Tim Forker (Senior Director, Strategic & Long-Range Planning, along with a Manager from Human Resources, Renalda Goodall. *See* Ex A ¶ 20; Ex R.

### DISPUTE

**Defendant Marva Brown established an interview panel to conduct interviews for the PMO position. It was comprised of all white personnel from her Capital Programs unit, with the exception of Renalda Goodall of Human Resources who Defendant Brown understands the role in the panel as limited to an overseer**. See Exh 49, TA 3711, TA 3643, T.A 3707; Exh. 9 Brown Tr. p. 70: 15-23

42.     Plaintiff was deemed qualified for the position, along with a number of other candidates, including internal candidates Joseph DiLorenzo (54 year-old male [self-identifies as "Other"]), David Chan (55 year-old Asian male), and Franz Polycarpe (61 year-old African American male). *See* R; Ex Z, TA 3738-9.

### DISPUTED

**Seven Qualified individuals were interviewed for the position. At the time of the interviews DiLorenzo was 49, Chan was 50, Polycarpe was 56 and Plaintiff was 59 years old. The Decision maker, Defendant Brown, identified Joseph DiLorenzo as a white male.** See Exh. 45 at TA 1693, Exh. 9 Brown Tr. p. 32: 16-25; Exh 49 (names and DOB). TA2616, TA3712, TA3738, TA3692.

43.     Out of 52 resumes received, seven applicants were interviewed. *See* Ex's R, S.

### ADMIT

44.     Brown asked the panelists to refer "three or so candidates who performed the best in the interview".   Ex C at 34:22-25; 35:1; *see* Kaufman Dec. ¶ 18.

### ADMIT

45.     Plaintiff was interviewed for this position on or about October 9, 2013.  Ex A, ¶ 20.

**ADMIT**

46.     The panel asked each of the candidates the same questions at their interviews. Kaufman Dec.19; Ex C at 216: 23-25, 217:1-15.

**OBJECTION**

**Inadmissible hearsay evidence pursuant to Federal Rules of Evidence ("FRE") 802 and Rule 1002 Best Evidence Rule. Under Rule 1002, to prove the content of a writing, the original writing must be proffered.  Here Defendants have proffered no writing from their exclusively possessed documents with the questions asked of the candidates by the panel.  Without waiving this objection:**

**ADMIT**

47.     Kaufman testified her observation was that Plaintiff did "well" at the interview, but she was a bit "confrontational and unenthusiastic". Kaufman Dec.  22; *See* Ex G (TA 873-877).

**DISPUTE**

**Kaufman did not "testify" but unilaterally submitted a Declaration with subjective opinions.  She was not subject to cross-examination.**

48.     DiLorenzo was Kaufman's first choice, and Kaufman did not recall Plaintiff being anyone's first choice.₂ *Id.*  26.

**OBJECTION**

**Hearsay with regard to what Kaufman did not recall, pursuant to FRE 802 and 803, without foundation and no exception to the hearsay rule.**

**DISPUTE**

**Robert Levine, Defendant TA's employee and part of the interview panel told Plaintiff that she was referred for the job. They referred several candidates to Marva Brown, Plaintiff was one of the top two candidates referred and that Joseph DiLorenzo was not referred for the job.** Exh. 8 Pl. Tr. at 75-76

---

[2] According to a report issued by the TA's Department of Equal Opportunity & Diversity regarding its investigation into this hiring decision, Robert Levine's first choice was Frantz Polycarpe, and Tim Forker's first choice was DiLorenzo. See EX G, TA 877-878

49.     Plaintiff, however, was one of the top four candidates that was referred to Brown by the panel, along with internal candidates Joseph DiLorenzo, David Chan and Franz Polycarpe (Ex C at 35: 42:1-7; 52:6-12 Errata Sheet correction; Kaufman Dec. 27).

**DISPUTE**

**See Response to ¶ 48.**

## IX.    BROWN SELECTS JOSEPH DILORENZO FOR THE POSITION BECAUSE HE WAS THE BEST CANDIDATE FOR THE JOB.

**OBJECTION.  This is an unnumbered statement of fact.**

50.     Brown conducted second interviews with Plaintiff, DiLorenzo, Chan and Franz Polycarpe. *See* Ex C at 35:15; 42:4 (Errata Sheet corrections).

**DISPUTE**

**Plaintiff did not have a second interview and Brown doesn't remember whether or not she gave Plaintiff a second interview.  Therefore, Brown contradicted her prior testimony. It is painfully obvious that Brown was attempting to mislead the Court. Moreover, there is no evidence that Plaintiff, DiLorenzo, Chan or Polycarpe got a second interview apart from the Brown's incredible testimony and there was certainly no second interviews for the Chan promotion since Brown sat on the three person panel (one person was from HR) and Brown was the ultimate decision maker.**  See Carr Decl. at ¶ 35 Exh. 9 Brown Tr. p. 45, Exh. 48. (EEO/interview notes)

51.    Brown ultimately selected DiLorenzo for the position, and the remaining candidates, including Plaintiff, were deemed qualified but not the best candidate.  *See* Ex's R, S.

**DISPUTE**

**It is admitted that DiLorenzo was selected for the position, but denied that the Plaintiff wasn't the best candidate**.  **See Response to ¶ 48.**

52.    DiLorenzo has a Bachelor of Architecture from the New York Institute of Technology and a Masters of Business Administration in Corporate Finance from Fordham University. *See* Resume, Ex S.

**OBJECTION.**

**Hearsay FRE, Rule 802, 803 there is no exception to the hearsay rule.**

**DISPUTE**

**Plaintiff was qualified for the job.** See Exh. 44 (resume comparisons); Exh. 45 (Applicant flow Data Report).

53.     DiLorenzo has been with the TA since 1989, beginning as an Assistant Architect, and was promoted a number of times thereafter, eventually into the title of Director of Stations and Facility Programs/Acceptance and Engineering Review, wherein he was responsible for, among other things, developing and administering a comprehensive program for all station component, station renewal and employee facility projects for the 5-year capital program (totaling $1.1 Billion), and later overseeing the rehabilitation of 15,000 station components throughout the TA. Ex S, TA 1698.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**
**See Response to ¶ 52 above.**

54.     DiLorenzo had reported directly to Brown when Brown was a Senior Director in Capital Programs (Ex C at 26-27).

**DISPUTE**

**Plaintiff also reported directly to Marva Brown .** See Exh. 12 at PL0269 (2011 MPR).

55.     When asked why Brown selected Joe DiLorenzo, Brown testified, among other things (Ex C at 26-27).

When I joined -when I was promoted to vice president in capital programs, part of what I wanted to do was take the unit in a different direction. I wanted just to have more technical staff on board, and so when the opportunity came to promote someone into this position, because stations and the infrastructure program area you require some technical expertise. If you're going to make decisions on a program area, I feel that having someone in a technical area makes a lot of sense. So I made certain changes in the unit, and my requirements, what I was looking for, was someone who had a technical background …

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**Objection. Hearsay FRE, Rule 802 and 803, there is no exception to the Hearsay rule. Without waiving the above objections, plaintiff responds:**

**DISPUTE**

**Deny this was reason Plaintiff was denied the promotion.  The above information was not provided to applicants in the job description. The Responsibilities stated in the job posting were:**

**The Senior Director will be primarily responsible for managing and coordinating the planning and development of a comprehensive Capital Program for Tunnel Lighting, Line Structures and Line Equipment from project inception to completion valued at approximately $1 billion for the 5-Year Capital Program. Manage and oversee the Force Account area which involve the development of the TA Labor and EFA estimates for the Department of Subways. Coordinate project budget and scope changes between Subways' Divisions and CPM to ensure the most cost effective and maintainable solutions are implements.  Provide project management and contract interpretation.  Direct the development of major analytical undertakings ad oversee the automation of the Force account process.  Other responsibilities include, directing the utilization of in-house forces to perform capital work, as well a project oversight and planning ranging from monitoring capital budgets to ensuring that Subways' operating requirements and standards are met. Make recommendations for projects in the Small Business mentoring Program and ensuring timely close-outs of projects.**
**Accordingly, Plaintiff was qualified for the described position.**

**Furthermore, on February 3, 2014 Brown met with Plaintiff and ask Plaintiff what will she do if she doesn't get the job. Brown further stated that the job is "not the right fit" for you. I am giving it to Joe DiLorenzo because "your not ready for the next level."  See Exh. 8 Pl Tr. p. 73,  Exh. 2 (AC) ¶21; Exh. 43 (JVN) at PL0219**

56.    Plaintiff does not have a technical background.  Pl. Dep., Ex B at 83:9-10.

**ADMIT**

57.     Brown testified that "the combination of ' Dilorenzo's "experience,

and his technical background, and his interview made him the best candidate for this job."

*(Id.* at 27).

**OBJECTION: Hearsay , FRE 802, 803. There is no exception to the hearsay rule that makes this self-serving statement admissible.**

**DISPUTE**

**DiLorenzo is a younger white man and Brown's statements above are nothing more than pretext. Plaintiff is over 10 years older than DiLorenzo and that is why he was selected.** See Exh. 8 Pl. Tr. pp. 86-87, Exh. 9 Brown Tr. p 22:15-18 compare with pp. 210-213 of the Brown Tr.; Exh. 49 p. TA 3616 and TA 3738; Exh 47 (org charts) at TA 1689

58. Brown testified (Ex C at 37: 7-15):

Q.  Now, you said that you didn't take age into consideration,  why not?

A.  Because it's not something that I judge people on.

Q.  Did you take race into consideration?

A. Absolutely not.

Q.  And what about gender?

A. Absolutely not.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**See Response to ¶ 57 above.**

**X.     PLAINTIFF'S CLAIMS AND TESTIMONY REGARDING THE PMO <u>DECISION</u>**

59.     Plaintiff was informed that she was not selected for the PMO position by

Brown on February 3, 2014 (Ex A, 21; Ex B at 73: 1-7).

**ADMIT**

60.     Plaintiff claims Brown told her words to the effect of: "It's not the right fit for

you" and that she was "not ready for the next level" (PL Dep., Ex B at 73-74).

**DISPUTE**

**Admit that Plaintiff claims Brown made the above statements, and deny that the accusation wasn't true. When asked Brown equivocated about making the above statements, but didn't remember making them.** See Brown Tr. 40:22-41:18

61.     Plaintiff stated that she is using the first promotional decision "to show a

pattern of discrimination because of her age". *See* Pl. Dep., Ex B at 79-81.

> Q. Is the answer that No, it is not a claim, but you are using it as background
> A. It is a claim of pattern that occurs in the Division of Capital Programs.
> Q. And is your claim that you were discriminated against because of your age?
> A. Yes.
> Q. Is that the only reason you believe you were discriminated against?
> A. My race and sex.
> Q. And you believe that in being DISPUTED this promotion, you were discriminated against for all those reasons?
> A. Yes, and there are several reasons why I believe that, and I would –
> Q. Okay let's start with age, okay? On what basis do you believe you were denied this promotion because of your age?
> A. Because Joe DeLorenzo is a white male who is younger than I am.
> Q. Is that the only reason?
> A. Yes, I do believe so.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**Object to the extent that this posed question was a legal question put to the Plaintiff, seeking a legal conclusion. Without waiving these objections:**

### ADMIT

62.    Plaintiff testified that "they [the panel] had to refer several candidates to her [Brown]. I'm not sure how many they referred, and I was not told the way I ranked. But that's what I was told, that "I was one of – one of the top two – one of the top candidates – one of the top two candidates referred to Marva for the position."

**Objection. There are no cites to the record to support this asserted material.**

63.    Plaintiff did not know she was one of Amy Kaufman's, Tim Forker's, or Renalda Goodall's top two candidates. Ex B at 77.

### DISPUTE

**Denied, Plaintiff did know that she was told by Robert Levine that she was one of the top two candidates selected and that Joe DiLorenzo was not one of the two recommended candidates.** Pl. Tr. p. 75:21-76:24

64.    Plaintiff testified "I do believe that Frantz Polycarpe was more qualified than I am for that position." Ex B at 83:1-4.

### ADMIT

65.     Plaintiff testified *(id* at 67):

 A. My belief is that I was qualified for the position.
Q. But do you believe that you were more qualified than him?
A. I -- I haven't managed Joe. I haven't supervised Joe's work. I don't know what his qualifications are. So I -- I know what my qualifications are, and I know I was qualified for that position.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

### ADMIT

66.     Plaintiff testified that she never heard Brown or witnessed Brown say anything derogatory about hers or anyone else's race, gender or age.  Ex B at 83: 15-20.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

### DISPUTE

**Plaintiff's claims in large part are supported by circumstantial evidence, not direct evidence.**  See Exh. 2 (AC) Causes of Action 1 through 11

67.     Plaintiff further testified (Ex B at 94):

Q. Why do you believe you were discriminated against because of your race?
A. Because I have seen a pattern of promotion. There's no one that -- of my age, my gender, my race, whose been promoted to a level of senior Director and as a direct report to Marva Brown.
Q. Even though we just listed a number of older female African-American employees who Marva has promoted?
A. I mentioned two who are close friends with Marva Brown and even in their professional capacity. I am talking about the senior Director title as a direct report to Marva Brown who is African-American, 62 years old, a woman, I have not seen one promoted to that title, man or woman
A. I would correct you. I did not say that I believe she doesn't. I have not seen her promote any African-American female, age 62, and a female. I have not seen that.
Q. Age 62.
A. Sixty-two. I'm sorry.
Q. No, I mean, I believe you said, "Age 62."
A. Sixty-two. Yes
Q. So that's your basis for believing that this was because of your age, race and gender?
A. That is my basis.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**Object to the extent that the material cited above posed a legal question to Plaintiff, seeking a legal conclusion.**

### DISPUTE

**In fact the entire record is bereft of any evidence where Marva Brown has promoted a black woman to be a direct report to her in the Senior Director position.**

XI.   **IS FOLLOWING DILORENZO' S APPOINTMENT, KAUFMAN OBSERVES THAT PLAINTIFF INCREASINGLY HOSTILE TOWARDS HER AND BROWN**

**OBJECTION.  This is an unnumbered statement of fact.**

68.   Kaufman testified that following the appointment of DiLorenzo to the PMO position in around February 2014, Plaintiff became more "hostile" towards her and "openly hostile to Marva Brown". Kaufman Dec. ¶32

**DISPUTE**

**Kaufman did not "testify" but unilaterally submitted a Declaration with subjective opinions.  She was not subject to cross-examination.  On April 12, 2013 Kaufman did the Managerial Performance Review ("MPR") for Plaintiff for the calendar year 2013. On that date she gave Plaintiff an Overall Rating of Excellent. In the skills section she rated her Good in both "Customer Service Skills" and in "Team and Interpersonal Skills."   She commented "Jennifer continues to be an effective leader in the Communications area for DOS Capital Programs.... She takes an active role in the decision-making process for changes to projects as well as prior to implementation of new communication systems."  One month after giving Plaintiff this highly favorable evaluation, Kaufman left the TA. In her Declaration Kaufman discloses that she left the TA for employment with Parsons Brinckerhoff ("Parsons").  Parsons benefits from maintaining a positive relationship with the TA and in particular Defendant Brown's unit.  Parsons reportedly does business directly with Defendant Brown's unit.  In particular Parsons reports that it is involved with the 7 Subway Extensions Project. This project is assigned to Senior Director Perdomo in Defendant Brown's unit.  In addition, Parsons was involved in the Second Avenue Subway and the East Side Access to Grand Central Terminal projects[3]. Kaufman's  current employer Mott MacDonald also obtains  involved with the Transit Authority.  It reports that it too is working on the East Side Access project[4].**

See Exh. 12 p. TA 1025; Kaufman Decl. ¶2.

---

[3] A Google search of the company Parsons Brinckerhoff provides its current projects in the Wikipedia article.
[4] A Google search of the company Mott MacDonald provides its current projects in the Wikipedia article.

69.     Kaufman testified that Plaintiff "refused to put her work and documents on a shared drive on the computer" so that she could have access to them and that she frequently asked other people for information she "should have been getting" from Plaintiff  *Id.*  at ¶34-35.

**DISPUTE**

**See Response to ¶ 68 above.**

70.     Further, Kaufman testified that at her Monday staff meetings, "Jennifer's attitude was very resentful, and other analysts would adopt her attitude." *Id.*  At ¶37.

**DISPUTE**

See Response to ¶68 above. **Furthermore, Earl Jackson has a different memory. He testified that Amy's knowledge of the Communications area was somewhat "vague and uncertain" and that she appeared to understand the bigger picture, but not the details. Earl testified that Jennifer appeared frustrated with Amy's guarded communication style as she would frequently attend meetings with departments in the program area and not keep Jennifer and the team abreast of the actions and items needed to be successful at our work. Jackson testified that he did not "recall Amy holding weekly Monday 'stand up' meetings."** Affidavit of Earl Jackson at ¶¶ 6, 7

71.     Kaufman testified about an incident in March 2014 in which Plaintiff "became enraged" and "yelled" at her that she (Plaintiff) was not consulted directly about vacation days, when those days had been scheduled well in advance and posted on two calendars. Id at 36.

**DISPUTE**

**See Response to ¶68 above.**

72.     In an e-mail relating to this exchange, Ex T, Plaintiff e-mailed Brown, Kaufman's boss, and said "Amy scheduled her vacation five months ago without affording

me the basic common courtesy of providing me with a copy of her vacation schedule and without inquiring if I had plans of my own outside of this office" and "I too have a life outside this office". *See* Ex T.

**ADMIT**

73.     Plaintiff acknowledges that they "clashed" over this incident. See Ex B at 61-62.
**ADMIT**

## XII.  ANONYMOUS COMPLAINT OF AGE DISCRIMINATION IS MADE REGARDING  PMO APPOINTMENT ON APRIL 21, 2014 AND NO REASONABLE CAUSE FINDING

74.     On April 21, 2014, the MTA Office of the Inspector General (MTA OIG) received an anonymous hotline complaint concerning an allegation of age discrimination within Capital Programs, and referred the complaint to EEO for review. Ex U.

**DISPUTE**

**Objection. This anonymous complaint of discrimination has absolutely nothing to do with Plaintiff. Plaintiff write it or call it in. Defendants cannot prove that she did. Thus, all statements regarding this "anonymous complaint should be disregarded by the Court. Furthermore, Defendant's impermissibly attempt to mislead the Court by stating that they (TA EEO Office) investigated the DiLorenzo complained of promotion [as if] the complaint was made by Plaintiff. When in fact, the TA EEO Office never conducted an investigation into DiLorenzo's discriminatory promotion on behalf of Plaintiff.  Moreover, Defendants' didn't disclose this report to counsel in their Rule 26 initial disclosures thus, counsel was unaware that it existed.** See Defendants' Exh. G (no reasonable cause finding)  at page 873, 880 **where the Office of EEO state in their report that "concerning the first non-promotion by Brown to the PMO positon that DiLorenzo was selected for, this hiring decision was the subject of a prior anonymous age discrimination complaint EEO Case #2014-05-02-0009…"** at 873… **"With respect to the first non-promotion, Brown was interviewed by Office of EEO staff on June 9, 2014 in connection with the above-mentioned prior Office of EEO investigation…"** at 880.  **Apparently, the EEO Office submitted to the Court the results of their investigation into the "anonymous complaint" for the results of Plaintiff's formal EEO complaint filed September 23, 2014 which was subsequent to Brown's interview that occurred on June 9, 2014.** See Exh. 15 at PL0141, 0146 (Personnel Actions 5, 6); Exh. 51 (Def's Rule 26 Initial Disclosures).

75.     The TA's Department of EEO handles and resolves internal complaints brought

by employees and applicants who believe that they have been subjected to employment

discrimination and/or retaliation.  See Ex 11, EEO Policies, P/I 1.11.1.[5]

**DISPUTE**

**Although the Defendant TA believes their EEOC is the exclusive Department to handle complaints, their own policy states that an employee also has the right to contact the united states EEOC, the NYS Division of Human Rights.**  See Defendants' Exh V, TA 392.

76.     The anonymous complaint to MTA OIG alleged that in the hiring process for the

PMO position, "other employees of higher director levels" than the selected candidate "were

deemed unqualified for the position." Ex U.

**Objection.  Hearsay, non-authenticated statement and violation of Best Evidence rule: this is a quote within a document and the source of the information (the telephone hotline complaint) has not been provided.  This is a summation in a Defendant created report of information purportedly provided by a third party.  The best evidence is the recording that is exclusively in Defendant TA's possession and is not included with the exhibits.  Without waiving the above-stated objections plaintiff responds:**

**DISPUTE**

**The full statement in Defendant TA's statement reads: "the anonymous complainant alleged that in the hiring process for the position of Director of Station Programming "other employees of higher director levels" than the selected candidate Joseph DiLorenzo, "were deemed unqualified for the position."  The complainant further alleged "a noticeable trend of younger employees receiving promotions when older employees are more qualified for the position and a 'belief' that Mr. Dilorenzo 'was selected for the position because of his age."**  Defendant's Ex U, TA  885 Also, see response to ¶74 above.

77.     Further, the complainant alleged "a  noticeable trend of younger employees

receiving promotions when older employees were more qualified for the position". *Id.*

**Objection. Please see objection and response to ¶74 above.**

---

[5] The TA's Respectful Workplace and EEO policies prohibit discrimination, including race, age, and gender discrimination, and retaliation, or any forms of discriminatory or retaliatory harassment in all phases of employment, including but not limited to hiring and promotions. *See* Ex V. Ex B at 36. There is, *inter alia*, mandatory annual EEO training in this regard for all employees, and bulletins and letters are posted and distributed to employees regarding these policies. *Id.*

.

78.     On June 19, 2014, a Report was issued finding "no reasonable cause" on this

Complaint. Among its conclusions, the Report stated (Id.):

- Brown was interviewed and provided age-neutral, nondiscriminatory business reasons.
- The position was filled in accordance with policies and procedures: the position was posted, 54 applications were collected, and a hiring panel comprised of three senior directors interviewed and rated seven candidates; of four top candidates recommended, the median age was 54;
- The allegation that higher level directors were "deemed unqualified" was refuted by the hiring records
- Review of records included information on thirteen employees who were selected for promotion within the past two years and showed that 62% (8 out of 13) of the promoted employees were forty-five or above; and 38% (5 out of 13) of the promoted employees were age Fifty-two and above.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**See OBJECTION and response to statement response to ¶74 above**

79.   Plaintiff does not discuss this Complaint or the resulting finding in this action.

### DISPUTE

**Objection. By this statement Defendants admit this is not a material fact at issue in the Complaint. Furthermore, Plaintiff did not have privy to this information.  Also, the above material was not disclosed in Defendants' Rule 26 disclosures.**  See Exh. 51 Defendants' initial Rule 26 Disclosures . **Without waiving this Objection, Plaintiff Admits that she did not discuss an anonymous complaint that she did not know about, apparently raising one of the same concerns as she raised in her lawsuit.**

### XIII.   PLAINTIFF APPLIES FOR THE POSITION OF PROGRAM MANAGEMENT & <u>ANALYSIS ("PMA") AFTER KAUFMAN RESIGNS</u>

80.     When Kaufman left the TA in May 2014 for another opportunity, the Program

Management & Analysis position became vacant, and the position was posted (Ex W).

### DISPUTE

**Admit that Kaufman left the TA in May 2014; however, the Program Management & Analysis  position was posted in June, 2014.**  See Exh. 43, PL  000246.

81.     According to the job posting for this position:

The Senior Director is part of a managerial team that is responsible for the overall coordination of the Department of Subways' (DOS) 5-year Capital Program, and ensures that Subways receives an adequate level of funding to rebuild its assets and infrastructure in the most cost-effective manner possible. The Senior Director is also charged with overseeing all analysis for the Communications & Systems, and Elevators & Escalators program areas. He/she works with Infrastructure Capital Construction to maintain the correct balance of staff required for in-house managed construction projects. The Senior Director is the lead person responsible for analyzing, coordinating and prioritizing the Communications & Systems, and Elevators & Escalators capital programs. The incumbent handles preparation and review of budget modification and procurement staff summaries, facilitates the development of Project Profiles, Master Plans including the preparation of Operating Budget impacts, cost benefit analyses and concepts of operation, etc.

### ADMIT

82.     The panel of interviewers for this position included Brown, as Chief Officer, Deborah Chin, Program Manager, Engineering, Communications within Capital Program Management (44 year-old Asian female), and Jennifer Franceschini, Director, Client Services in Human Resources (47 year-old Caucasian female). Ex X; *see* Declarations of Deborah Chin ('Chin Dec.") and Jennifer Franceschini ('Franceschini Dec.).

### DISPUTE

**The Franceschini Decl. was not provided in support of this motion. Defendants admit this was a panel of three (3) selected by defendant Brown, with only defendant Brown and Chin having an active role on the panel.  This process did not have an interview panel making recommendations to defendant Brown.** See Brown Tr. p. 217:6-9

83.     Brown asked Chin to be a part of the interview panel because Chin would be interacting frequently with the selected candidate, and the person needed to be someone she could "communicate with". Ex C at 219:21-25; Chin Dec. ¶ 8-9'

**DISPUTE**

**Admit that Brown asked Chin to be a part of the interview panel for the Senior Director Program Management & Analysis vacancy.  However, there was nothing in the job description that referenced the Capital Program Management ("CPM") Department. Among other Departments that the Senior Director would have significant communications with was the Department of Subways ("DOS") that and other units did not have a representative on the panel.  Defendant brown testified in her deposition that there are at lease five other areas in the TA with frequent communications with Capital Program Management.**  See Exh. 43, PL 0246; Response to ¶ 24 above; Carr Decl. ¶¶15,37-42;  Exh. 9 Brown Tr. pp. 218-219

84.     Ten candidates were interviewed and asked the same questions. See Ex's X, Y.

**DISPUTE**

**Defendant Brown asked Plaintiff one additional question numbered 4 and did not ask other candidates.**  See Exh. 48 (interview notes), TA 996.

85.     Plaintiff applied for this position, was deemed qualified, and interviewed for this position on or about July 30, 2014. Ex A ¶ 25.

**ADMIT**

**XIV.   THE INTERVIEW PANELISTS RANK DAVID CHAN AS THEIR FIRST CHOICE**

**OBJECTION. This is an unnumbered fact assertion.**

86.   According to Brown, Chin and Franceschini, there was a consensus on the top two candidates - Chan and another candidate who worked at Metro North, Steven Brusca - but Chan came out on top.   Ex G (TA 878-881); Chin Dec. ¶29-30; Franceschini Dec. ¶ 16.

**DISPUTE**

**The Franceschini Decl. was not provided in support of this motion. This is according to defendant Brown. This was the interview panel of three panelist (including Brown) selected by defendant Brown. It was essentially a self-serving interview panel.**

87.   Chan majored in Electronic Engineering at DeVry Technical Institute, has a

Bachelor of Science in Electrical Engineering from Pratt Institute, and a Masters in Business

Administration (Banking & Finance) at Dowling College. See Ex's N. Y.


88.   Chan has been with the TA since 1987, beginning as an Associate Engineering

Tech II, and was promoted thereafter a number of times. Id.

**OBJECTION.**

**Hearsay FRE, Rule 802, 803 there is no exception to the hearsay rule.**

**DISPUTE**

**Plaintiff was qualified for the job.** See Exh. 44 (resume comparisons); Exh. 45 (Applicant

flow Data Report).


89.   In October 2004, he was promoted into the title of Director of Capital Budget, in

the Division of Operations Support, Administration & Finance (Car Equipment), where he was

responsible for managing the overall development, control and reporting  of Car Equipment's

Capital Budget and 5-year Capital Program. *Id.*

**DISPUTE**

**Plaintiff was qualified for the job.** See Exh. 44 (resume comparisons); Exh. 45 (Applicant

flow Data Report).

90.   Brown stated that Chan's experience in Car Equipment was "relevant" experience

for the PMA position. See Ex C at 73.

**DISPUTE**

**Plaintiff has direct experience as Director of Communications.**  Carr Decl. ¶¶2-7; Exh. 44.


91.   Franceschini recalls Chan performing very well at his interview, as did Chin.

Franceschini Dec. ¶13-14; Chin Dec. at  20; see also Ex G (TA 878-881).

**DISPUTE**

**The Fraceschini Decl. was not provided in support of this motion.**

92.     Regarding Plaintiff s interview, Chin said Plaintiff came in with "a sense of entitlement to the job" and proclaimed things like "I do everything by myself without help, without guidance." Chin Dec. ¶17-18. Ex G.

**DISPUTED**

**This is the subjective statement of what Chin said in her Declaration, but this is not included in Chin's contemporaneous panel interview notes of plaintiff's responses, nor is it included in the notes of any other panel member.** Carr Decl. ¶¶36, 42-45; Exh 48, (interview notes) TA 996-998.

93.     Franceschini testified that Plaintiff lacked "enthusiasm" during the interview and that her interview was "average". *See* Franceschini Dec. ¶15; *see* Ex G.

**DISPUTE**

**The Franceschini Decl. was not provided in support of their motion.**

94.     Further, Chin had daily contact with Plaintiff for about two years given the close working relationship of Capital Programs and Capital Program Management. Chin Dec. 13; Pl. Dep., Ex B at 105-106.Ex G.

**DISPUTE**

**Objection. No time frame is given.**

95.     Chin testified that there were negative elements of Plaintiff's work style, including "pitting departments against each other as opposed to facilitating between departments (operating and capital side)." Chin Dec. ¶24. *See* Ex G.

**DISPUTE**

**Chin did not "testify" but unilaterally submitted a Declaration.  She was not subject to cross-examination.  Chin did not state this prior to her 2019 post litigation statement.  She did not make, pre-interview panel, any complaints at the relevant time while working with Plaintiff.** See Carr Decl. ¶¶  36, 39-45.

96.    Chin did not believe, based on her work-related experience with Plaintiff, that Plaintiff had the right "temperament for the job "or that they "would work well together". *Id.  ¶26*.

## DISPUTE

**Objection. This is an improper lay opinion.** FRE 701

**Chin did not state this prior to her 2019 post litigation statement.  She did not make, pre-interview panel, any complaints at the relevant time while working with Plaintiff. Furthermore, Apparently, Chin was an improper person to have sit on the PMA interview panel separate and apart from the fact that she is not a member of DOS or Capital Programs, by Chin's own admission she has a bias toward Plaintiff because of "negative elements of Plaintiff's work style, including 'pitting departments against each other' as opposed to facilitating between departments."** See response to ¶ 95 above.

## XV.    BROWN SELECTS DAVID CHAN BECAUSE HE WAS THE BEST CANDIDATE <u>FOR THE JOB</u>

97.    Brown ultimately selected Chan for the PMA position, and 6 of the other candidates, including Plaintiff, were deemed "qualified", but not the best candidates for the job. Ex Y.

## DISPUTED

**Chan was selected because he was a younger non-black male, not because he was the best candidate for the job.** Exh 49 (names and DOB). TA 3616, TA 3712.

34

98.     Brown testified that "the combination of his [Chan's] interview, his resume, and the references that I got from him made him the best candidate for the position"(Ex C at 28: 3-25; 29:1-20; 20-25).

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."… Without waiving the above objections, Plaintiff responds:**

### DISPUTE

**Deny this was the reason Plaintiff was denied the promotion.** See Exh.2  (AC ) at  ¶¶ 26-31

99.     Further, in selecting Chan, Brown explained that there "are lots of technical aspects in the area" and having someone who "has an electrical background, who would be able to understand drawings, who would be able to understand, you know, specifications of an electrical program area" and "someone who can speak the same language as – as the engineers in the engineering department" was "important" to her. Ex C at 28-29.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

### DISPUTED

**The above technical aspect statement was not information of a requirement that was provided to prospective job applicants in the Job Description/Responsibilities Section of the Job Vacancy Notice ("JVN"). Accordingly, Brown's above statement is nothing more than pretext for discrimination, because otherwise, the TA Human Resources Department would have to go through another process to re-hay the PMA position (to a higher Hay grade) if Brown was is in fact requiring that the job be filled by an engineer. For Example, Amy Kaufman was not an engineer. Further, Brown didn't write this technical aspect in her hiring justification memo for Chan.  Also, none of the candidates was ask any questions relating to their technical/engineering backgrounds.**  See Exh 2 (AC at ¶¶ 26-31); Exh. 43, PL00098; Exh. 46; Exh. 48 (notes of interviews) at TA 985-end.

100.     Brown told EEO during the course of the investigation into this hiring decision,

that Chan's technical background would complement her and other skillsets in her department

and that he could work "well and smoothly" with Chin and her group.  Ex G, TA 880.

### DISPUTE

**Although EEO made those notes of Brown's statement at the bottom of the cited page,
Defendants omit the fourth full paragraph that states "In terms of making the hiring
decision, Brown was looking for someone who had very good analytical skills, understood
capital budget processes; had good people skills to interact well with multiple groups
(Capital Program Management, user groups and Capital Planning and Budget). In
addition, since the position was in the communications area, someone with technical
knowledge who could understand customer needs and environment was desirable."  See**
Defendants' Ex G, TA 880.  **Jennifer has been doing all of these job duties and
responsibilities since at least 2011 if not earlier, when the Director Communications job
was re-hayed by Brown.  See for example,** Exh. 12 (MPR's) at PL 0269 Plaintiff rated
Excellent overall and Excellent in Customer Service Skills; TA 1026 Plaintiff rated Excellent
overall and Excellent at Budget Control; TA 1025 where Plaintiff was rated Excellent overall
and Excellent in Problem Solving and Decision Making, **just to name a few categories.
Thus, Plaintiff  possessed the skill sets that Brown desired and she had an added
advantage over other candidates, including Chan in that she had been doing the
Communications job as senior manager since prior to 2010.  Furthermore, compare
Plaintiff's performance evaluations with David Chan's. The result shows that Plaintiff is
as qualified, if not more qualified than David Chan and she has the experience doing the
job. Chan's MPR isn't even signed. Defendants' could only produce this one Chan (self-
written 2011 MPR) that the authenticity of the document is questionable at best. See also,**
Affidavit of Donald Tsang ¶¶ 4-7; Carr Decl. ¶ 3,  Exh. 41, (consolidation of Director of
Communications with the Senior Directors job); Exh. 46 (Chan 2011 unsigned MPR) at p.
3800

101.      She also told EEO that she did not think Plaintiff was ready to make the

transition to senior director given: how she handles her current functions; her people skills

"fall short"; she did not always interact well with Chin, with whom she would have to interact

almost exclusively; and, although about ten years ago when she came into the department

Brown recommended to her that she get to know other areas in the department, she stayed to

herself and never connect with peers or tried to understand the rest of the organization (Ex G

TA 881).

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**See response to ¶¶ 99, 100 above.**

102.     Brown did not question that Jennifer was "qualified", but explained that

"tenure in a position is not the driving force for a promotion" and that "there are people who

have been in positions for multiple years who have never made that transition for one reason

or another." (Ex C at 181:16-25; 182: 1-10)

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**See response to ¶¶ 99, 100 above.**

## XVI.    PLAINTIFF'S CLAIMS/TESIMONY CONCERNING THE PMA DECISION

103.     Plaintiff testified: (Ex B at 117-121):

Q. Do you know if David Chan was qualified for the job?
A. I do not know that, but based on the job posting, I know that I was qualified for the job.
                                        ***
Q. So my question is not whether you were qualified, but do you believe that you were more qualified than David?
A. I believe that I have been doing the job managing the overall responsibilities of the Communications area with excellent evaluation. I have never been told that I was not doing a good job, and as a result, yes, I do.
Q. But you've stated that you weren't aware of David's background and experience and work performance; is that right?
A. I stated that I do know that David Chan had not managed the overall responsibilities of the Communications area in the Division of Capital Programs in the Department of

Subways.

Q. So on what basis are you challenging - you stated, I believe -- let me just ask the question again. And apologize if it was answered already. On what basis are you challenging this decision as unlawful?

A. I am challenging the decision to hire David Chan in that position because I have the experience, the records, the evaluations, performance evaluations in managing the Communications area.

Q. And is there any other reason that you're challenging this decision?

A. I believe I answered that question. That David Chan is an Asian male younger than I am.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**See response to ¶¶ 99, 100 above.**

## XVII.   COMPOSITION IN BROWN'S GROUP

104.    Since Brown's appointment as Vice President, who between August 2010- early 2018 oversaw between approximately 32 to 38 budgeted positions each year (Ex 0), she has either appointed, re-appointed, promoted, or helped obtain salary increases for approximately 14 African-American employees, approximately 16 employees 50+, five (5) listed as 60+, and approximately 33 female employees, including Plaintiff herself. *See* Franceschini Dec., Ex Z (report generated by TA business service center based on People Soft records listing promotions/appointments/re-hires/lateral transfers since Brown's appointment as Acting Vice President & Chief Officer in August 11, 2010 until January 31, 2018).

**Objection. The Franceschini Decl. was not provided in support of Defendants' motion.**

**Objection. FRE 802. Defendants' Ex Z is hearsay that was not produced for anyone's deposition.**

105.     Among others, Brown obtained a re-hay and salary increase for Titus Byaruhanga, an African-American, born in 1952 (66 year-old male) from a Director into a Senior Director role in 2013. *See* Ex Z.

**ADMIT**

106.     Subsequently, in 2016, Brown advanced Mr. Byaruhanga into his current position of Assistant Chief. *See* Ex C at 193-194; *See* Ex Z.

**DISPUTE**

**Objection. This is a subsequent remedial action and is inadmissible pursuant to** FRE 407

**Brown advanced Byaruhanga only after she learned that she was the subject of a discrimination complaint. Further, the above cited material is not the testimony that Brown offered at the deposition. Furthermore, Brown contradicts her testimony. Compare Brown's testimony at** Exh. 9 Brown Tr. pp. 193-194 **above (Titus went through a competitive interview process for Senior Director) with her testimony at** page 102**. Brown testified there that Titus became Senior Director through a re-hay process that didn't involve a competitive interview process.**

107.     Among others, Brown has promoted Wanda Minton (born 1955), a 63-year old Hispanic woman in 2013, and in 2016 into current title of "Manager" and as her direct report. *Id.* Ex C at 197.

**DISPUTE**

**Objection. This is a subsequent remedial action and is inadmissible pursuant to** FRE 407 **According to the statement above and Brown's testimony, Wanda Minton would have been promoted from secretary to confidential secretary, a non-managerial title in 2013 and in 2016, subsequent to Plaintiff's complaint of discrimination, Brown promoted Minton again to office manager, a low level managerial position.** Exh. 9 Brown Tr. p. 196

108.     Among others, Brown has promoted Renee Jackson, a 58-year-old African-American female, from an Analyst position to a Director position in 2016. *Id.*   Ex C at 197-198.

**DISPUTE**

**Objection. This is a subsequent remedial action and is inadmissible pursuant to** FRE 407

**In any case, Renee Jackson was not promoted to the Senior Director position.** Exh. 9 Brown Tr. pp 197-198.

## XVIII.     BROWN NOTIFIES PLAINTIFF THAT SHE WAS NOT SELECTED FOR THE PMA POSITION, AND RECOMMENDS HER FOR A LEADERSHIP INSTITUTE PROGRAM

109.     Brown told Plaintiff she was not selected for the PMA position on or about August 20, 2014, and said words to the effect of "I want to take Communications in another direction." Ex A; *see* Ex C at 72:1-7.

**DISPUTE**

**This was a pretext statement made by Brown and used as an excuse and justification for not promoting Plaintiff into the Senior Director Communications position.  For e.g., there were no interview questions ask of the candidates that are indicative of a new technical direction.**  See Exh. 48 (interview notes beginning at TA 987-TA 1013. **Furthermore, Brown testified in sum and substance that Chan doesn't use his electrical engineering background, but he has an engineering degree, he has academic preparation, but he's not a licensed engineer and he doesn't sign off on drawings.** Exh. 9 Brown Tr. pp 244-245.

110.     Plaintiff responded that she was going to Brown's boss Joe Leader (Senior Vice President, Department of Subways), and requesting a transfer.  *See* Ex A 29; Ex B at 74:1.

**DISPUTE**

**The above material is not what Plaintiff testified to. Plaintiff went to meet SVP Joe Leader the following day August 21, 2014, but there is no evidence that Plaintiff told Brown when she was going to meet SVP Joe Leader.**  See Exh. 2 (AC) ¶29

111.   Brown testified that she may have had a conversation with Jennifer afterwards, wherein she "instructed her about the policy and the procedure. If you're unhappy with a promotional decision, going to my boss is not going to change my mind." Ex C at 75.

**DISPUTE**

**At their follow up meeting on or about August 21, 2014, after Plaintiff met with SVP Joe Leader, Brown in addition to the above material, also reprimanded Plaintiff by telling her "I told you not to go to my boss."** Exh. 2 (AC) ¶30

112.   On August 20, 2014, that same day she notified Plaintiff about this decision, Brown recommended Plaintiff for a Leadership Institute Program. *See* Ex AA; Ex B at 116-117.

**DISPUTE**

**True. Brown recommended Plaintiff for the NYC Leadership Institute to appease Plaintiff for not getting the promotion. Brown's recommendation however, came one day before she learned that Plaintiff had gone to her boss. On or about August 21, 2014, after Brown learned that Plaintiff had met with Joe Leader to complain about not being promoted, Brown scolded Plaintiff by telling her, "I told you not to go to my boss." Brown testified about the New York City Leadership Institute; she admitted that she recommended Plaintiff to attend, she admitted that she thought very highly of Plaintiff's professional skills, she admitted that she signed Leadership application on August 20, 2014 and that what she wrote in her application recommendation for Plaintiff was absolutely true, but that she would not do it again today. Exh. 2 ¶30; Exh. 11(Leadership Institute) at PL0880; Exh. 9 Brown Tr. pp. 275-279. Here, Plaintiff highlights the animus that Brown must have had for her back on August 21, 2014 when she first learned that Plaintiff complained to her boss Joe Leader and apparently, Brown still feels the animus today, the same as she felt back on August 21, 2014.**

113.    Brown also told Plaintiff that they should work on a development plan for her, but Plaintiff did not want any part of it and told her she did not want to work there anymore. Ex G, TA 881.

**DISPUTE**

**See response to ¶ 112 above.**

114.    Brown testified that when the Leadership Institute Program ends, there is a presentation that's made where the manager who was recommended invites their boss to come and to be recognized, "but that was not offered by Jennifer" (Ex C at 280-81).

**DISPUTE**

**See response to ¶ 112 above.  Also, Plaintiff received a presentation for completion of the Leadership Institute Program.  The Leadership Institute Program brochure and application do not state a provision for the recommended person to invite their boss to come and be recognized.**  See Exh.  11

115.    While the PMA position was vacant, between May and October, Plaintiff reported directly to Brown.  *Id.* at 131:1-2.

**DISPUTE**

**The above material mischaracterizes what Brown testified to.  Brown said that when Amy Kaufman left for a brief period, Plaintiff reported directly to her.**  Brown Tr. 130:22-131:12.

**XIX.    PLAINTIFF'S SEPTEMBER 29, 2014 COMPLAINT TO EEO & DIVERSITY**

116.    On or about September 29, 2014, Plaintiff raised complaints against Brown with the EEO and a formal complaint was filed on September 29, 2014.  *See* Ex F.

**DISPUTE**

42

**Plaintiff raised her EEO complaint on September 3, 2014 and then again on September 23, 2014.**  See Exh. 15, TA 763, PL000141.

117.    In her EEO complaint, Plaintiff alleged that Brown discriminated against her based on race, color, ethnicity and gender when Brown offered the positions to "younger males". *Id.*

### DISPUTE

**Plaintiff stated in her EEO complaint dated September 23, 2014 that her claim was that Marva Brown has administered MTA NYC Transit's Personnel policies in a discriminatory manner in violation of Policy/Instruction No. 1.15.3. Plaintiff further complained of denial of promotional opportunities, acts of intimidation, harassment, and bias treatment in the workplace has adversely affected her opportunity for advancement…**Exh. 15 (EEO Compl.) at PL0141

118.    Records show that Brown was notified on or about September 29, 2014 that Plaintiff had an appointment with EEO and was interviewed about the complaint on February 24, 2015 (Ex G), though she does not recall exactly when she learned the details. Ex C at 120-121.

### DISPUTE

**Admit that Brown was interviewed with respect to the second promotion denial (Chan) on February 24, 2015, some six (6) months after Plaintiff had complained about discrimination. Deny that an investigation was ever conducted into first promotion denial that Plaintiff complained about that was given to Joe DiLorenzo.  Defendants' impermissibly attempt to attribute their EEO investigation into an [anonymous] claim as if the claim emanated from Plaintiff which it did not.** See Defendants' Ex. G at TA 880

119.    Plaintiff asked EEO if Chan would still be appointed based on the filing of her complaint of discrimination, and was informed that they do not "routinely stop hires or promotions that are the subject of allegations of discrimination." *See* Ex CC.

43

**DISPUTE**

**The proper procedure was not followed by SVP Joe Leader who should have informed the EEO Office on or about August 21, 2014 when he learned of the incident.** See Resp. to ¶ 125 below.

## XX.   CHAN INTRODUCES HIMSELF TO PLAINTIFF ON OR ABOUT SEPTEMBER 8, 2014, AND PLAINTIFF SAYS "DON'T WORRY I WON'T BE HERE WHEN YOU GET HERE"

120.      On or about September 8, 2014, following a meeting at which Chan and Plaintiff were present, Chan introduced himself to her as her new boss. Ex B at 134-13.

**ADMIT**

121.      Plaintiff said Chan told her that he was "impressed by the way I handled the meeting and how well I know Communications issues and hope that we can work together in the future." Pl. Dep., Ex B at 135:1-11; *see also* Ex F, PL000147.

**ADMIT**

122.      Plaintiff said she was "shocked" and said, among other things: "Don't worry won't be here when you get here" (Ex B at 136, L1-3; Ex D at 17: 6-21).

**DISPUTE**

**The only reason Plaintiff testified that she was a little "shocked" is because Marva didn't tell her that she had hired David Chan and Plaintiff had never met him prior to that conversation. Plaintiff also said that she told David about her years in the Communications area and how hard she worked. Plaintiff further testified that she mentioned how excited she was that her daughter had gotten accepted into Harvard Business School.** Exh. 8 Pl. Tr. 135:12-23

123.      Regarding this conversation, Chan testified that he was "taken aback" in an "unpleasant" kind of way and was "kind of shocked." Ex D at 18:11-17.

**DISPUTE**

**See Response to ¶ 122 above.**

124.    Chan was appointed to the position effective October 13, 2014.  Ex N.

**ADMIT**

**XXL.    PLAINTIFF CONTINUES TO SEEK A TRANSFER OUT OF HER
DIVISION AND CORRESPONDS WITH EEO**

125.    On September 18, 2014, Plaintiff met with Subways Vice President,

Operations Support, Sally Librera and Labor Relations representative Evette Vargas,

seeking a lateral move out of her division. *See* Pl. Dep., Ex B at 127-128.

**DISPUTE**

**Admit that this meeting occurred September 18, 2014, but deny that it should have
occurred at all.  The NYCTA Labor Relations Department hereinafter ("LR") is not
tasked with the responsibility to discuss, investigate and resolve EEO/discrimination
complaints and matters directly relating to those types of complaints. In other words, it's
not the LR's mission to discuss and resolve Plaintiff's transfer request because they are
not the Office of EEO and there is no mention that LR discussed the matter with the EEO
Office.  When Plaintiff met with SVP Joe Leader and discussed that she was passed over
for promotion based on unfair promotion practices and requested a reassignment out of
the Capital Programs Division Mr. Leader should have taken the matter to the EEO
Office immediately and not referred the matter to LR.  Had Mr. Leader followed the TA
Policy Instructions on EEO and Respectful Workplace, Plaintiff may not have had to
suffer the hostile work environment that she now suffers.  See for e.g., NYCTA EEO
Policy Instruction ("PI") states at** Defendants' Exhibit V at page TA 389 EEO Policy
Instructions 4.6, 5.2 and 5.3 instruct in sum and substance that all managers and supervisors
have a duty to take appropriate action to promote a positive workplace that is free of unlawful
discrimination and harassment.  Managers and supervisors must respond to employee
expressions of concern about perceived discriminatory treatment…Managers and supervisors
must notify the Office of EEO of all complaints of discrimination as soon as they become aware
of such complaints. PI 5.3.3 instructs that the complainant should be interviewed by the
manager or supervisor to get the relevant facts, including what happened, who was involved,
when did the incident take place, where did it take place and were there witnesses…PI 6.2.2
instructs that managers and supervisors are reminded that an employee's right to file a
complaint is guaranteed and must be exercised freely without retaliation, penalty, or any
resulting adverse difference in treatment…**Accordingly, SVP Joe Leader took the wrong
course of action when he referred Plaintiff to Labor Relations.  Apparently, he ignored the
EEO Policy Instructions.  Mr. Leader should have interviewed Plaintiff first, ascertained
the relevant facts of Plaintiff's statement of being passed over for promotion and wanting
a transfer out. If Leader had followed the instruction he would have learned that Marva**

**Brown was involved as the negative decision maker and that Debbie Chin, somebody who is not even in the Department of Subways, was on what was essentially a two person panel with the third person being an HR representative who is supposed to be present to ensure that proper procedures are followed. Thus, the two decision makers were Brown and Chin, but Brown was the ultimate decision maker. Certainly, those facts should have raised concerns about the promotion selection process with Mr. Leader. Because that course of action was not taken by Mr. Leader, Plaintiff's immediate supervisor Marva Brown was free to take her hostility out on Plaintiff for having gone to meet with Mr. Leader to discuss what she perceived as unfair promotion practices and request a reassignment.** Exh. 8 Pl. Tr. p. 126; Exh. 9 Brown Tr. p. 70

126.    Plaintiff was told that she has to go through the application process. *Id.*

**DISPUTE**

**See response to ¶125 above.**

127.    In an e-mail dated October 15, 2014, to EEO, Plaintiff complained that Brown's introduction of Chan, along with her allegation that Brown has not spoken with her personally about the selection of Mr. Chan, was "retaliation" for filing her EEO complaint and requesting a lateral transfer from Joe Leader. *See* Ex CC.

**DISPUTE**

**The truth of the matter is that Marva Brown developed an animus against Plaintiff the moment she learned that Plaintiff had gone to meet with her supervisor Joe Leader to discuss discrimination in the promotion process, or as Plaintiff put it "unfair hiring and promotional practices by Marva Brown"** See Carr Decl. ¶20 See Exh. 2 (Amended Complaint) at ¶30. Exh. 5 ¶ 11 (admission that Brown told Plaintiff that she was not getting promoted on August 20, 2014).

128.    Plaintiff also stated: "I am working in this environment that I believe could only get worst [SIC], I feel isolated and I am not sure how long I can continue to work in this environment." *Id.*

**ADMIT**

129.    Plaintiff testified (Pl. Dep., Ex B at 137:4-12):

A. I have been running the Communications area for a long time. Marva told me she hired a person from outside. Marva had never called me into a meeting to let me know who she had hired. I cannot recall where she disclosed to me that I would be reporting to David Chan and that she had hired David Chan. And I felt that

created a sense of hostility because I don't believe that that has been ever been done with anyone else.

**DISPUTE**

**Brown told Plaintiff that she was promoting Chan on August 20, 2014 and Plaintiff went to meet with Joe Leader on August 21, 2014.** Exh. 2 (Amended Complaint) ¶¶ 26, 29

## XXII.  CHAN AND KAUFMAN'S DISCUSSION ABOUT PLAINTIFF'S UNCOOPERATIVENESS

130.    Chan and Kaufman had a number of conversations following Chan's assignment about the duties and responsibilities of the position Chan took over.  Kaufman Dec. 40. *See also,* Ex. D at 22:4-7; 75-76.

**DISPUTE**

**Admit that is what Amy Kaufman wrote in her Declaration, but DISPUTE the truth of the matter.  Amy Kaufman has serious credibility issues that must be sorted out by a jury. For example, but not the only example of Amy Kaufman's incredulity is where she rated Plaintiff's job performance as excellent in Plaintiff's 2013 MPR. It is probable that Kaufman also rated Plaintiff's performance as excellent in 2012 as well because she was promoted to Senior Director in or about July 2012.  In the 2013 MPR Summary Comments section Kaufman wrote that "Jennifer continues to be an effective leader of the Communications area for DOS Capital Programs. With several competing presidential initiatives in the current and upcoming programs, Jennifer is instrumental in the development of comprehensive operating /maintenance budget impacts. She and her staff track the communications program with diligence and attention to detail. She takes an active role in the decision-making process for changes to projects as well as prior to implementation of new communications systems." If we compare Plaintiff's 2012 Excellent MPR with Kaufman's 2013 Excellent rating of Plaintiff's performance we will discover that the two MPR's are almost identical, strongly indicating that Kaufman wrote them both.** See Pl. Tr. Exh. 8 p. 69; Exh. 12 at TA 1025 and 1026.  **Accordingly, it appears that Kaufman's opinion of Plaintiff changed because of outside considerations, not Plaintiff's job performance.  Plaintiff and Kaufman had a heated argument over vacation leave. By Kaufman's own words Jennifer became "enraged and yelled" at her because Kaufman didn't tell Plaintiff that she was taking certain days off for vacation. Thus, it's clear that Kaufman harbors animus against Plaintiff for their discord over vacation.**  Kaufman Decl. at ¶ 36; **Plaintiff testified that generally her and Kaufman's working relationship was good, but there was a time when their vacation schedules clashed. Brown has a policy that no two managers should be out on vacation at the same time. When the senior director is out on vacation the director has to cover. That's how it works. There was an incident where Plaintiff requested vacation and Kaufman denied it because she wanted to be out on vacation. Plaintiff went to Brown because she thought it was not fair to be denied vacation because she didn't take a lot of vacation. Furthermore Kaufman worked for Parsons Brinckerhoff when she resigned from the TA. A simple**

**Google search shows that Parsons Brinckerhoff contracts with NYCTA to do engineering work on the new Second Avenue Subway and Kaufman currently works at Mott McDonald who similarly is in the transportation engineering business and does business with the TA. Accordingly, Kaufman may have an economic interest in the outcome of this case.** See Kaufman Decl. at ¶2; Pl Tr. Exh. 8 pp. 58-62 Furthermore, Kaufman has a bias in favor of Brown because Brown is the person who hired her. Kaufman speaks very highly of Brown saying among other praises "that Marva is awesome" and that she "would work for her in a second." See Exh. 48 at TA 923.

131.    Chan told Kaufman Plaintiff was "less than cordial" with him, and that he was having difficulty communicating with her and getting information from her. *Id.* 41.

**DISPUTE**

**Please see response to ¶130 above.**

132.    He told Kaufman that Plaintiff would forward him e-mails without providing any background or context, often catching him off guard, and that Plaintiff would leave staff summaries on his desk, without having assigned buckslip writing or follow-up research to the analyst reporting to her. *Id.* 41, 42.

**DISPUTE**

**Please see response to ¶130 above.**

133.    Chan told Kaufman that when he would ask Plaintiff to handle the processing of the staff summary, Plaintiff would reply "'well what should I do? You're the boss'", "despite being responsible for the same work for the past several years." *Id.* ¶43.

**DISPUTE**

**Please see response to ¶130 above.**

134.    Kaufman told Chan that that she was "not surprised", and that Plaintiff had become progressively "uncooperative" with her in 2014. *Id.* ¶44

**DISPUTE**

**Please see response to ¶130 above.**

### XXIII.  PLAINTIFF FORWARDS WORK-RELATED E-MAILS BY CHAN TO EEO AND SAYS THEY ARE RETALIATION FOR GOING TO JOE LEADER AND FILING HER SEPTEMBER 2014 COMPLAINT, IN <u>VIOLATION OF RESPECTFUL WORKPLACE POLICIES</u>

135.   In or around February 2015, Plaintiff began forwarding e-mails to EEO

claiming that Chan's e-mails were "retaliation" for filing her September 2014 complaint and in

violation of the TA's Respectful Workplace Violence Policies. *See* Ex EE.

**DISPUTE**

**The NYCTA EEO Office is not an independent enforcement agency and all NYCTA-EEO employees are on the TA payroll.  As such, EEO Investigators Carolyn Kumah and Antonio Seda had an interest and bias in the outcome of the investigation in favor of their employer. Thus, it wasn't in their employment interest to objectively or subjectively see what was there to be seen and ascertain that a retaliatory hostile work environment was being created by David Chan in addition to the violation of the TA's Respectful Workplace Policies.  Otherwise, the EEO Office should have gotten involved in the investigation of Plaintiff's complaint on or about August 21, 2014 when SVP Joe Leader should have reported Plaintiff's complaint of discrimination in the promotion process to them.**  See generally, Defendants' Exh. G and response to ¶125 above.

136.   However, Plaintiff does not know whether Chan was informed about the

EEO complaint against Brown, and neither Plaintiff nor Brown ever discussed such

complaint with Chan, nor was Chan a witness or part of EEO's investigation (Ex D 14-

16; 162:15-25; *see generally,* Ex G).

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**Plaintiff has reason to know and believe that Chan was informed about the EEO complaint against Marva Brown because of the circumstances that Plaintiff's EEO complaint would have caused Brown to have animosity against Plaintiff for filing it. Because Chan was Brown's chosen candidate to get the promotion to Senior Director Communications it is reasonable to believe that Brown told her direct report about the EEO case.** See Exh. 46 Brown's Hiring Justification Letter for Chan.  **Chan was informed that he was the chosen candidate in August 2014 and began to work in the Communications Program area part time in October 2014** See Chan Tr. Exh. 10 p.11. Pl. Decl. ¶18. **On August 20, 2014 Brown told Plaintiff that she "decided to bring a person from outside" to fill the position**

49

**because Plaintiff "was not ready for the next level." Marva Brown first knew that Plaintiff was dissatisfied with the Chan promotion and she was told of Plaintiff's EEO Complaint against her on September 29, 2014 by EEO Investigator Antonio Seda during a telephone call. Furthermore, Brown testified that she was aware that Plaintiff had filed an internal EEO complaint against her and an external EEOC Charge of Discrimination.** See EEO Activity Log, handwritten notes Exh. 15 TA763, 851, 856. Also see Plaintiff's Personnel Action #7 Exh. 15 PL0147; Exh. 9 Brown Tr. pp. 114, 125. **Compare Brown's later testimony on the subject where she testified that she knew of the internal charge, but not the external charge of discrimination.** Brown Tr. Id. at pp 184-85.

137.   As examples, Plaintiff said Chan "talks down" to her, said things like "Come see me" rather than, "Can you come and see me please?" and that she felt his "tone" was disrespectful. Ex EE.

**DISPUTE**

**Plaintiff said a lot more than the above statements. Indeed, Chan was disrespectful to Plaintiff and he began to harass Plaintiff by first taking away her analyst support while at the same time demeaning her with his degrading emails. For Example Plaintiff testified that in 2015 after she had filed her internal EEO complaint and her external EEOC complaint Chan and Brown assigned her several task which were unrealistic because prior to March 2015 Plaintiff had up to three analyst reporting to her to assist her in her responsibilities and tasks. The analyst were Earl Jackson AA male, Jacqueline Woodley AA female and Andeley Grand Paul. Jacqueline reported to Plaintiff in 2011, 2012 she applied and got promoted to another job in a different area of Capital Programs. They were all analyst, Andeley Grand Paul reported to Plaintiff in or about 2012.** Pl. Tr. Exh. 8 pp 47-48. See also, Plaintiff's Declaration at ¶¶ 17-19, 21. **Furthermore, Chan began to send disrespectful emails to Plaintiff that are numerous soon after he after he became Senior Director Communications.** See generally, Exh. 23 which are examples of Chan and Brown's hostile, disrespectful and pressurized work environment that they created for Plaintiff. Also see Affidavit of Earl Jackson ¶¶ 9-12

138.   EEO explained that the concerns she raised did not establish a potential violation of the TA's EEO policies but may relate to the TA's Respectful Workplace policies, and could be handled by someone in her Department, and did not have to be Brown. *Id*

**DISPUTE**

See responses to 135-137 above.

139.   While Plaintiff appeared to have sent an e-mail to Senior Vice President, Subways, Joseph Leader about these concerns on one occasion, she testified that she did not

follow up with him or Human Resources or Labor Relations, nor did she speak with Brown.  *See*

Ex EE (TA 659); Pl's Dep., Ex B at 143-144.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

      **DISPUTE**

**Plaintiff met with Joe Leader, Senior Vice President Department of Subways and Marva Brown's direct supervisor on August 21, 2014 to complaint that she had been passed over for the Senior Director Communications promotion and to request a transfer out of the Capital Programs Division.  Plaintiff met with Mr. Leader in person and he referred Plaintiff to Sally Librera at the TA Labor Relations Department. Plaintiff attended a meeting scheduled by Labor Relations on September 18, 2014 with Sally Librera and Evette Vargas.** See Pl's Declaration ¶20.  See also, Exh. 6 (Defendants Response to Supplemental Admissions)  ¶¶ 8, 15; and Pl's Exh. 14, (May 27, 2015 Memorandum to Senior Vice President Joseph Leader); Pl. Tr. Exh. 8 pp. 125-126. **Librera and Vargas told Plaintiff that it's not Transit's policy to reassign people. Accordingly, "nothing happened" after Plaintiff met with Librera and Vargas as referred by Joe Leader. Furthermore, Plaintiff was reprimanded by Brown because Plaintiff complained to Brown's supervisor (Joe Leader). Brown said to JBC "I told you not to go to my boss."** See Pl. Tr. Exh. 8 pp. 127-130. This was the first overt sign that Brown had developed animosity against Plaintiff for going to her supervisor Joe Leader to complain about being passed over for promotion.

## XXIV.  ON APRIL 24, 2015,  EEO ISSUES A "NO REASONABLE CAUSE" <u>FINDING</u>

      140.    After a full investigation of Plaintiff s September 29, 2014 Complaint, on April 24, 2015, EEO issued a "No reasonable cause" finding, concluding that Brown provided 'neutral, business-related reasons  for the hiring  decision she made, which were supported by  other witnesses, records pertaining to the hirings, and even Berkeley-Carr's statement that she initially "trusted her [Brown's] decision" regarding DiLorenzo," noting that "Brown did promote Berkeley-Carr approximately two years before she filed her EEO complaint." Ex G.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

      **DISPUTE**

**The NYCTA EEO Office should have issued a reasonable cause finding for the reasons**

**stated above in ¶¶135-39. Plaintiff was not promoted. Indeed, Plaintiff was denied two promotions that she sought, interviewed for and was qualified for. What Brown did for Plaintiff was to give her more work responsibility by combining the Director Communications job with the Senior Director Communications job in 2011 and promoting Plaintiff in place ("PIP") as opposed to promoting plaintiff in a competitive interview process. Brown said that PIP's are not something that is generally offered to the managerial ranks, it is given to professional/technical titles.** Exh. 9 Brown Tr. pp 61-65, 207, 355. **By combining the two jobs, Brown showed complete trust and confidence in Plaintiff that she could do the work of the Senior Director position. However, because of Plaintiff's age Brown decided to give the job to David Chan a younger Asian male.** See Exhs. 41, 43, 44, 45; Pl Decl. ¶¶ 9-10, 18 and Aff. of Joan Newbold ¶¶ 4-6.

141.         Further, the Report addressed Plaintiff's various claims that she was subject to "harassment" and "retaliation" by Brown in that Brown did not notify her of Chan's selection as the new Senior Director, and that Brown and Chan had communicated with her "disrespectfully", concluding that "these subsequent allegations did not provide a sufficient basis to establish a potential violation of NYCT's EEO policies, and, therefore, were not accepted for investigation." Ex G, TA 873, fn5.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**See responses to above ¶¶ 135-140.**

142.         Plaintiff was notified about EEO's decision, as well as Brown.  Ex G.

**ADMIT**

## XXV.   ON APRIL 27, 2015 PLAINTIFF IS APPOINTED TO THE NON-COMPETITIVE CIVIL SERVICE TITLE OF SUPERINTENDENT

143.         Effective April 2015, Plaintiff was moved from the "provisional " title of "Administrative Manager", into the non-competitive civil service title of Superintendent (for Maintenance of Way). See Franceschini Dec.; Ex L.

**OBJECTION**

**Franceschini Decl. was not provided in support of Defendants' motion.**

144.    The reason for this personnel action was that a civil service examination was being administered by the NYC Department of Citywide Administrative Services ("DCAS") for "Administrative Manager," the title Plaintiff had been provisionally placed in. Franceschini Dec. ¶21-25.

**OBJECTION**

**Franceschini Decl. was not provided in support of Defendants' motion.**

145.    Plaintiff, along with other provisional employees, were vulnerable to being displaced by individuals who took and passed the examination and could be reached for appointment. *See* Franceschini Dec. ¶25; *see* Personnel Rules and Regulations of the City of New York 3.2.1.

**OBJECTION**

**Franceschini Decl. was not provided in support of Defendant's motion.**

146.    In February 2015, Plaintiff was asked by management to take that civil service exam, along with the exam for "Administrative Staff Analyst", which she later did and passed. *Id.* 28; Pl. Dep., Ex B at 239: 14-18.

**Objection. Franceschini Decl. was not provided in support of Defendants' motion.**

147.    Since the Superintendent title is a "non-competitive" title, there is no civil service examination associated with it and she would not have been at risk for displacement by a civil service list. *Id.* ¶33.


**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."… and Franceschini's Decl. was not provided as support for Defendants material facts.**

DISPUTE

**In any case, Plaintiff took and passed the civil service exams for Administrative Manager and Administrative Staff Analyst. Brown purposefully retaliated against Plaintiff out of animosity because plaintiff filed an internal EEO complaint, and external EEOC Charge of Discrimination and filed the instant lawsuit against her in Federal District Court by denying Plaintiff civil service designation, even though Brown herself has permanent civil service status with job protection.** See Exh. 24 generally and TA 3154 **in particular, showing that Marva Brown has the civil service title of Administrative Staff Analyst. Thus, Browns hostility has been shown against Plaintiff. Furthermore, the denial by Brown of Plaintiff's Civil Service Appointment should be seen by the Court as an act of retaliation and just harassment. When ask about her decision not to give Plaintiff permanent civil service status Brown stated that she believes it's her "right to say yes or no" to permanent civil service status. Accordingly, Brown declined to give permanent civil service status to Plaintiff.** See Exh. 5 ¶¶ 22-26 (admissions); Exh. 7 ¶26 (admission); See Exh. 9 Brown Tr. pp. 363-64. Plaintiff stated in her Declaration at ¶ 34 last bullet point above the conclusion **that she took and passed two Civil Service exams for the Administrative Staff Analyst and Administrative Manager titles. In March 2017, Plaintiff was called from the list for a permanent title as Administrative Staff Analyst. Brown and NYCTA have denied Plaintiff's Civil Service appointment. Plaintiff contacted HR and they informed her that if Brown refused to sign the document there is nothing that can be done. To Plaintiff's knowledge, everyone in the Division of Capital Programs who passed the Civil Service exams in 2015 and were called from the list received their Civil Service appointments.**

**XXVI.    ON MAY 20, 2015, PLAINTIFF  RECEIVES AN OVERALL "GOOD"
            MANAGERIAL PERFORMANCE REVIEW FOR THE YEAR 2014**

148.    As a manager, Plaintiff was evaluated annually based on her performance for the preceding year, and the written evaluation was by way of a document known as a Managerial Performance Review ("MPR").  *See* Ex FF.

**ADMIT**

149.    Plaintiff received an MPR from Chan on May 20, 2015, for the preceding year, 2014.  Ex FF.

**ADMIT**

150.    Plaintiff's review was an overall "Good" with five areas rated "Good" (e.g., in 'Diversity Management", "Budget Control") and two rated "Marginal" – in the

areas of "Team and Interpersonal skills" and "Problem Solving and Decision Making". Ex FF.

**ADMIT**

151.    Plaintiff claims this review was retaliatory (Ex A, ¶35; PL Dep. Ex B 226).

**ADMIT**

152.    Plaintiff testified that she has "no proof of that", but what she "surmised" was that Chan was informed that she "filed an EEO complaint" against Brown. *Id.* at 226-227.

**DISPUTE**

**Plaintiff testified that her hostile work environment began after she filed her EEOC complaint…shortly thereafter. The question posed by opposing counsel to Plaintiff was not a fair one in that Plaintiff is not a trained lawyer, she is a lay person when it comes to the law. What Plaintiff was attempting to communicate is that there was no direct evidence of Browns animus that she was aware of, but circumstantially (surmise) there is substantial evidence that demonstrates that Brown retaliated against Plaintiff for filing her discriminations complaints. The facts and circumstances of the case show that Plaintiff's "surmise" is in fact the truth of what happened.** Please see response to statement 136 above. **In addition, Plaintiff filed her internal EEO Complaint against Brown on September 23, 2014 see** Exh. 15, **then she filed her first EEOC Complaint on May 11, 2015,** Exh. 16 at PL0112, 0116. **The NYCTA per Eamon Foley, General Counsel was notified of Plaintiff's charge of discrimination on or about May 18, 2015** Id. PL 0111 **and finally Plaintiff received her first two [marginal] ratings ever in her career at NYCTA on or about May 20, 2015 on her 2014 MPR. That was the start of the retaliatory hostile work environment that Plaintiff has endured to the present time.** See Exh. 12, TA 3200, 3198, 3197, 3240, 3238. **The closeness in time from when Plaintiff filed her external EEOC Charge of Discrimination on May 11, 2015 to when she received two marginal ratings on May 22, 2015 circumstantially supports Plaintiff's assertion and a reasonable inference that Brown told Chan about Plaintiff's EEO complaint against her and in turn, Chan showed Brown his support and loyalty by giving Plaintiff two marginal ratings on her 2014 MPR. This inference is further supported by the fact that Chan had only been supervising Plaintiff for two and one half (2½) months, mostly on a part time basis, before he pinned his 2014 evaluation of Plaintiff's performance. Further support comes from the facts that Chan's former supervisor, Senior Director Douglas Olney, wrote Chan's 2014 MPR and not Brown. Further, Brown got involved in the discussion and drafting and editing of Plaintiff's 2014 MPR by initially rating Plaintiff's performance as marginal in two categories, Brown's handwriting appears along with Chan's in the comments. A jury could find that Brown's animus toward Plaintiff filing discrimination complaints against her showed through Chan's two**

marginal ratings on Plaintiff's 2014 MPR and subsequent gradual reduction downgrades of Plaintiff's 2015, 2016 and 2017 MPR's. See Chan Tr. Exh. 10 pp. 12-13, 25-26, 31-37; Exh. 12 (Plaintiff's MPR's) 2014 MPR at TA 3197.

153.    Chan prepared the review based on his "experience while supervising Jennifer and also based on conversations with Amy Kaufman, her previous manager." Ex D at 29: 4-7; 300- 301.   *See also,* Ex C at 131: 13-23; l32:10-23; PL Dep. Ex B, 150:20-25.

### DISPUTE

**Chan testified that he was advised by Brown as to how to rate Plaintiff's 2014 MPR. Plaintiff testified that Brown is retaliating against her for filing an internal EEO Complaint and an external EEOC Charge of Discrimination against her. Plaintiff states that Marva Brown was the person who wrote the comments in the "Reviewers Section" of her 2014 MPR… not Chan.** See Chan Tr. Exh. 10 pp. 29-31, Pl. Tr. Exh. 8 pp. 173-74.

154.    In particular, in around March 2015, Kaufman and Chan had a telephone conversation in which Kaufman discussed the difficulties she experienced with Plaintiff, such as the fact that her withholding information was counter-productive for the unit. Kaufman Dec. ¶45.

### DISPUTE

**Admit that is what Amy Kaufman wrote in her Declaration, but DISPUTE the truth of the matter. Kaufman rated Plaintiff's job performance as excellent in Plaintiff's 2013 MPR. It is probable that Kaufman also rated Plaintiff's performance as excellent in 2012 as well because she was promoted to Senior Director in or about July 2012.  In the 2013 MPR Summary Comments section Kaufman wrote that "Jennifer continues to be an effective leader of the Communications area for DOS Capital Programs. With several competing presidential initiatives in the current and upcoming programs, Jennifer is instrumental in the development of comprehensive operating /maintenance budget impacts. She and her staff track the communications program with diligence and attention to detail. She takes an active role in the decision-making process for changes to projects as well as prior to implementation of new communications systems." If we compare Plaintiff's 2012 Excellent MPR with Kaufman's 2013 Excellent rating of Plaintiff's performance we will discover that the two MPR's are almost identical, strongly indicating that Kaufman wrote them both.** See Pl. Tr. Exh. 8 p. 69; Exh. 12 at TA 1025 and 1026.  **Accordingly, it appears that Kaufman's opinion of Plaintiff changed because of outside considerations, not Plaintiff's job performance.  Plaintiff and Kaufman had a heated argument over vacation leave. By Kaufman's own words Jennifer became**

**"enraged and yelled" at her because Kaufman didn't tell Plaintiff that she was taking certain days off for vacation. Thus, it's clear that Kaufman harbors animus against Plaintiff for their discord over vacation.**  Kaufman Decl. at ¶ 36; **Plaintiff testified that generally her and Kaufman's working relationship was good, but there was a time when their vacation schedules clashed. Brown has a policy that no two managers should be out on vacation at the same time. When the senior director is out on vacation the director has to cover. That's how it works. There was an incident where Plaintiff requested vacation and Kaufman denied it because she wanted to be out on vacation. Plaintiff went to Brown because she thought it was not fair to be denied vacation because she didn't take a lot of vacation. Furthermore Kaufman worked for Parsons Brinckerhoff when she resigned from the TA and she currently works at Mott McDonald; a simple google search confirms that both firms do work for the TA. Accordingly, Kaufman may have an economic interest in the outcome of this case.** See Kaufman Decl. at ¶ 2; Pl Tr. Exh. 8 pp. 58-62 Furthermore, Kaufman has a bias in favor of Brown because Brown is the person who hired her. Kaufman speaks very highly of Brown saying among other praises "that Marva is awesome" and that she "would work for her in a second." Exh. 42, 51 at p. TA 923.

155.   *When Chan prepared the review, he did not know what Plaintiff received on prior MPRs.  Ex D at 47.*

### DISPUTE

**Plaintiff cannot admit or deny this statement because there are credibility issues here with David Chan's testimony and his self-serving written statements to the file. Chan admitted that he, unbeknownst to Plaintiff's counsel, sat in the room during Brown's entire deposition testimony. That statement in conjunction with Brown's influence and direction of Plaintiff's 2014 MPR make it apparent that there are serious credibility issues surrounding Plaintiff's 2014 MPR and the case in general. Furthermore, on the credibility issues of both Brown and Chan, Brown admitted that she and Chan sat in on Plaintiff's deposition testimony, Brown admitted  that she talked to counsel Mariel Thompson about Plaintiff's testimony during breaks, Brown didn't remember whether she and Chan discussed Plaintiff's testimony with counsel during breaks and she admitted that Chan was present for her deposition testimony and that there were several breaks taken throughout the day where her testimony may have been discussed.** See Exh. 9 Brown Tr. pp. 340-346 **Likewise, Chan admitted to sitting through Brown's entire deposition testimony; however, Chan wasn't present for Brown's continued deposition. In accordance with the above conduct of Chan and Brown in unison both of their comments appear on Plaintiff's** 2014 MPR at Exh. 12 at TA 3197, 3240; Exh. 10 Chan Tr. pp. 38, 57. **Furthermore, it appears from the evidence that Chan was tape recording the meeting conversations between himself, Plaintiff and Brown because of the [stenographic] appearance, length, and thoroughness of his type written notes, together with the fact that he testified that he didn't take any handwritten notes during any of the meetings described below. Chan testified to the following on the subject and made some more admissions concerning his conduct. Chan was shown page 1862 which is Exhibit one to the memorandum which is Chan's "note to the file" concerning a meeting that he had with Plaintiff. This is a three page type written note that Chan wrote in the office and finished at home.** See Exh. 38. **The meeting**

**was held on July 13, 2015 at 10:15 a.m. Chan admits that his notes are copious, but oddly DNR how long the meeting lasted and denies that he took written notes during the meeting. Chan denies tape recording the meeting and states that the notes come from his memory. Chan didn't remember how long it took him to write the notes. Chan wrote the notes because he felt that there was an issue that he would have to refer back to later on because he said Plaintiff yelled at him. Looking at page 1868 Chan identifies these notes as notes taken by him at a July 14, 2015 meeting between Brown, Chan and Plaintiff. Chan testified that he wasn't taking any handwritten notes and that he was not tape recording the conversation. Chan testified that these are his private notes from the meeting. He denied using any recording device at the meeting. Beginning at page 1877 of Depo. Exh. 5 Chan testified that these are notes of a meeting between Chan and Plaintiff from a meeting conducted on May 5, 2016. Starting at page 1881 of Depo. Exh. 6 Chan identified this as notes of a meeting on May 6, 2016 between he, Brown and Plaintiff. Plaintiff states in the notes that she is harassed by Chan, that Chan talks down to her and that he doesn't respect her; Plaintiff doesn't like the tone of voice Chan uses to speak to her, neither the tone of his emails to her. These are Chan's notes based on the meeting. Plaintiff goes on to state in the notes that the emails are disrespectful, that Chan threw papers in her cubicle, and that she has no analyst or staff to which Chan agrees. Plaintiff states that she has to do data entry and update spread sheets to which Chan agrees. Plaintiff claims Chan is passive-aggressive, she claims that the way he talks to her is not the same way he talks to his wife. Chan acknowledged that Plaintiff's claim is that he has created a hostile working environment for her and that she wants to be transferred to a different unit, out of Chan's unit. Chan testified that the decision to let Plaintiff leave the unit is not his. Chan testified that Plaintiff falsely accuses him. Chan testified that he still relies heavily on Plaintiff to get her projects done and to oversee other than just her projects. Chan admits that he has direct reports and that Plaintiff doesn't and that Plaintiff has more knowledge and experience in the Communications area than he.** See Exh. 10 Chan Tr. pp. 164-174; Exh. 37.

156.  Chan testified (Ex D at 30-31):

The process was I did the MPR with Amy Kaufman's input. I submit it as a draft for Marva to review and to provide her update for the time period that Jennifer was working at capital programs before I got there"

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

That is what Chan said, but see Response to Statements 152 and 155 above.

157.  Brown did not participate in drafting Jennifer's evaluation. Ex C at 133.

**DISPUTE**

See Response to Statements 152 and 155 above.

158.    Chan printed out a draft on May 15, 2015 for Brown's review (Ex GG -e-mail

and series of drafts) which contained the following language:

By December 31, 2014, I had only supervised this manager for 2½ months. During this
period she required an enormous amount of direction for a Director, interactions was less
than cordial; however, the work was completed, hence an overall rating of "G" for this
manager.

**DISPUTE**

**See Response to Statements 152 and 155 above.**

159.    Brown recommended the following language upon review (*id.,* TA 3197):

Jennifer's overall rating is Good. Based on my supervision of 2½ months and with input
from her previous manager Jennifer is not functioning at the level of her current position.

**ADMIT**

160.    The previous manager Brown was referring to in this comment was Kaufman.

Ex D at 30-31; Ex C at 161:18-21.

**DISPUTE**

**The evidenced shows that it could have very well come from Brown.** See Responses to
Statements 152 and 155 above. **Chan presumed that Brown was Plaintiff's manager after
Kaufman left and Brown admitted to making comments on Plaintiff's 2014 MPR because
at "some point" she did supervise her.**  See Exh. 10 Chan Tr. p. 29; Exh. 9 Brown Tr. p. 133

161.    Brown also suggested that one of his proposed "Marginal" ratings as it relates

to "customer service skills" be changed to "Good" which Chan ultimately changed. *See* Ex

GG (TA 3197); Ex GG; *see* Ex C at 162:1-5; Ex D at 35: l9-25; 36:1-5.

**ADMIT**

162.    Brown also suggested by e-mail dated May 20, 2015, that Chan

implemented: "I will continue us to work with Jennifer to further develop her management

skills increase product knowledge of the overall projects in the comms and elevator and

escalator program areas." Ex HH.

**DISPUTE**

**This is nothing more than a pretext statement for what is otherwise unlawful retaliation and harassment.** See Response to Statements 152 and 155

163.   Pursuant to an Agency-wide policy concerning eligibility for General Wage Increases ("GWI"s), Plaintiff received a GWI on July 1, 2015 as a result of having satisfactory performance during the time period *(see* Ex NN, TA 3653 ('Employees must have satisfactory performance"]). *See also* Ex L (salary increased from $104,733 to $106,828).

**DISPUTE**

**True, however, Plaintiff was denied wage increases for 2016 and 2017 calendar years because of alleged unsatisfactory work performance as part of a plan, scheme and design by Marva Brown and David Chan to discredit Plaintiff and force her to resign from her job. Plaintiff's 2016 and 2017 MPR's state overall that Plaintiff's work needs improvement ("NI"). This outcome is in stark contrast to four (4) consecutive years of excellent reviews by different managers including Marva Brown herself and Amy Kaufman. It wasn't until Chan was promoted and designated as Plaintiff's supervisor that Plaintiff's yearly MPR'S began to decline year-after-year beginning with her 2014 MPR until Plaintiff now has unsatisfactory "NI" MPR's. Indeed, the evidence demonstrates that Marva Brown and David Chan as Plaintiff's two supervisors presided over a gradual reduction of Plaintiff's yearly MPR ratings until Plaintiff could no longer get a general wage increase ("GWI") that all employees get who have a satisfactory performance rating.  In fact, it can be and will be argued with force that Plaintiff deserved a merit increase in salary because she was called on to carry/lead at least three (3) major "Special Projects": (OBI, Communications Strategy and Critical Issues Report) that were not part of her regular duties and responsibilities as Director of Communications. This 2015 negative MPR outcome was not a coincidence, and certainly not because Plaintiff was doing a poor job; no this evidence demonstrates three (3) things: (1) Brown harbors significant animus against Plaintiff, (2) Defendants manipulated the MPR ratings so as not to call attention to their scheme and plan to force Plaintiff to leave her job and (3) to create a very "hot" and "hostile" work environment so that Plaintiff would give in, pack up, and leave/resign from the NYCTA. Accordingly, Plaintiff's gradual reduction in her MPR ratings was/is nothing more than a purposeful plan, scheme and design to discriminate, retaliate, and harass Plaintiff for having filed complaints of discrimination against Marva Brown.** See Exhs. 12 (MPR's), 13 (2016/2017 MPR's), 32(GWI)

## XXVII. PLAINTIFF ALLEGES THAT THE 2014 MPR WAS IN RETALIATION FOR FILING HER SEPTEMBER 2014 COMPLAINT

164.   Plaintiff wrote a memorandum to Joseph Leader dated May 27, 2015, alleging

that this MPR was in retaliation for her September 2014 EEO complaint, and such memo was forwarded to the Office of EEO for handling. *See* Ex EEO Pre-Complaint Form and memo (PL000255), Ex II.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**Plaintiff actually stated to Joe Leader in the May 27, 2015 memorandum that "[a]fter 4 consecutive years of 'Excellent' Performance Reviews, this 2014 Managerial Performance is being used as retaliation against me for my meeting on August 21, 2014 with the Senior Vice President to request a transfer from the Division of Capital Programs due to unfair promotional and hiring practices" and my filing of the EEO Complaint on September 23, 2014 against Marva Brown.** See Exh. EEO Pre-Complaint Form and memo (PL000255), Ex II. **As further evidence that Brown discriminated against Plaintiff in the promotion process and then retaliated against Plaintiff for having gone to complaint to Brown's supervisor Joe Leader, is where on August 20, 2014 Brown told Plaintiff that she was not going to promote her to Senior Director Communications. However, on the same date August 20, 2014 Brown wrote a glowing recommendation for Plaintiff to attend the NYC Leadership Institute. On the following day August 21, 2014 Plaintiff met with Joe Leader to ask for a transfer out of the Department of Subways. Accordingly, the evidence shows that Brown had a guilty conscious about not promoting Plaintiff and sought to appease her by recommending that she attend the Leadership Institute. And then became furious at Plaintiff when she learned that Plaintiff had gone to visit her supervisor.** See Exh. 2 Amended Complaint at ¶¶ 26, 29 and Exh. 11 at p. PL 0880.

165.    Plaintiff was invited to meet with EEO to discuss her allegation and file a retaliation complaint with the office, but she did not respond to the invitation or make any further complaint.  *See* Ex II (e-mail dated June 2, 2015, TA 637).

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

Plaintiff never submitted a pre –EEO Complaint Form. The form referred to is not signed by Plaintiff and it was referred from some Department. Accordingly, this form cannot be submitted into evidence against Plaintiff. Fed. R. Civ. P. 56(c)(2).

**XXVIII.  ON JUNE 4, 2014, PLAINTIFF OBJECTS TO THE 2014 REVIEW AND**

## INFORMS CHAN FOR THE FIRST TIME THAT SHE INTENDS TO FILE A COMPLAINT WITH EEO AGAINST HIM

166.    On June 4, 2015, Plaintiff submitted a memorandum to Chan that stated

the following (Ex JJ):

I received a response from New York City Transit's Office of Equal Employment Opportunity (EEO) offering me the opportunity to file a complaint with their office regarding the use of the attached 2014 Managerial Performance Review as retaliation. While I do intend to file a complaint with EEO, in addition, this is my written request to appeal the attached 2014 Managerial Performance Review. The reasons for this appeal are outlined in my attached response which you also received on Wednesday, May 27, 2015.

**ADMIT**

167.    Plaintiff testified regarding this memorandum (Pl. Dep, Ex B at 162:15-25):

Q. And do you recall any other time prior to this that you told David of an intent to file a Complaint against him with EEO?
A. No, I don't believe I have ever told David that.

**ADMIT**

## XXIX.   CHAN CONFERS WITH KAUFMAN ABOUT THE 2014 REVIEW TO MAKE SURE THEY ARE ON THE SAME PAGE AND THEY ARE

168.    On June 4, 2015, Chan had a telephone conversation with Amy Kaufman as a

result of Plaintiff's objection *(see* Ex KK). Kaufman Dec. ¶46.

**ADMIT**

169.    Chan followed up with her by e-mail dated June 5th to confirm what

Kaufman relayed *(Id.* at Ex KK):

- Jennifer would complete her assignments but not update her Senior Director (you)
- Does not provide information on upcoming issues that she is aware of – even at the weekly staff meetings
- In turn, when you went to meetings, you were caught off-guard
- No sense of team when dealing with Jennifer
- 2013 evaluation -mostly "G" and overall was a "G"

**DISPUTE**

**It appears that Chan is telling Kaufman, putting words into her mouth, what his alleged experience was with Plaintiff and Kaufman agrees. Chan doesn't ask Kaufman an open ended question. He is basically telling her what to say. As discussed previously, Kaufman has animus against Plaintiff over the vacation clash issue that escalated to Brown's attention.** See Response to Statement 154 above.

170.   Kaufman responded: "You pretty much captured my review of her 2014 work (January through May). You're kind to give her a G as it sounds like she was purposely difficult your first 2+ months in your job." *Id*. ¶KK.

**DISPUTE**

**See Response to Statement above.**

171.   Kaufman testified that at no point during any of her discussions with Chan did they discuss a complaint of discrimination or retaliation by Plaintiff. *Id.* ¶49.

**DISPUTE**

**This assertion of fact is not credible nor grounded in logic. The entire reason for Plaintiff's complaint regarding the two marginal ratings on her 2014 MPR is retaliation and discrimination by Brown and Chan. Plaintiff told Chan as much too. Thus, it is unreasonable to believe that Chan didn't discuss Plaintiff's retaliation and discrimination allegations with Kaufman during their telephone conversation.** See Statements and Responses to ¶¶ 168, 169 above and Defendants' Exh. JJ at TA 3215. **Furthermore, this 2014 MPR is in vast contradiction to the recent review given by Brown in support of Plaintiff's application for the New York City Leadership Institute in August of 2014 that cited Plaintiff's leadership skills and product knowledge as qualities that Plaintiff possesses for the Leadership Institute. Plaintiff's 2013 MPR was [Excellent] and it was signed by Brown. Since Plaintiff has been in the Division of Capital Programs, the Elevator and Escalator Program area was never part of her job function. Moreover, Chan didn't have sufficient knowledge to rate Plaintiff's management skills nor her overall product knowledge of the Communications Program area since he himself depended on Plaintiff in his new role as Senior Director.** See Carr Decl. at ¶¶ 26-28; Exh. 12 (2013/14 MPR's) Exh. 11 (Commendation Letter to Plaintiff written by Jay Walder, Chairman and CEO of the MTA and the 2015 Leadership Institute documents. Please see among other pages PL 0880, 0881.

## XXX. PLAINTIFF   WITHDRAWS   FROM   THE MPR   APPEAL   PROCESS AND DECLINES A MEETING WITH CHAN REGARDING HER REVIEW

172.   In her complaint, Plaintiff alleges that she "attempted to exercise the NYCTA evaluation appeal process, but was blocked from doing so by defendants David Chan and Marva Brown." Ex A.¶39.

**ADMIT**

173.   Chan offered to have Plaintiff meet with him in the next step of the appeals

process,  but was guided by the Department of Labor Relations to have a witness present.

*See* Ex LL; Ex D at 65:1-9.

**DISPUTE**

**On May 20, 2015 Plaintiff met with Chan and Tim Forker to discuss her 2014 MPR. Forker explained that the reason he was there was because he was sitting in for Brown. However, Forker wasn't supposed to sit in for Brown on any personnel matters. Plaintiff considered her 2014 MPR to be a private personnel matter. NYCTA has an MPR Appeals procedure that Plaintiff attempted to use. Specifically, there are four (4) steps to the appeal process. Plaintiff and Chan were stymied on Step 1 of the procedure. Step 1 states in pertinent part: The manager must submit to the interviewing manager a written request to appeal the overall rating within 10 business days from the receipt of the review. Plaintiff complied.** See Exh. 27 at TA 3215. **Next the reviewing manager should schedule a meeting to discuss the rating within ten business days from the date of the appeal request. The parties were stymied here because Chan called for a person from Labor Relations to sit in on the meeting as opposed to having the meeting with Plaintiff alone which is what the procedure calls for. Nowhere in Step 1 of the procedure does it state that a witness may be present. This is an internal NYCTA procedure that should be strictly adhered to, otherwise Defendants are defeating their own rules, policies, and procedures.** Exh. 27 at TA 506. **When Plaintiff received the meeting invitation email from Chan she noticed that another person from Labor Relations was going to be in attendance. Plaintiff told Chan that she wanted a Step 1 meeting not a Step 2 conference, meaning that she wanted to meet with Chan alone to discuss her review. However, Chan refused and Plaintiff declined to go any further into the process.** See Exh. 8 Pl Tr. at 158-61; Exh. 26 at TA 3193

174.   Plaintiff declined the meeting requests and withdrew from the appeal

process, and  the MPR was not changed.  *See* Ex LL; PL Dep., Ex B at 165-166; Ex D at 64-

66; *see also* Ex NN "Resolution to Managerial Performance Review."

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**See Response to ¶173 above.**

**<u>PLAINTIFF'S 2015 MPR IS  ANOTHER OVERALL  "GOOD" REVIEW</u>**

175.   Plaintiff received her 2015 MPR on or about April 1, 2016, which was an overall "Good", with 4 "Goods" and three "Marginals" in the areas of "Problem Solving and Decision Making", "Organizing and Planning Skills" and "Team and Interpersonal skills". *See* Ex OO.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**Taking a look at Plaintiff's 2015 MPR it becomes apparent quickly that Chan is rating Plaintiff progressively worse year after year as pretext for unlawful retaliation for filing discrimination complaints. See Exh. 12 (Plaintiff's 2015 MPR and drafts thereof).**

176.   This review was prepared by Chan, her manager for the year 2015. *Id.*

**DISPUTE**

**There are different versions of Plaintiff's 2015 MPR.** See Exh. 12

177.   In the Reviewer's comments Chan provided:

Jennifer has been responsible for the oversight of the communications Capital Program area for DOS for several years. Jennifer's involvement and productivity is not at the expected level. Her output is not consistent with the expected level for her current "C Grade" position. She has to pay closer attention to deadlines, as she has missed deadlines for several assignments. She was required to attend a course on respectful workplace.   Jennifer has the ability to perform  at a higher level  if she chooses. Recommend that she attend managerial development courses as available and do more to further expand her knowledge base.

**DISPUTE**

**There is a different draft of the 2015 MPR from the above.** See Exh. 12 TA 3399**, that supports Plaintiff's 2015 performance with no marginal ratings and "good" Reviewer's Comments.** See also TA 3345 **where Chan crosses out two excellent ratings and downgrades them to marginal and one good rating and downgrades it to marginal with his negative handwritten comments to the right of the rating. The Reviewer's Comments section remains the same, but Chan hand writes in additional negative information. Plaintiff signed her 2015 MPR and attached her response to it.** See PL 0873, PL 0872

178.   Plaintiff objected to this review and alleges in her Complaint that the

"evaluation did not put forth any concrete examples of issues or incidents that Plaintiff was deficient in the year 2015." Ex A, ¶41.

**ADMIT**

179.    However, Plaintiff had received, among other things, a memorandum on December 31, 2015, documenting her lack of progress on a work assignment she had been given on May 11, 2015. Ex PP.

**DISPUTE**

**This memorandum is actually further evidence of the hostile work environment that Chan and Brown created for Plaintiff. The Operating Impact Budget a/k/a "OBI" was assigned to Plaintiff by Brown to lead. This assignment was in addition to Plaintiff's core duties and responsibilities of Director Communications. Those duties and responsibilities are to ensure all Department of Subways ("DOS") capital needs are addressed and Plaintiff oversees all facets of the program development and management of communications and new technology and related projects within the Department of Subways. Plaintiff negotiates and resolves issues, prioritize requests from Subways' operating divisions based on emergency and safety needs, and negotiates funding levels with the Division of Capital Planning and Budget and the Department of Capital Program Management ("CPM") for inclusion in the Capital Program. Plaintiff has handled projects outside of her normal duties and responsibilities and has gotten recognition for doing it well.** See Carr Decl. ¶¶ 6-7. **Furthermore, the Capital Programs Division develops the 20 year needs assessment for the operating divisions. The process begins with condition surveys of our assets for the Department of Subways. From the condition surveys a 20 year needs assessment plan is developed based on the survey's condition of assets. From the 20 year needs assessment a five year capital plan is developed. The five year capital plan is a five year outlook of assets. The most critical assets are funded in the five year plan and capital monies are provided to either up-grade or replace the asset(s) like subway cars, infrastructure (copper cables, antenna cables, network equipment etc.). The different areas within the Capital Programs Division are: Stations area, Communications area, Signals area, Line Equipment, Force Account Estimates area. Everybody works together on a daily basis. Employees also work with people from different departments too. Like Capital Program Management ("CPM"), the operating divisions such as: Electric Maintenance Division ("EMD"), Rapid Transit Operations... all of the operating divisions within the Department of Subways.** Pl. Tr. Exh. 8 pp. 42-43 **Capital Panning didn't have strict deadlines outside of the 20 years needs assessment and five year capital plans prior to Chan. In Plaintiff's job as Director in the Communications area, she now has task that have specific deadlines. She has deadlines for task that have been assigned to her and she has struggled to meet the task. Chan assigned Plaintiff tasks with unrealistic deadlines. Since 2004, Plaintiff has worked in the Division of Capital Programs; from 2008 until 2013 she received overall excellent performance evaluations in managing and carrying out the responsibilities of the Communications area.  However, in 2015 after Plaintiff had filed her**

internal EEO complaint and her external EEOC complaint Chan and Brown assigned her several task that were unrealistic because prior to March 2015 Plaintiff had up to three analyst reporting to her to assist her in her responsibilities and tasks. Analysts reporting to Plaintiff were: Earl Jackson AA male, Jacqueline Woodley AA female and Andeley Grand Paul. See Pl. Tr. Exh. 8 pp. 46-48; also see Affidavit of Earl Jackson ¶¶ 8-11 and David Weinzimmer ¶¶12-20. **Indeed, Brown and Chan used this OBI deadline has a high pressure tactic against Plaintiff at or around the Christmas holiday period and threatened to take away her vacation if the John Decker of the Department of Busses didn't sign the form. All other aspects of the OBI assignment had been completed. Plaintiff states to Chan in her** memorandum in response dated December 31, 2015 Exh. PP at 2242-43 last paragraph **that "[y]ou informed me on December 31, 2015 at 4:32 p.m. that Marva informed you that unless the OBI assignment is completed before my vacation scheduled for December 8, 2015 my vacation will be rescinded. I told you unless I get a response from Mr. Decker there are no changes to the OBI forms or the OBI manual.**

180.    Brown testified that Plaintiff was asked to "take a lead in revamping the Operating Budget Impact ("OBI") document, which is a form used by both Subways and Buses to assess the impact on the operating budget when we make a capital investment in a project."  (Ex C at 284).

## ADMIT

181.    In the memorandum, Chan stated (Ex PP):

The re-evaluation and revamping of the OBI process has taken far too long. This assignment was initiated on May 11, 2015 and as of today [December 31, 2015], it is still not completed. The following are still some of the outstanding issues:
- Minutes of meetings for the three presentations/meetings held on October 16th and October 23rd have not been issued.
- All comments from the December 14th Department of Buses (DOB) meeting have yet to be incorporated. (Based on the attachments to your December 28th email to John Decker)
- The deliverables of this task, the OBI Template and Instruction Manual have not been finalized.

## DISPUTE

**That is what Chan's memo says, but it disregards Plaintiff's response provided the following day.** See Exh. PP at 2452-53.

182.    In addition, the memorandum stated *(id):*

On December 11th, both Marva and I instructed you to have the finalized package (OBI form and instruction manual) concurred by DOB and sent out to CP&B before your scheduled vacation of December 18th. You assured us that you will accomplish this task at the latest by Wednesday, December 16th. You have missed both deadlines.

### DISPUTE

**As stated above in response to ¶179 above, this is one of many emails that document a highly pressurized deadline filled agenda that Chan and Brown created for Plaintiff to work under.  One example, but not the only example, of Chan burdening Plaintiff with extra work that is outside the scope of her normal duties and responsibilities while she has no analyst support is the assignment of two large projects.** See Exh. 30 at (DC 21). **After analyst Earl Jackson left in early 2015 he was the last person to have supported Plaintiff in her job. Chan never permitted plaintiff to have another analyst report directly to her after Jackson left. Accordingly, Plaintiff had to do all of the work by herself and she was reprimanded by Chan, if an analyst not assigned to her, did any overtime work on any of her assigned projects.**  See Exh. 29

183.    Plaintiff disputed that she had missed her deadline, stating that she had

reached out but had not received concurrence from the Department of Buses. *See* Ex PP

(TA 2453).

### ADMIT

184.    Brown testified that "that is totally inappropriate for a C-Grade director.

If     you have an assignment, you are supposed to make it your business– if you call and

leave message and someone doesn't respond to you, to me the responsible thing to do is

you should go over there  and see that person." Ex C at 228-229.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."… Also, the above statement is Brown's opinion testimony.**

### DISPUTE

**The above statement isn't what Brown said in her deposition testimony at** pages 228-229. **However, in any case, Plaintiff will take this opportunity to explain how the OBI assignment was designed to harass and humiliate her. The Operating Budget Impact ("OBI") is a document that is prepared for the Department of Capital Planning and the Budget is attached to what is called a "Master Plan" during the developmental phases of a project. The Operating Divisions will fill that form out, and they are supposed to give some narratives about strategy and what the project is to be attached in the Master Plan.**

**It's for the Department of Subways.  However, Brown and Chan included the Department of Buses, because they use the same form, and Brown wanted to revamp this form, and to have an instruction document with the form. Chan came to Plaintiff and told her that Brown wanted that form revamped and that she is assigning Plaintiff as the task force leader of that task. That involved meetings with all of the directors and senior directors and several meetings with the Operating Division staff.  Plaintiff conducted those meetings sometime at the end of 2015.  She was not assigned a deadline, and she was not assigned staff to assist her. Andrew Zsoldos and Frantz Polycarpe assisted Plaintiff.  As the task force leader, Plaintiff was responsible for all of the tasks involved; with preparing the document, with presenting, with having meetings with the Operating staff including Buses. On January 5, 2016 Plaintiff had to go to Buses in East New York, Jamaica Avenue in 19 degree weather to visit John Decker, the person in charge of Budget for Buses, after she had reached out numerous times by email to the Department of Buses for input into this assignment with no success.  Plaintiff had not received a response from John Decker for months, it was an on-going attempt to reach him. On that particular day, January 5, 2016, Chan told Plaintiff that she should go to East New York, when Plaintiff arrived at East New York, John Decker was not there. He was at a meeting causing Plaintiff to have to wait for over an hour to have this discussion with him about the forms. The issue was not resolved because they had not prepared for Plaintiff's visit. Per Chan instruction Plaintiff emailed John Decker and told him that she was coming to his office.  After that visit with John Decker he ultimately came to Plaintiff's office and went over the forms and ultimately completed the form and the assignment. It took Plaintiff from 6-8 months to complete the assignment because it involved attention in addition to her assignments. Plaintiff submitted the document to Brown and Chan they approved it and praised it and it was done.** Pl Tr. Exh. 8 pp. 184-186.  **In more simple terms, Chan and Brown were holding Plaintiff accountable over a signature from John Decker who is Plaintiff's superior. Brown and Chan demanded that Plaintiff do a messengers work and go out to East New York to get a form signed. By taking that action Brown and Chan abused Plaintiff's dignity, time, and the TA's resources. Moreover, Decker could have taken exception to Plaintiff coming when he had not invited her. Finally, Plaintiff testified that she works in the Department of Subways, not in the Department of Buses. She was assigned the OBI which was created by the Department of Capital Planning and Budget.  Plaintiff completed that task, sent it to the Department of Capital Planning and Budget for approval so that it could be put into use for the Department of Subways and they didn't respond to it, nothing happened. This is an example of a high pressure tactic to get Plaintiff to crack that wasn't even needed by Capital Planning and Budget.** Id. at p. 192

185.   Plaintiff was given until January 7, 2016 to complete the assignment,

and the assignment was completed by that date. *Id*, PL000520.

## ADMIT

186.   In further explanation of her 2015 MPR, Chan explained at the deposition,

*inter alia (id* At 47-48; *see also* 300):

The level of work that comes out, the quality of work that comes out, the path in which the document is processed. It should be more seamless, but it takes a lot of iterations and revisions to get a document completed, the buck slip done, to be submitted to Marva for her signature.

Well, for 2015 there was a few task; for instance, there were D4s, those are reimbursable budget requests for manpower that need to be processed. We had to get it back up to capital planning and budget and OMB in a certain timeframe. Those were late. We got calls from the maintenance department that submitted the budget requests asking for the status. Where are they? Why is it taking so long?

Q.  Is there anything else that she was late on?

A.  Master plans that needed to be processed, needs to be moved.  They were not.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

### DISPUTE

**That is what Chan testified to, but it is mere pretext statements for what is an otherwise hostile work environment that he and Brown have created for Plaintiff and to discredit Plaintiff for work that she has done and that Chan couldn't or wouldn't do. Chan and Brown attempted to set Plaintiff up to fail and in doing so they abused Plaintiff to the point where she had to seek psychiatric help to deal with her hostile work environment. For example, Plaintiff testified that having gone to Joe Leader, having filed a complaint against Brown, Plaintiff believes that Chan had knowledge of that because Chan reported to Brown. Plaintiff's 2015 MPR was presented by Chan to her on April 1, 2016.  Plaintiff's overall rating was Good. Chan's comments were read into the record. Plaintiff was required to attend a course on collaborative conflict resolution and she complied.  Plaintiff submitted a written response to the 2015 MPR.  Plaintiff said of all the directors and senior directors in the Division of Capital Programs, including managers who are at lower levels than Plaintiff like Wanda Minton who is office manager, Steve Lore who is a 20 something year old white male, who was just promoted to manager, they all have direct reports to assist them in their work. Since the analyst that reported to Plaintiff resigned in 2015 Brown has not replaced the analyst to assist her in her work. Plaintiff has been overwhelmed.  She has been given several assignments at the same time. One assignment was a communications strategy document. One was to revise the concept of operations for the Help Point System; one was to revamp the Operating Budget Impact Statement for the Department of Subways and the Department of Busses with an instruction manual. All without any support staff or any analyst reporting to her.  Plaintiff was told that she should go to locations to get information if she is not getting any responses. She had to go to such an errand on January 5, 2016.  Assigning all of those tasks to Plaintiff in addition to managing the Communications area was unreasonable, and it has not been assigned to any other Director in the Unit, especially when Plaintiff had no staff to support her. As another example of being overworked and overwhelmed, Plaintiff was assigned the employee manual, when there were three HR representatives in the Unit and they were not assigned to help with the document. Plaintiff was assigned several tasks at the same time in addition to her responsibility of managing the Communications area. She was assigned the tasks of preparing staff summaries. Those tasks are reserved for**

**analysts. JBC was assigned the task of reviewing the Critical Issues Report which involves every one's program area. The report is published quarterly they usually come with grammatical errors and incorrect information. JBC was told by DC in one of his many emails "you must have it 100 percent correct before it comes to me." Plaintiff was told that if it's not correct, she is to go to the Directors and get the information, whatever it takes to do, that is what she should do. There are three HR representatives in the Unit: Wanda Minton, AnnaMaria Perdomo, and Renee Jackson.  Plaintiff was the only one assigned the task of updating the Human Resources Manual, which is a training manual, that consist of about 1400 pages. Plaintiff believes those tasks were unrealistic because she is a C-level Director with no support staff to assist her in those tasks. She also believes that there is no other Director in the Unit who is being assigned these tasks without the support of an analyst. Plaintiff's analyst Earl Jackson resigned March 2, 2015.** See Carr Tr. Exh. 8 pp. 176-182 See generally, Exh. 17 (email chain between Chan, Plaintiff and Earl Jackson); Exh. 18 (Training Manual special project); Exh. 19 (OBI special project); Exh. 21 (Communications special project); Exh. 22 (Critical Issues special project) Exh. 23 (certain emails concerning Defendants hostile, disrespectful, and pressurized work environment); Exh. 30 (Certain emails evidencing Chan's overburdening Plaintiff with work while she has no support); Exh. 31 (a certain email from Chan showing that he said Plaintiff oversees the Communications Room projects for him); Exh. 39 (Plaintiff's mental health provider letters). **Plaintiff further testified that she has lost time from work as a result of the defendants' actions. She suffers from hypertension when she is under stress; her hypertension triggers migraine headaches. There are times when she has called out sick because she couldn't sleep at night. Plaintiff has called out sick more times during the relevant time period than before. She doesn't know how many times she's called out sick. Plaintiff was diagnosed with hypertension a long time ago.  She has been on medication for approximately 10 years. Plaintiff suffers mentally and emotionally.  She cries easily. She visits with a psychiatrist and a therapist, she has trouble sleeping. On Sunday nights she gets anxiety attacks because she has to go to work Monday morning. The psychiatrist prescribed medication to help her get through the night on Sunday nights. Plaintiff began seeing a doctor in June or August 2017. Plaintiff looked up a doctor from a list of healthcare providers and she found Lennox Hill Mental Health clinic where she attends. Plaintiff visits her treating therapist once per week and her treating psychiatrist one time per month. Plaintiff started having sleepless nights since the problems at work began. She had some trouble falling to sleep, but it has really gotten worse since this incident began. The Laura Kopcynski event really was the trigger in making Plaintiff worse. She cannot sleep without medication. She takes it every night. Plaintiff takes Novastan for hypertension and another medication to help her sleep on Sunday nights. Plaintiff's marriage has been negatively affected. Plaintiff's sex life has been negatively affected because she doesn't want to have sex with her husband because of what's happening.  Plaintiff has also lost confidence in her work and feels like she is being punished. Plaintiff always thinks about her negative job situation.** Pl. Tr. Id. at pp. 248-258; Exh. 33 (relevant Laura Kopcznski documents); Affidavit of Laura Kopcznski

187.    When asked what he meant by "Jennifer has the ability to perform at a higher

level if she chooses", he explained (Ex D at 50:3-16):

A. I have seen Jennifer take projects and move them and fight for the
maintenance folks even against another department.  I have seen that she has

the ability.

Q. When did you see that?

A. And I have seen Jennifer do good work.  I praised her on doing good work as well.

Q. You saw that in 2015?

A. I saw glimpses of it in 2015, yes.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**In any event, please see response to ¶ 186 directly above.**

188.    Plaintiff received a GWI on July 1, 2016 as a result of obtaining a

satisfactory review for 2015.  Ex L; *see* Ex NN.

**DISPUTE**

**See response to statement ¶¶ 163, 186 above.**

**Furthermore, while it is true that Plaintiff received a general wage increase in 2015 with a "Good" MPR with three marginal ratings attached to it, she shouldn't have received any marginal ratings. She received marginal ratings because she was overburdened with exta-work and deadlines that have nothing to do with Plaintiff's core responsibilities as Director of Communications. In any case, the scheme and plan to discredit Plaintiff plays out in 2016 and 2017 because in those years Plaintiff didn't receive a general wage increase.  Plaintiff's MPR for 2018 has not yet been disclosed as of the date of this response. However, the evidence shows that Brown and Chan had a plan that they executed and the plan was to gradually–year by year starting with the 2014 MPR diminish Plaintiff's ratings until she has a rating of Needs Improvement ("NI") with no general wage increase attached to it which is the case at bar.** See Exhs 12, 13.

**XXXII. ON MAY 10, 2016, BROWN SEEKS GUIDANCE FROM EEO AND LABOR RELATIONS REGARDING ESCALATING ISSUES BETWEEN CHAN AND PLAINTIFF, AND INFORMS PLAINTIFF OF HER RIGHTS UNDER TA'S EEO POLICIES**

189.    Brown e-mailed Evette Vargas, Senior Director of Labor Relations, Field

Operations, and Joel Andrews, Chief Officer, EEO, on May 10, 2016.  *See* Ex QQ:

The purpose of this email is to obtain your assistance in an office matter that has come to a point that I feel needs your input. Jennifer Berkeley-Carr is a Director who works in Capital Programs. She reports to David Chan, Sr. Director. David started in the unit a little over a year ago. The relationship did not start well and it has gotten progressively

worse. David has been patient and has done as much as he could to work with Jennifer. From my observation, she has not been cooperative and is not producing to the level that is expected. Last week David came in to inform me that he had a conversation with Jennifer about an assignment that was given to her and she accused him of harassing her and that this is a hostile work environment. David told me that this is not the first time she said this. I spoke to both of them last week. She reiterated her claim in a very aggressive manner. She raised her voice and she was being very hostile. I do not want this to get further out of hand. I asked how we could resolve this matter. David said he does not have a problem working with Jennifer, and shows her respect in their interactions. Jennifer said she wants me to reassign her. I received the memo from Evette about respectful work place and have a meeting calendared for 2pm to meet with her. I need your direction in dealing with this matter.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**In any event, Marva Brown emailed LR and EEO much too late. She should have taken contacted the EEO Office way back on or about August 21, 2014 when she first learned that Plaintiff had a meeting with Joe Leader to discuss her perceived discrimination at not being promoted and requesting a reassignment out of Capital Programs. However, Brown did the opposite, she made matters worse by reprimanding Plaintiff for going to meet with her supervisor when Brown should have been contacting the EEO Office to try to sort things out.** See Amended Complaint ¶¶ 28-30 and Defendants Ex. V at TA 389 citing to EEO PI 5.2 and 5.3.

190.    At a follow up meeting on May 10, 2016, at which another Manager Wanda Minton was present, Brown gave Plaintiff the policy and told her that "I spoke to HR and EEO and informed her of her right to do so. I told her that I was concerned at the seriousness of the claims. She took it and had no comment." *See* Ex QQ.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**See response to ¶189 above.**

**XXXIII. CHAN'S MAY 31, 2016 MEMORANDUM TO BROWN REGARDING <u>PLAINTIFF'S WORK PERFORMANCE</u>**

191.    Chan wrote a Memorandum to Brown on May 31, 2016 (Ex RR):

This memorandum is to express my continued concern for Jennifer Berkeley Carr's poor work performance and offensive defaming accusations. I was supposed to have given this to you much earlier; however, I wanted to take the time to go over in my mind about this and past incidents with Jennifer. Basically, by putting myself in her shoes to see if there was anything I could've done to mitigate these situations. I've tried and tried and came to the same conclusion, the only way to avoid this was to do all the work myself and not assign it to Jennifer, which would be next to impossible since the unit was just me and her. In addition, as you know, I am temporarily overseeing the Signals and Track areas as well.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

<b>DISPUTE</b>

**Chan's statement in this memorandum involves a question of credibility in as much as he and Brown knew and should have known that case was in litigation. As such please** see Plaintiff's response to statements ¶¶ 155, 186 above. **Furthermore, the above Chan statement is nothing more than a self-serving misguided statement, the substance of which cannot be proved at the trial of this matter. By May 31, 2016 he and Brown were well aware of this instant lawsuit filed against both of them and they would need to manufacture some kind of pretext. Thus, it is true that Brown and Chan created a hostile working environment for Plaintiff, it is true that they piled on work for Plaintiff to accomplish that had deadlines attached to it; it is true that Defendants took away Plaintiff's support staff and Chan had all of the analyst support to himself. Chan can hardly complain about a work condition that he created to the person who helped him to create it. As far as Plaintiff being counseled for disrespectful workplace violation, Chan should have been counseled as well. This much is clear, Chan cannot keep an analyst, they all resign or are fired by him. He points the finger at Plaintiff, but in the mirror the finger is pointing right back at him. For example, but not the only examples of a hostile and pressurized workplace: Chan sent an email to Plaintiff at 7:51 a.m.** See Exh. 23 in general and in particular at PL O830**; Chan's direction to Plaintiff regarding their respectful work place meeting,** TA 2390**; Chan's redirection of work to Plaintiff that was given to him by Brown,** TA 2418**; Chan assigns more work to Plaintiff without giving her any direction or assistance, even when plaintiff requests his assistance,** TA 2427-28, 2341**; another example of Chan and Brown assigning work to Plaintiff that is not part of her regular duties and responsibilities and placing deadlines on her and not providing her with any guidance or support,** TA 2337, 2332, 2336, 2331, 2330**;  another email pushing Plaintiff when she has no help with a deadline attached to it** PL 00789**, an example of Plaintiff being responsible to both Chan and Brown and they are both pushing her at her,** TA 3349, PL 0790-791**; to name some of these pressurized emails that Plaintiff has to deal with on a daily basis. Further, as examples, but not the only examples of Chan harassing Plaintiff is where he has no problem giving Plaintiff work assignments in the middle of the night as part of her OBI assignment,** see Exh. 19 at PL 0600**, and no problem giving Plaintiff a deadline at 7:38 a.m. that needs to be done before Plaintiff can take vacation,** Id. at TA 2412. **Chan had no problem giving Plaintiff a "re-instruction" on her weekly reporting task at 1:35 a.m. and 2:09 a.m.** see Exh. 21 at PL 0925, 0926**; Chan thought it was okay to provide Plaintiff with an instruction to correct work that she had already done on the Critical Issues Report at**

**6:44 a.m.** see Exh. 22 at PL 0694**.**  Also see Chan Tr. Exh. 10 p. 80; Carr Decl. ¶ 34 and bullet points; Affidavit of David Weinzimmer ¶¶ 25-26; Affidavit of Osmond K. Pearce ¶¶ 6-10.  **In relevant testimony given by David Chan he denied pushing Plaintiff, but admitted that he has given her multiple high level projects to complete and gives her emails everyday, but Chan attempts to evade the question by stating that he gives all of his analysts emails everyday. Chan admitted that he sent Plaintiff work emails at 2:00 a.m. and 3:00 a.m. Further, Chan admitted that he gives Plaintiff work related emails every day, but denied pushing Plaintiff. Chan admitted that emails relate to multiple Plaintiff assignments that are going on simultaneously, that he wants completed on time. Significantly, Chan acknowledged that Plaintiff must do the work by herself. Chan admitted to pushing Plaintiff by stating that he assigns her work, or has her look at specific tasks within a project. Chan testified "that is all the costs of doing work." Likewise, Chan admitted that certain items are time sensitive. Chan testified that in terms of projects that are time sensitive, "it is inflexible to me." See Chan Tr. Exh. 10 pp. 160-163. For all of the above reasons, facts and circumstances, Plaintiff avers that the above is credible evidence that Brown and Chan were attempting to set
her up to fail.**

192.    This memorandum also discussed a "Priority" level assignment Plaintiff was given of "assembling a matrix of critical projects for Livingston Plaza, RCC and PCC for discussion the following day", which Plaintiff did not complete before she left that day, and which Chan had to complete. *Id.*

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**See response to statement ¶191 above.**

193.    Plaintiff had raised her voice after he approached her regarding the assignment, accusing him of, among other things, "hiding behind emails and buckslips", "harassing" her" and "creating a hostile work environment", calling him "passive aggressive." *Id.*

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**See response to statement at ¶ 191**

## XXXIV: PLAINTIFF'S 2016 REVIEW BASED ON NEW MANAGEMENT SYSTEM: <u>PLAINTIFF GIVEN AN OVERALL "NEEDS IPROVEMENT"</u>

194.    For the year 2016, there was a new managerial performance review system.  Ex TT.

**DISPUTE**

**This is not what Defendants' Exhibit TT states.**

195.    All that was required from Managers was an "overall rating" but not specific evaluations (Ex C at 228:19-25; 229)

**DISPUTE**

**Admit that Brown testified to what she testified to concerning the new MPR's. However, Brown testimony on this point may not be truthful. Taking a look at the 2016 MPR itself, we can see that it has various sections that have to be rated such as: Core Competencies and Leadership Competencies that are rated within the subsets of those two groups.** Please see Exh. 13 starting at PL 0980 and 0981 **those are rating systems that should have been rated. Now compare with certain pages starting at TA 3590-3592. You will see that Not Applicable ("N/A") is typed beside those ratings. Now please compare the 2016 MPR with the 2017 MPR and we discover that in 2017 all of the Core Competencies and Leadership categories are rated.** Id. starting at PL 0955-0961.  See also Plaintiff's response to statements at ¶¶ 152, 163 above.

196.    Instead of "Excellent", "Good", etc. the ratings were "Exceptional Performance", "Exceeds expectations", "Meets Expectations", "Needs Improvement". *Id*

**DISPUTE**

**"Exceptional Performance", "Exceeds Expectations", "Meets Expectations", and "Needs Improvement" are the overall ratings for the 2016 and 2017 MPR's, but the manager should have been rated in the sub categories as well.  See response to statement ¶195 above.**

197.    Plaintiff received a "Needs Improvement", administered on or about April 4, 2017, which is defined in the new policy as "the quality and timeliness of the Manager's work does not meet expectations and established targets." *See* Ex SS.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**Please see Plaintiff's response to statements at ¶¶ 152, 155, 163, 196 above.**

198.   As an explanation, the "Overall Rating Summary" stated the following, which was based on Plaintiff s work performance in 2016 *(id.)*:

> Jennifer has been a member of the Capital Program team for over 10 years. Her performance is not at the expected level for a Director overseeing the communications area in Capital Programs. Assigned work still has its challenges in the area of completeness and timeliness. Assignments still requires an overabundance of direction, follow-up with no sense of urgency. Many assignments require intervention for resolution. Multiple revisions are requirement before the assignment could be completed. Jennifer continues inappropriate and unprofessional conduct, and has been reinstructed on more than one occasion.

**DISPUTE**

**Admit that the statement above is what Chan wrote, but he is not credible and he and Brown have a motive to fabricate. Please see Plaintiff's response to statements at ¶¶ 152, 155, 163, 196 above.**

199.   Plaintiff did not receive a GWI for the year 2017. *See* Ex L.

**ADMIT**

**XX.XV: PLAINTIFF RECEIVES A MEMORANDUM AND LETTER OF REINSTRUCTION ON FEBRUARY 27, 2017 BASED ON WORK PERFORMANCE AND INAPPROPRIATE CONDUCT**

200.   On or about March 23, 2017, Plaintiff was issued a letter of Reinstruction dated February 27, 2017, regarding her "failure to properly and timely complete assignments and inappropriate comments." *See* Ex TT.

**DISPUTE**

**Plaintiff admits that she was given this memo, but denies the truth of the matters asserted therein. Indeed, this is more evidence of Defendants' hostile work environment that they created for Plaintiff in an attempt to pressure her into resigning.** Please see Response to ¶ 155 above.  **In further example, but not the only example, Plaintiff testified that in another incident in 2017 in response to a task that she completed Chan responded to everyone on the email chain "Jennifer, not so fast. You had not told me that. I did not see a response from…" that was the tone of Chan's email. That**

**was an example of the humiliation that Plaintiff has been enduring.  Plaintiff felt that communication between she and Chan could have been handled better. For example, Plaintiff testified that she sits directly in front of Chan's office, that she emailed only Chan back saying "this could have been a conversation between you and I."  Chan replied by sending Plaintiff an email saying "come see me." This was meant to degrade her work and humiliate her. Plaintiff endures this type of treatment on a daily basis. P. 198 Plaintiff felt as though she could not perform her task; she became paralyzed at doing her job. The reason Plaintiff feels paralyzed is because when she is at her computer and she sees an email from Chan come in she literally becomes anxiety-ridden because the emails are usually not written professionally. She testified that this is  harassment. It's like what happened to Marva Pascal, the 62 year old AA woman and what happened to Laura Kopczynski after she filed a complaint; the retaliation is a pattern.** Pl Tr. Exh. 8 at pp. 198-199. **Plaintiff further testified that it took her 8-9 months to complete the training manual. Chan and Brown created a toxic environment for Plaintiff where every day she had to do these assignments in addition to her core work in the Communications area. The Employee Manual, the OBI, the Concept of Operations were all given to Plaintiff, all were assigned to Plaintiff in the same period of time. Further, Plaintiff testified that every Monday morning at their meeting Chan will go over the plan and ask for a deadline. Not having any staff to help Plaintiff in her work most times she was unable to even look at the document or look at the extra assignment of the additional tasks. So most times Plaintiff was unable to meet the deadline because she was working on the tasks by herself.** Pl. Tr. Id at pp.  208-209.  Also see Exhs. 30 (overburden Plaintiff with work), 33 (Laura Kopczynski), 34 (Marva Pascall).

201.    The LOI discussed an assignment Plaintiff received on February 1, 2017 in which Plaintiff was instructed to "prepare a write up on a specific technology including what it does, what we need, how much is funded and the overall strategy going forward." *Id.*

**DISPUTE**

**See response to ¶ 200 above.**

202.    After several emails requesting further explanation of what was being requested, Plaintiff submitted information that was not on point with the requested write up and as of that date (February 27th) had failed to complete the assignment. *Id.*

**DISPUTE**

**See response to ¶ 200 above.**

203.    Further, Chan stated that on February 6, 2017, Plaintiff entered his office in a

loud and unprofessional tone complaining that his emails regarding this assignment were

"harassing and abusive". *Id.*

### DISPUTE

**Plaintiff testified on the point and said on February 27, 2017 when the incident happened, David went to Laura Kopczynski and Richard Mai and told them to write a statement about what they witnessed, they were to print it out and give it to him; and they were not to tell Plaintiff that he told them to do that. Plaintiff did not raise her voice, she does not raise her voice.  Plaintiff testified that she challenges Chan to prove it because there are people who sit all around them including Robert Levine. Plaintiff has spoken to people in her group about the way Chan treats her.  Plaintiff talks about how she has no staff and how Chan degrades her. She has spoken to many people about that. Plaintiff has referred to Chan as harassing her. Laura Kopcznski has complained to Plaintiff many times about Chan. Wanda Minton is loud.**  See Pl Tr. Exh. 8 at pp. 229-232

204.    The memorandum referenced similar prior conduct by Plaintiff in response

to questions about work assignments.  *Id.*

### DISPUTE

**See response to ¶ 203 above.**

205.    The memorandum also discussed the staff meeting held that day, where

Plaintiff became "disruptive, argumentative using an unprofessional and loud when

questioned about work assignments that were overdue and/or submitted with numerous

errors" including making a derogatory comment about Chan's ability to manage. *See* Ex

TT, statements from the Analysts.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…
DISPUTE**

**See Response to ¶ 203 above.**

206.    Plaintiff was warned that her "inappropriate conduct and behavior as well

as her "disregard for providing accurate and timely assignments is unacceptable", and she

was advised that "if any future incidents of this nature occur" she will be "subject to

further action including disciplinary action" Ex TT.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

### DISPUTE

See Response to ¶ 203 above.  **Plaintiff further testified that she believes she was subjected to a hostile work environment because she filed a complaint against Marva Brown and David Chan.  Plaintiff believes that the reason why she doesn't get any staff, why the analysts are told not to take any instruction from her, and why Chan told Richard Mai and Laura Kopczynski that he fired Andrew Zsoldos is because he took instruction from Plaintiff.  Plaintiff testified further that NYCTA has the records of the high turnover (of analyst) in the Unit.** See Pl. Tr. Exh. 8 pp. 235-236.

## XXXVI:  PLAINTIFF'S 2017 MPR IS A "NEEDS IMPROVEMENT" AS A RESULT OF HER WORK PERFORMANCE AND CONDUCT

207.    In Plaintiff's 2017 MPR, administered to her on or about January 17, 2018, Plaintiff received an overall "Needs Improvement" as a result of her work performance and conduct. Ex UU.

### DISPUTE

**Admit the fact that Plaintiff did receive a "NI" on her 2017 MPR, but DISPUTE that the rating was justified.  This is largely a matter of the credibility of Brown and Chan in as much as the evidence demonstrates that they have created a hostile working environment for Plaintiff and now are engaged in the business of trying to justify their horrendous treatment of Plaintiff by making her the scapegoat.** See response to ¶¶ 155, 163 above.

208.    As an example, in the Reviewer's comments section for Goal #1, it stated, among others, "minimal work has been done in the further development of the communication investment strategy." *Id.*

### DISPUTE

**Admit that that's what it says, but DISPUTE the truth of the matter. Plaintiff states in her Declaration that Chan directed her to provide goals for 2017. After Plaintiff submitted her goals Chan didn't accept them and provided Plaintiff with goals that Marva Brown wanted in the document. These goals were not part of Plaintiff's core function, which is overall responsibility for Transit's communications assets, but were assigned to Plaintiff as "special assignments…."** See Carr Decl. at ¶¶ 30-33

209.   A Goal was established for Plaintiff, which included: "develop a communication investment strategy which outlines an overall plan of capital investments necessary to keep telecommunication infrastructure and network systems in a state of good repair." *Id.* at TA 3595.

### DISPUTE

**As stated in previous responses, this statement is merely another part of a plan, scheme and devise to force Plaintiff to quit her job. Specifically, taking a look at Defendants** Ex. UU at TA 3595 **we can readily see that there are no goals for the manager i.e., Chan. However, there are goals for the employee…Plaintiff. These goals were foisted upon Plaintiff without any input from her. She didn't agree to these goals and they are not part of her core duties and responsibilities. By example, and not the only example, of not providing plaintiff with the proper help, support, guidance, direction and resources to do her job is where Plaintiff was given the responsibility of creating the "Communications Strategy" (first time it was done) as a special project.** See Exh. 21(Communications Strategy) in general. **Plaintiff received no help, no guidance and no direction from Chan, her immediate supervisor, and he denied Plaintiff support from analyst and engineers.** See Id. Pl 0297, PL 0303-0304, PL 0305-0310, PL 0928-930, PL 0988-0989, PL 0942-0944, PL 1022. **All Plaintiff received was criticism from Chan. Plaintiff testified that the deadlines that she talked about in her Complaint were task that were given to her without the support of an analyst reporting directly to her. There's a difference between having a direct report and having people who simply help out. The deadlines were unrealistic because Plaintiff had no one, as a C-level Director, supporting her with the assignments given to her to complete. Furthermore, the assignments were different from the assignments given to her in the past. For example, Plaintiff had never been assigned the Employee Development Manual to do in the past; she had never done the Critical Issues Report. Plaintiff had done the Concept of Operations because she developed it. Plaintiff had never written a Communications Strategy nor had she ever revamped the OBI and the accompanying manual. These were very unreasonable assignments for a manager without a staff. There is no one else in the Division that was given these assignments without a staff that Plaintiff is aware of. The OBI, Employee Manual and the other assignments were unreasonable because they were assigned to Plaintiff in addition to her regular tasks and responsibilities in the Communications area without an analyst reporting directly to her.** See Exh. 8 Pl. Tr. pp. 211-212. **As another example, but not the only example of Chan's harassing, intimidating and bullying tactics, is the email string between he, Plaintiff and Earl Jackson, Plaintiff's then assigned analyst.** See Exh. 17.  Also see response to ¶ 207 above.

210.   As another example, in regard to Goal #3, Chan wrote that "Jennifer has been receiving monthly cost control reports for projects that she oversees", but that "[i]t is unsure whether any comparisons have been made against the force account and if any

meetings were held with CPM on potential and/or current overruns". *Id.*

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

    **DISPUTE**

**See response to ¶ 209 above.**

    211.    As an objective, the review states: "Develop a process to evaluate the progress and financial impacts of projects during the construction phase in order to ensure that Force Account charges are in line with the project's completion schedule." *Id.*

    **DISPUTE**

**See response to ¶ 208 and 209 above.**

    212.    Pursuant to the Agency-wide policy in effect for GWI's, Plaintiff was not eligible for and did not receive a GWI in 2018. *See* Ex L; Ex C at 188-189.

    **ADMIT**

## XXXVII: <u>PLAINTIFF'S MISCELLANEOUS ALLEGATIONS OF RETALIATION</u>

    213.    Plaintiff alleges that "since Plaintiff filed her internal charge of discrimination in September 2014 and her external Charges of discrimination in May 2015 defendants Marva Brown and David Chan have denied Plaintiff the help of support staff and have assigned her unattainable tasks with unrealistic deadlines", "implementing rules which only apply to Plaintiff", "denying her vacation requests", and generally "disrespected and harassed Plaintiff in the workplace". Ex A, 44-45.

    **DISPUTE**

**The above allegations are examples of Defendants creation of a retaliatory hostile work environment for Plaintiff to suffer in and which contributes to Defendants' attempt to force Plaintiff to resign.** See Exh. 2 (Amended Complaint) at ¶¶ 31, 32, 33, 37, 39, 40, 43, 44, 45

i.      **Plaintiff complains about the Operating Budget Impact Task**

214.    As an example of an "unrealistic deadline" she was given, Plaintiff referenced the OBI assignment referred to in 183-187, which she was given on May 11, 2015, and for which Plaintiff testified she was "not assigned a deadline".Pl. Dep, Ex B at 184-185:1-4.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

**DISPUTE**

**Plaintiff testified that the Operating Budget Impact ("OBI") is a document that is prepared for the Department of Capital Planning and the Budget is attached to what is called a "Master Plan" during the developmental phases of a project. The Operating Divisions will fill that form out, and they are supposed to give some narratives about strategy and what the project is to be attached in the Master Plan. It's for the Department of Subways. However, Brown and Chan included the Department of Buses, because they use the same form, and Brown wanted to revamp this form, and to have an instruction document with the form.  Chan came to Plaintiff and told her that Brown wanted that form revamped and that she is assigning Plaintiff as the task force leader of that task. That involved meetings with all of the directors and senior directors and several meetings with the Operating Division staff.  Plaintiff conducted those meetings sometime at the end of 2015. She was not assigned a deadline, and she was not assigned staff to assist her.** See Exh. 8. Pl. Tr. pp. 184-185. **Further, Chan was relentless in prodding Plaintiff to get John Decker to sign off on the OBI report.  Plaintiff testified to, among other things, that Chan sent her two or three email memos, one was eleven or twelve paragraphs long. Chan would send an email to Plaintiff with a copy to himself so she knew that he was documenting her work. Chan gave Plaintiff all of these assignments with no staff, everything that came into the Department came to her. Chan's mantra was "Jennifer runs the Communications unit for me." Chan would tell Plaintiff in staff meetings with the analysts, "you are not doing your job because you do not go to the source to get information." Plaintiff remembers telling Chan "I am not going to walk into a deputy chief's office and tell them how to do their job. I was not hired to be a messenger." Chan constantly told Plaintiff that she should go to the source. Plaintiff testified that she writes emails, makes telephone calls, it is not her responsibility to tell a deputy chief or a chief officer that they should provide her with information that she is requesting.** Id. at p. 187

215.    Brown explained that these assignments weren't "necessarily related to communications or related to strategic and long-range planning [Porker's area], but "there were things that needed to be done and they were assigned to different areas." Ex C at 285-

287.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

      **DISPUTE**

**We admit that's what Brown said in her testimony, but deny, to the extent that Brown attempts to justify her unfair overburdening of Plaintiff with work without providing Plaintiff with needed support.**

216.   At the same time Brown gave this assignment to Plaintiff, Brown gave a similar assignment of "updating the capital project profile document" to Tim Forker, Senior Director.  Ex C at 285:4-18.

**Objection. FRE 802 Brown offers this hearsay statement for the truth of the matter asserted. There is no exception for this statement FRE 803**

217.   Plaintiff objected to this assignment because she "has no affiliation with the Department of Buses." Ex A, ¶56.

      **DISPUTE**

**Plaintiff stated in her Amended Complaint at ¶56 that "As an example, but not the sole example of harassment, is when Plaintiff informed David Chan that she did not have the engineering expertise to write a communications strategy. Chan brought Plaintiff before Marva Brown for a reprimand. Brown instructed Plaintiff that she was to prepare a weekly activity report to document her work. Plaintiff had to include in the activity report the date assigned, date completed, and report on the progress made on the development of the communications strategy.** See Exh. 2 (Amended Complaint) at ¶ 56

218.   Plaintiff claims that "Brown and Chan threatened to DISPUTE Plaintiff her earned vacation time unless she completed this assignment without the help of an Analyst or support staff." Ex A, ¶46.

      **ADMIT**

219.   According to Plaintiff, she completed the assignment in "six, eight months" said David and Marva "approved it and praised it", and she was able to take her

vacation (Pl. Dep., Ex B at 186):

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

220.    The assignment was completed on or about January 7, 2017, for a total of 8 months (Ex PP, PL 00520).

**DISPUTE**

**Admit that Marva Brown's memo regarding the OBI went out on January 7, 2016, but DISPUTE that the work was completed on January 7, 2016.  Actually, the work was completed in October 2015 (that when Plaintiff conducted all of the meetings and presentations) for a total six (6) months.**  See last paragraph of the memo attached as Defendants' (Ex PP at PL 00520).

221.    Plaintiff testified she had the assistance of Andrew Zsoldos and Franz Polycarpe on this project. Pl. Dep. Ex B, 185: 5-10

**DISPUTE**

**Andrew Zsoldos was an analyst who reported directly Chan.**  See Defendants' Ex. ZZ.  **Frantz Polycarpe is a manager in a different unit from Plaintiff.  Neither of them reported directly to Plaintiff.  However, they helped Plaintiff because she needed the support.**

**i.   Plaintiff complains about developing a Communications Strategy**

222.    As an example of "harassment", Plaintiff discusses a "Communications Strategy" that she states "required systems engineering expertise". Ex A, ¶46, 56.

**ADMIT**

223.    Plaintiff was given this assignment in August 2016. Ex VV (PL000297).

**ADMIT**

224.    She repeatedly objected to this assignment as "requiring technical expertise" (e.g., PL00298).

**DISPUTE**

**Plaintiff ask Chan repeatedly for help, assistance and guidance in drafting the communications strategy in as much as he claims to be an engineer, and she never received any help, support or guidance from him.** See Exh. 21 at PL 0298 for example.

225.    At Brown's deposition, she was asked (246:23-25; 245:1-21):

Q.  Does a communication strategy, does it require engineering expertise?
A.  Absolutely not. We write strategies for different components in the program ...Jennifer has participated in authoring some of those or co-authoring some of those strategy documents…I didn't ask for an engineering assessment. All I asked for was a strategy,  which is data collected from the program areas, laying out what's in the area, laying out the life cycle, and laying out a plan for what we're going to do. If we need to replace PS land, we need to do it ten units at a time.  That's what a strategy consists of.

### DISPUTE

**Admit that the above statement was Brown's testimony on the subject, but deny that her testimony was truthful and accurate. Brown admitted that Plaintiff, (as someone who does the communications work) came to her and said that the communications strategy required engineering expertise.**  See Exh. 9 Brown Tr. at pp. 247:22-249:7

226.    Plaintiff still had not completed this assignment at the time of Brown's deposition on November 21, 2017, over one year later.  Ex C at 249-250.

### DISPUTE

**The assignment is ongoing. Exh. 9 Brown Tr. 249-250.**

227.    Plaintiff alleges that as "harassment" she was asked to develop a "new employee training manual for the CPM Division with no assigned help, even though Ana Maria Perdomo, Renee Jackson and Wanda Minton are the assigned Human Resources reps for the Division and have a total of six analysts and support staff at their disposal." Ex A, ¶57.

### ADMIT

ii.  **Plaintiff complains about a task to update a training manual for Capital Programs**

228.   Brown and Chan explained that the document had nothing to do with Human Resources, and was originally started by Kaufman (Ex C at 299-303; Ex D at 73-77).

**DISPUTE**

**Brown further testified that she, Perdomo, Minton and Jackson handle Human Resources for the Capital Division and that she's not sure why they would help Plaintiff with the Training Manual because it has nothing to do with Human Resources, even though it's a training manual.** See Exh. 9 Brown Tr. p 301

229.   The training manual was meant to be a "reference guide" for employees working in Capital Programs, almost nothing was "created afresh", and was a compilation of documents already in use by the division" that she [Plaintiff] herself have worked on", and was "just a matter of compiling information and having it reside in one place." Ex C at 299, 305; Ex D at 77.

**DISPUTE**

**Plaintiff complained that this Training Manual assignment was given to her as part of the creation of a hostile work environment.** See Exh. 2 (Amended Complaint) at ¶57 **Plaintiff testified that it took her 8-9 months to complete the training manual. Chan and Brown created a toxic environment for Plaintiff where every day she had to do these assignments in addition to her core work in the Communications area. The Employee Manual, the OBI, the Concept of Operations were all given to Plaintiff, all were assigned to Plaintiff in the same period of time. Further, Plaintiff testified that every Monday morning at their meeting Chan will go over the plan and ask for a deadline. Not having any staff to help Plaintiff in her work most times she was unable to even look at the document or look at the extra assignment of the additional tasks. So most times Plaintiff was unable to meet the deadline because she was working on the tasks by herself.** Exh. 8 Pl. Tr. at p. 208

230.   Plaintiff testified that "there were no deadlines given to me" in connection with this project (PL Dep. 207:17-19; *see also,* Ex D at 77.) and that it "probably took eight, nine months" (208:8-9).

**DISPUTE**

Please see response to ¶ 229 above. **Plaintiff also testified that she was overwhelmed**

**with work she was given the OBI and the training manual assignment and all of those assignments at the same time and each Monday morning Chan wanted a report. Plaintiff testified that there were no deadlines given to her because she was responsible for all of the communications work.** Exh. 8 Pl. Tr. p. 207: 4-25. See Exh. 18 (Training Manual for Capital Programs)**. In addition to the three major special projects that Plaintiff was assigned to lead, she also had to draft weekly progress reports to Chan.** See Exh. 20

231.   Plaintiff testified that she got "glowing reviews" from Brown and Chan (Ex B at 238:10-13).

### DISPUTE

**Plaintiff also testified that she said to Brown that when we walked into the evaluation, David started talking about incidents of how I addressed him. It was not about my work product. And when he was finished I turned to Marva, and said to her "I have produced an Employee Training Manual which was well received by you, and David came in, and he started with the negative review that talked about him and I and our relationship. And he never talked about the good points of my work product."** See Exh. 8 Pl. Tr. p. 238:14-22

232.   Plaintiff also testified that she obtained assistance in connection with this assignment. Ex B at 209:22-25; *see also,* Ex D at 77:13-23.

### DISPUTE

**Plaintiff testified that she did receive help from them not because they were assigned to Plaintiff as her direct report to assist her in her work.** Exh. 8 Pl. Tr. at p. 210:1-2

233.   Plaintiff complains as harassment that she is "required to complete work normally done by an analysts in addition to her regular work assignments" and that "David Chan treats Plaintiff as if she is an analyst". Ex A, ¶48.

### ADMIT

### iii. Plaintiff complains she was assigned "Analyst" work

234.   However, every supervisor and manager in Brown's Department, including Brown and Chan themselves, must perform administrative tasks (which can be considered "Analyst" work) when needed. Ex C at 268:1-25, 269 ("I make copies, I'm a

vice president. "); Ex D at 150: 12-20; 182:1-8 ('I make my own copies", "I review master

plan", "I analyze projects to make sure there is sufficient funding in the project," "so we are

all doing part of analyst work.").

## DISPUTE

**The above statement by Chan and Brown are self-serving statements. However, Plaintiff had no analyst assigned to her when other managers of a lower Hay grade than Plaintiff had analyst assigned and reporting to them. Plaintiff testified that Plaintiff testified that of all the Directors and Senior Directors in the Division of Capital Programs, including managers who are at lower levels than her--Wanda Minton who is office manager, Steve Lore who is a 20 something white male, was just promoted to manager--they all have direct reports to assist them in their work. Since the analyst that reported to Plaintiff resigned in 2015 Brown has not replaced the analyst to assist her in her work. Plaintiff testified that she has been overwhelmed.  She has been given several assignments at the same time.** See Exh. 8 PL. Tr. p. 178

235.    Further, every manager under Brown is given work outside their basic

duties and functions, based on the demands as they arise.  Ex C at 282-283; 299-306.

## DISPUTE

**See response to ¶ 234 above.**

236.    Plaintiff does not know what Brown assigns others in the Division. Pl. Dep.

Ex B at 212:17-23.

## ADMIT

### iv.    **Plaintiff complains that she was "Denied Support Staff"**

237.    Plaintiff also claims that she was denied support staff as an example of

retaliation. Ex A, ¶44.

## DISPUTE

**More specifically, Plaintiff alleges that the above was part of Brown and Chan's creation of a retaliatory hostile work environment.  Furthermore, Plaintiff was the only Director in Capital Programs Division who did not have any administrative staff reporting to her. All other Directors had administrative staff reporting directly to them.**  See Exh. 2 (Amended Complaint) at ¶¶ 45, 47, 48; Exh. 52 (Capital Programs List of managers and their

administrative support staff.

238.   Plaintiff had an analyst, Earl Jackson, assigned as a direct report to her until March 2015 when Earl Jackson resigned from the TA.  Pl. Dep., Ex B (209: l0-12); Ex D at 80-81.

**DISPUTE**

**Even prior to Earl Jackson's removal, Plaintiff lost two analyst after she filed her internal EEO Complaint. Plaintiff lost Edna LeGrand Paul and Winslow Hylton. They were removed from Plaintiff's staff and never replaced.** See Carr Decl. at ¶21 **Furthermore, Earl Jackson and Plaintiff were reprimanded by Chan because Earl Jackson spoke up for Plaintiff in statements that he made to Chan in an email about the disrespectful hostile environment that he had created for Plaintiff. Among other things, Jackson left Transit because he disagreed with the serious culture problem in the Department that was not being addressed by leadership and favoritism that was being shown to some and not others. Furthermore, Chan rated Earl's performance as marginal in his Final Evaluation of a Separating Employee. Accordingly, Chan has a tendency to retaliate against those people who question him.** See entire Exh. 17 and Aff. of Earl Jackson at ¶¶ 10, 16

239.   Plaintiff's counsel asked and Chan responded (Ex D at 79-80; 300):

Q.  Now, sir, what is the reason why Jennifer has not had a direct report since Earl Jackson left?
A.  So while Earl was still here working for Jennifer, I was not getting information from the unit.  All I heard was Jennifer was overloaded.  So I decided, after hiring up to staff, I had decided to flatten my organization so that it works better for me, this way I get a better sense of what each is doing, if they're not too overloaded to be distributed (SIC) of work."
Q.  Can you describe what you mean by "flatten"?
A.  By having my whole entire staff directly report to me.  So therefore – my unit consists of four people, myself, Jennifer and two analysts.

**DISPUTE**

**This is nothing more than pretext testimony by Chan for not permitting Plaintiff to have any support by analyst who report directly to her while Chan and Brown smother her with work that's not even her core responsibility. Plaintiff testified that Brown retaliated against her by not providing her with staff.  Chan told Plaintiff that she has to provide a weekly catalog of her work. There is no other Director or manager in the Division of Capital Programs that does not have an analyst as a direct report. There's no other C-level Director that does not have an analyst reporting to them.** See Exh. 8 Pl. Tr. p. 203

240.   Regarding Analyst support, Plaintiff testified, Ex B at 168-9: l-3:

Q. Did they ever assist you with any of your assignments?
A. They have, yes.

### DISPUTE

**Plaintiff makes the point and Chan admits the point above that Plaintiff was not provided with even one analyst since Earl Jackson left who was a direct report to her. Other C level Directors and managers, including David Chan, have analyst who report directly to them.** See response to ¶ 239 above.

241.    She testified (183:4-10):

Q. You had stated earlier that you did receive help at times from some of the other analysts with the approval of David; is that right?
A. David assigned those tasks. For example, the Critical Issues Report. The Critical Issues Report, David had said to me, "They are only helping you. It's your job. "

### DISPUTE

**See response to ¶ 239 above.**

242.    She was offered the help of a high school intern as well at one point but

refused (206-207).

### DISPUTE

**Chan offering Plaintiff a high school intern was of no help to Plaintiff. In fact it would have hindered her in doing all the work that she had to do because she would have to take the time to teach and train the intern. Plaintiff testified that Chan did offer her a high school intern when she was so overwhelmed with work, but Plaintiff told him that she did not have time to supervise a high school intern because she was so overwhelmed with work.** Exh. 8 Pl. Tr. pp. 206:13 -207:5

243.    When questioned again, Plaintiff testified (Ex B at 209-210):

Q. So you didn't -- you didn't receive any assistance from Richard or Earl, when he was here, or –
A. Earl reported to me.
Q. Right.
A. So he assisted.
Q. Well, Richard is still here. So you don't ever receive assistance from Richard?
A. Yes, I go to Richard to -- I will ask him to proof read my work for me. Like, if I do a budget mod, I will do -- he will assist me. I wouldn't assign him, like – if I get a budget modification to do anything related to Communications, normally I would assign it to an analyst. I wouldn't assign it to him. And I am sure that I have

asked for his help. Laura assisted me in creating the cover and things like that for the training and -- for the employee training manual. So I am sure I have interacted, and they have supported me. Not because they were assigned to me as my direct report to assist me in my work.

Q. Right. They're not your direct reports, but they have assisted you.

A. Let's say yes.

## ADMIT

244.    Chan testified (Ex D at 82-82; 91-92; 176 and *see also* Pl. Dep. at 206:10-12):

> ...My instructions to staff, Andrew and Laura and Richard is, "If work–you report directly to me. So I would give you the work that I need to be done. Jennifer is a director. If she gives you work you cannot refuse. She has a higher title than you, but what I would ask is that you come back to let me know because I need to know the distribution of work is not overloading you."

## DISPUTE

**Plaintiff testified that she believes she was subjected to a hostile work environment because she filed a complaint against Brown and Chan. Plaintiff testified that she believes that the reason why she doesn't get any staff, why the analysts are told not to take any instruction from her, and why Chan told Richard and Laura that he fired Andrew was because he took instruction from Plaintiff.** Pl. Tr. at p. 235

### v.    Plaintiff complaints that she was "Excluded on Certain Projects"

245.    Plaintiff alleges as an example of harassment by Chan, that she was "excluded" from certain meetings and certain projects such as the Beacon Project (Ex 1 ¶ Ex B at 215). Id.

## DISPUTE

**Plaintiff testified that she has never been invited to a Beacon Project meeting which is a highly visible project. David always took Laura with him to those meetings. P. 215 David gives out the assignments therefore, Plaintiff had no reason to ask to be invited to a meeting.** Pl Tr. at pp. 216-217

246.    When asked whether she ever asked to attend those meetings or work on those projects she conceded she did not, saying "Why do I need to ask if I should attend a meeting?" *See id.* at 215-216.

**DISPUTE**

**See statement response to ¶ 245 above.**

247.   Chan "never precluded Jennifer from going to any meetings" and said "she never asked to be involved in the Beacon project or "to be involved or continue to be involved in the Help Point projects", pointing out that "all projects are open". (Ex D at 179-180):

**DISPUTE**

**See statement response to ¶ 245 above.**

> **vi.    Plaintiff complains about being denied vacation requests**

248.   Plaintiff complains about being denied vacation requests in her complaint, despite acknowledging Brown's "strict policy that two managers should be in the unit at the same time....she doesn't want two directors out at the same time." Ex B at 61; Ex C at 306-310.

**DISPUTE**

**Plaintiff admits that she complained about being denied vacation, and contends that Brown's "coverage policy" is pretext for harassment. Plaintiff testified to some examples, but not the only examples, of how Chan unfairly denied her vacation requests as part of his harassment of her. Plaintiff testified that many times her vacation request have been denied. Plaintiff earns approximately six weeks of vacation per year. Chan has approved some vacations others he has not. There was one incident where Chan and Brown told Plaintiff that the Critical Issues Report had to be one hundred (100%) percent correct and completed or her vacation would be rescinded.  Plaintiff had to work until 7:30 p.m. that night to get it done. There was another incident involving the Critical Issues Report where Chan gave Plaintiff an ultimatum with dates: get it done or you can't take vacation.  As a result, Plaintiff testified that she had to cancel her planned vacation because she was not sure whether she could meet his deadlines. P. 218
There was another incident where Plaintiff sent Chan an email request asking for his vacation schedule so she could plan her vacation schedule.  He responded nonchalantly "Maybe sometime next week. I have to discuss it with my family." This occurred around Thanksgiving 2016 when Plaintiff was planning on taking a family vacation to Texas. Plaintiff felt as though that was insensitive and degrading because she has family too and they also make vacation plans.  Exh. 8 Pl. Tr. 217-219; see also Exh. 25 (denial of Plaintiff's vacation requests). Plaintiff further testified that as a result of Brown's coverage policy,**

**Chan and Brown have repeatedly denied her vacation requests under the pretense that the
Unit needs coverage, even when Plaintiff has in excess of thirty (30) days of accrued
vacation. Based on Transit's vacation policy, if not used within a certain period of time
Plaintiff will lose the vacation time. The denial of vacation time has been a form of
harassment intended to abuse and intimidate Plaintiff. Chan and Brown denied so many
of Plaintiff's vacation requests, even her request for a vacation day to attend court ordered
mediation on May 4, 2017 was denied.** See Carr Decl. ¶34 in the bullets section.

249.   Plaintiff's  complaints  about  Brown's  vacation  policy  pre-date  her

September 2014 complaint. *See* March e-mail, Ex T.

**DISPUTE**

**Plaintiff didn't accuse Amy Kaufman of creating a hostile work environment as she
accuses Brown and Chan of creating one.**  See Exh. 2 Amended Complaint at ¶45.

250.   A number of people in Brown's group have been denied vacation based

on this policy, not just Plaintiff.  Ex C at 309.

**DISPUTE**

**While this is Brown's testimony, her testimony is undermined by the fact that she
testified that she was unaware that when Plaintiff makes her vacation requests to David
that David won't immediately say yes or no to the request, but then when he denies it
he'll say " Oh. I'm taking vacation at that time." Showing evidence that Chan is
intentionally attempting to DISPUTE Plaintiff's vacation request.** See Exh. 9 Brown Tr.
pp.309-310

251.   Chan testified (Ex D at 106: 8-17) that when Plaintiff "submits it [vacation

request] and there is coverage in the unit, there is no problem to approve it, but if I have

already approved vacation and I'm going to be out at that time, I cannot approve that vacation

it will be going against policy ."

**DISPUTE**

**This is a made up pretext statement to hide his hostility toward Plaintiff and to justify
his poor conduct toward her.** See for e.g., response to ¶250 above.

252.   Chan has approved Plaintiff for vacation numerous times, and Plaintiff took

504 hours of vacation between October 1, 2014 and June 30, 2017 (the equivalent of

approximately 72 days)(Ex XX (last page); Pl Dep; Ex B at 218)

### DISPUTE

**Plaintiff was out for four (4) weeks for hand surgery from June 21st to July 21, 2016. Defendants counted this time as vacation time.** See Exh. 25 at TA 2522, 2523, 2521, 2520. **Plaintiff further testified that she remembers asking Chan if she can't sit in for him anymore, why can't she be out on vacation.  There are times when Plaintiff can't take vacation when Chan is there too, not only when he is out. P. 219-220**
**Plaintiff testified that she and Chan went to Brown because he had denied Plaintiff vacation requests so many times.  Plaintiff complained that Chan would not provide her with his buck slip for his requested vacation days so Plaintiff could plan around his vacation for her own vacation. Plaintiff stated that she never had a supervisor where she had so many issues around taking vacation. Plaintiff said she had one vacation issue with Amy Kaufman. Brown told Plaintiff that she was Chan's subordinate; he doesn't have to tell her when he's going on vacation, even though Plaintiff applied for her vacation before Chan she is still denied vacation.  So according to Brown,  Plaintiff doesn't get an opportunity to discuss when Chan is taking time off, he has told plaintiff that she is his subordinate, and that he does not report to her, and that he doesn't have to tell Plaintiff when he is going on vacation. Chan used those words on many occasions in front of Marva Brown and her response was "if I go to my boss, and he's going on vacation, and he denies my vacation…" something to that extent. So what Plaintiff did was ask for vacation and if it's denied that's it.  Plaintiff testified to another example of unfair denial of vacation. During the summer Plaintiff and Chan were in the middle of creating the Five Year Capital Plan. They had 20-25 more copies of documents to review.  Plaintiff wanted to take vacation.  Chan said he was going on vacation for eleven days.  Accordingly, Plaintiff stayed and reviewed the documents.  However, Chan came back into the office during his vacation wanting to know how much of the work Plaintiff has done.  Plaintiff stated that she was working on reviewing the documents, that there was a lot to do. She stayed and did it alone. When Chan came back Plaintiff requested vacation. She wanted to take eleven days.  Plaintiff had not gone on any vacation during the summer, but Chan had some issues with her vacation request. Plaintiff can't remember what it was. Plaintiff testified that she was denied vacation at crucial times that she needed it, and it happened very often with Chan, and that was part of the retaliation against her. The denials did not always relate to coverage in the office. For example, Chan was present at work when he told Plaintiff that he could not approve her vacation because he would be there alone. When he took vacation, Plaintiff was there alone. That occurred sometime in 2017 when Richard Mai (analyst for David Chan) went on vacation.**  See Pl. Tr. pp. 220-225

> **vii.    Plaintiff's alleges that Andrew Zsoldos was fired because of her**

253.    Plaintiff claims that Andrew Zsoldos, an Analyst in the group was fired

because he "sought Plaintiff's help in completing his job duties". Ex A, ¶52.

### ADMIT

254.   In fact, Zsoldos's probationary employment was terminated for poor

performance, and his 6-month "Marginal" review reflects issues such as being "caught asleep at his desk, texting on his personal phone at his desk and meetings" and having "incomplete/inaccurate work requiring multiple revisions". *See* Ex ZZ.

**DISPUTE**

**There is obviously a problem with Chan and not Andrew Zsoldos because Andrew was just one in a line of analyst who reported directly to Chan who either resigned or were fired or pushed out.** Plaintiff testified in her Declaration at ¶34 in the bullets section **that David didn't replace Earl Jackson in 2015. Earl was the last analyst to report to Plaintiff. Plaintiff has not been assigned analyst support as are other Directors on Plaintiff's level since then. Plaintiff's job functions have been downgraded to those reserved for analyst; Plaintiff is the only Director or manager who doesn't have a analyst directly reporting to her; analyst Richard Mai and Laura Kopcznski reported directly to Chan; both he rated their performance as marginal. Between 2015 and 2018 Brown and Chan hired three (3) Analyst in the Communications Unit, all reported to David Chan while Plaintiff continued to work alone; Laura Kopcznski age 23 filed a sexual harassment complaint against Chan; Brown and Chan retaliated against her by giving her a marginal review; forcing her to resign from her job. Since Chan took over the leadership of the Communications Unit in 2014, four (4) Analyst have resigned or been fired they are: Earl Jackson, Andrew Zsoldos, Laura Kopcznski, and Richard Mai as a result of Chan and Brown's imposing their abusive and hostile work environment against them.** See Exh. 5 (admissions) ¶ 46; Exh. 33 (Kopcznski); see also Affidavit of David Weinzimmer at ¶¶ 12-13, 20-22, 24-26

> **viii.    Plaintiff alleges that she is the only Director "assigned a lunch time"**

255.   Plaintiff alleges that she is the only Director who was assigned a lunch time in the Unit. Ex A, ¶59; Ex B at 214-215.

**ADMIT**

256.   However, Brown has asked every employee in Capital Programs to designate a lunch hour for coverage purposes, and she maintains a list as such. Ex YY; Ex D at 88-89

**DISPUTE**

**This "list" is apparently on paper only, it is not in actual use. As proof, Chan can't even name two Directors who have assigned lunch hours. He evades the question. Chan evades the question of whether Plaintiff complained to him about being assigned a lunch hour. Chan testified "this is her recommendation of the time that she wants to take her lunch hour."** See Exh. 10 Chan Tr. pp. 88-89. **David swung the**

**lunch time designation hour as a sword to penalize plaintiff and not as a shield for coverage purposes. The testimony is that Plaintiff has been in the Capital Program area for 15 years and it wasn't until after she filed her discrimination complaint that she was assigned a lunch hour.** Pl. Tr. p. 214:5-15

257.   Plaintiff has never been reprimanded or penalized in connection with taking her lunch hour nor has never been denied the ability to take lunch.   Ex B at 214-215.

**ADMIT**

**ix.    Plaintiff's complains that she sits in a "cubicle"**

258.   Plaintiff complains that Brown removed her from her office into a "cubicle".

**OBJECTION**

**Fed. R. Civ. P. 56(c)(1)(A). There is no citation to support for this assertion.**

259.   C Level Directors like Plaintiff are not entitled to Offices, but to "Managers' Bays",  which is where Plaintiff currently sits.  Pl. Dep., Ex B at 89:17-21; Ex C at 380-82; 388-89.

**DISPUTE**

**Providing office space is not rigid and Brown has a lot of discretion. Accordingly, she decided to give Plaintiff an office then she decided to take it away, but only after there was a complaint of discrimination filed against her. For example, Plaintiff testified among other things that she occupied an office. After Donald Tsang left Brown ask Plaintiff to occupy that office. After Joe DiLorenzo was promoted, Brown ask Plaintiff to vacate that office. To Plaintiff's knowledge no one was ever ask to vacate an office in her Division. Plaintiff further testified that later on Marva Brown built two offices: one for AnnaMaria Perdomo who is a C-level Director like Plaintiff. Plaintiff now occupies a manager's cubicle. Plaintiff admitted that C-Level Directors typically are not entitled to offices. B level and above get offices. Plaintiff further testified that Anna Maria Perdomo for example is a C level Director with a title of Senior Director. She was placed in an office and Brown ultimately built her an office. As an another example of disparate treatment based on age in 2016 Brown hired a young Caucasian female in her 30's in a C level Director title and built her an office.  Also, Brown announced it at a staff meeting that she was building an office for Erica De Credenza. Erica did occupy the office after it was built. Robert Levine is another C level director with the title of Senior Director who occupies an office.**  See Exh. 8 Pl. Tr. pp.  89-91; see also Exh. 35 NYCTA Space Planning Standards.

260.   Though Plaintiff was permitted to temporarily occupy an office in 2011

when it became vacant following the retirement of a former senior director, she was asked

to vacate it in April 2014, following DiLorenzo's promotion to Senior Director. *Id.*

### DISPUTE

**Plaintiff denies the word "temporarily". Plaintiff's contention is that had she not filed an EEO complaint against Marva Brown she wouldn't have lost her office upon Joe DiLorenzo's promotion.** See response to ¶59 above.

261.    Plaintiff testified (Pl. Dep., Ex B at 89:17-21):

Q. Okay.  To your knowledge, do directors typically get offices? Are they entitled to offices?
A. C-level directors, was told, are not –when I—when I came into the division, I was told B-levels and above get offices. Okay. So I was removed from that office for Joe DeLorenzo.
Q. Who became a senior Director, correct?
A. Who became a B-level senior Director.
Q. Okay.
A. Okay.
Q. So he was in a higher title and a higher grade level, right?
A. Yes. I would assume.
Q. So wouldn't you say that that person would have seniority over somebody in your title and grade level in terms of office space?
A. Yes.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

### DISPUTE

**Plaintiff's testimony does nothing to change the fact that Brown exercised her discretion to remove Plaintiff from an office that she occupied. Accordingly defendant's arguments are nothing more than pretext for harassing Plaintiff and creating a hostile work environment for her.** See response to ¶ 59 above. See also Carr Decl. at ¶¶ 13, 14

### x.    Plaintiff complains that she no longer sits in for Chan when he is absent

262.    Plaintiff claims that she no longer sits in for Chan when he is out of the

office, and apparently alleges that this action was retaliatory.  Ex B at 227; Ex D at 97-98.

### DISPUTE

**More specifically, this item is alleged as part of Plaintiff's retaliatory hostile work environment.** See Amended Complaint at ¶55

263.   Plaintiff, however, continued to sit in for Chan following her September 2014 Complaint, until in or around July 2015, after an incident in which Brown recalled Plaintiff gave her incorrect information about a project and did not go directly to see her, and that such incident was not the first time (310-316; *see* TA 1740-45 related to this incident).

### DISPUTE

**This is a pretext statement made by Brown to justify her wrong doing. Indeed, the excuse doesn't even sound right, the above statement sounds in retaliation and vindictiveness because of an alleged "mistake".** At ¶34 of the Carr Decl. **Plaintiff testified that prior to 2015 she sat in for David Chan and Robert Levine, a C Level Senior Director, during their absence. After the filing of Plaintiff's EEOC complaint Marva Brown terminated Plaintiff's acting capacity for no stated reason and without informing Plaintiff of that policy change.**

264.   Further, Brown was told by Chan and other employees that Plaintiff said she does not speak to Brown (Ex C at 310-316).

### OBJECTION

**See Fed. R. Civ. P. 56(c)(2). This alleged fact is not supported by admissible evidence. Brown can't prove this hearsay statement. Since Chan wasn't sitting in the deposition room with her during this testimony Brown couldn't get her story corroborated. Further, nowhere in Chan's testimony is the above hearsay statement mentioned.**

Brown testified (313-314):

I don't require that you speak to me, but when it comes to my job, you're talking about my livelihood. I'm not asking you to speak to me personally; professionally, I have exchanges with Jennifer all the time. Personally, she doesn't speak to me, she'll pass me in the hallway and won't say a word to me. That's fine. That's her choice, but when it comes to my job, ¶ you're going to now compromise my job by not giving me information because you feel like you don't speak to me, that is a problem. And at that point I advised David that she should no longer sit in for him. She still has the responsibility of the communications area, but she's not going to sit in for him if she's not going to provide me information that is helpful in me getting my job done.

### DISPUTE

**Taking a look at the justification above for Brown making the decision not to permit Plaintiff to sit in for Chan going forward, Brown never states what the "information" was that was incorrect. Thus, another pretext statement by Brown to justify creating a hostile work environment for Plaintiff because she filed complaints of discrimination her.** See Exh. 26 (denial of Plaintiff to sit in).

     **xi.    Plaintiff's claims about excessive scrutiny and "harassing" work e-mails**

265.    Chan responded to questions regarding his e-mails and responses to

Plaintiff regarding work. *See* Ex D at 161-162.

Q.  But you give her e-mails every day that are work-related, correct?
A.  All my e-mails to my staff would be work-related, it would not be anything else.
Q.  But you just said that you weren't pushing her.
A.  I'm not.
Q.  Well, sir, that's just a conclusion because you are giving her e-mails of stuff to do, you want it done on time, correct
A.  Yes, that is the reason for accepting assignment, to have it done on time.
Q.  And she has more than one project going on at any given time, correct?
A.  We all have more than one project going on at any given time, yes.
                    \*\*\*
Q.  I see in the e-mails where you push Jennifer.  Are you denying that?
    MS THOMPSON: Objection.
A.  I don't know what you are classifying as pushing Jennifer. If you mean assigning work to Jennifer, or have her look at a specific task within a project, yes, that is all the cost of doing work.
Q.  Within a specific time frame, correct?
A.  Certain times are time sensitive, and there would be certain time frames associated with.
Q.  And you have been relatively inflexible with her about those times, haven't you?
A.  In terms of projects that are time sensitive, it is inflexible to me.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

        **ADMIT**

266.    Chan testified (Ex D at 224):

    A.  Module three is "Rail traffic management system," not "traffic management system," and it's on and on.
    Q.  So this is just an example sir, of you holding Jennifer to a high degree of accuracy, correct?
    A. I'm holding Jennifer to providing accurate documents. Because if I am to provide this to my vice president, it will be my issue, and if it is incorrect, I feel the need to at least let her know that it's incorrect so that she knows that it is

incorrect.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

267.    Plaintiff testified (Ex B at 188; 196-197; 217):

> Q. Do you know if David sends similar buck slips and emails to his other employees?
> A. I do not know that.
>
> **
> *
>
> Q. Do you feel that -- do you feel that his tone the different with other employees who work for him, or do those employees say that he uses the same tone to them?
> A. I don't -- I don't know
> Q. Do you know the tone that he uses with other employees?
> A. No
>
> ***
>
> Q. Do you know if he marks up other people's work?
> A. I do not know. I can only speak for me.

**Objection. Local Civil Rule 56.1(a) and Individual Practices of Judge Deborah A. Batts at page 3 of 11 …"there must be only one factual assertion in each numbered paragraph."…**

268.    Plaintiff has not been suspended, demoted or subject to a reduction of pay or benefits throughout her employment, and continues to perform in the role of Director, Telecommunications & Systems (Pl. Dep, Ex B, 229).

**DISPUTE**

**Because Plaintiff filed discrimination complaints against Brown and Chan she has been subjected to a cruel, hostile and abusive working environment that has caused her mental and emotional harm. Plaintiff sought and receives on-going psychiatric support and counseling to cope with her mental anxiety and sleepless nights as a result of her supervisors Brown and Chan as they overwhelm her with multiple overlapping large scale projects in addition to her core duties and responsibilities. All of these projects had/have deadlines that Defendants pressured Plaintiff to meet. While at the same time gradually decimating Plaintiff's annual employee performance evaluations from Excellent "E" to Needs Improvement ("NI"). The evidence overwhelmingly demonstrates that Plaintiff has been overworked to the point of having "nightmares" about going to work. She has been the subject of retaliation by Defendants' not giving her two years (so far) of earned general wage increases ("GWI") and a vindictive denial of her permanent Civil Service designation. Plaintiff has been harassed by Chan and Brown by having her vacations denied, coverage designation**

**denied, analyst support taken away, Lastly, Plaintiff has been discriminated against on the basis of her age because she was passed over for two promotions that she was qualified for and should have received but for her age.  All of these claims have been discussed at length in the paragraphs above.** See for example, Exh. 9 Pl. Tr. pp. 248-258; Exh. 39 (Pl. doctors' notes) Exh. 7 ¶26 (admission that Brown didn't appoint Plaintiff to earned Civil Service title); Exh. 20 (Plaintiff's requirement to draft daily progress reports and submit them once per week); Exh. 21 (which shows all of the red ink that Chan placed on Plaintiff's communications strategy work product that he didn't help to draft); Exh. 6 admission #1 (Chan uses red ink), Exh. 48 (promotion interview notes) a copy of handwritten EEO/HR notes that show that the interview process for Plaintiff's two denied promotions was biased and completely subjective. **The evidence produced in this case to date demonstrates Brown and Chan purposefully discriminated against Plaintiff on the basis of her age and retaliated against her by creating a hostile work environment because she complained about discrimination by Marva Brown. Plaintiff directly reported to three past Senior Directors in the Communications Unit two of whom have engineering licenses and backgrounds and reported directly to Marva Brown. These three professionals have attested to and corroborated certain key facts in this case. They are Donald Tsang, Joan Newbold and Ken Pearce. Tsang and Newbold said that Jennifer was an excellent employee and an excellent writer who was very knowledgeable about the Communications area. They said that Jennifer had analyst support who reported directly to her. They called Jennifer a "senior" or "lead" manager. Donald Tsang testified that although, he is an engineer, he didn't need to use his engineering skills as Senior Director. Joan Newbold trusted Plaintiff enough to leave her in charge of the Communications area and only do weekly status update reports. Ken Pearce testified that about Brown's leadership and management skills. Ken testified that Marva was unprepared, not a good leader and morale among staff was negative among other things. Laura Kopcynski who reported directly to Chan testified that he told her not to seek assistance from Plaintiff, that he bad talks Plaintiff behind her back to other employees, that he is critical and abusive to her, but yet holds Plaintiff out as the resident communications expert. Ms. Kopcznski testified that Chan wouldn't help her with her work assignments because he was incompetent to do so, but Plaintiff assisted her with her assignments because she knew how to do the work in the Communications area.** See Affidavits of Donald Tsang, Joan Newbold, Osmond "Ken" Pearce and Laura Kopcznski.

Dated: Brooklyn, New York
        April 20, 2019

Respectfully submitted,

\s\ *Gregory Smith*
_____

Gregory G. Smith
Janet J. Lennon
81 Prospect Street
Brooklyn, New York 11201

(917) 748-2623
Gsmith225@aol.com
*Attorneys for the Plaintiff*