UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                                      :
JENNIFER BERKELEY CARR,                               :
                                                      :
                                Plaintiff,            :
                                                      :          16-CV-9957 (VSB)
                - against -                            :
                                                      :          **OPINION & ORDER**
                                                      :
NEW YORK CITY TRANSIT AUTHORITY, :
MARVA BROWN, and DAVID CHAN,                          :
                                                      :
                                Defendants.  :
                                                      :
------------------------------------------------------X

<u>Appearances</u>:

Gregory Gladstone Smith
Gregory Smith & Associates
New York, New York
*Counsel for Plaintiff*

Kathryn E. Martin
NYS Office of the Attorney General
White Plains, New York
*Counsel for Defendants*

Mariel Alyson Tanne
New York City Transit Authority
Brooklyn, New York
*Counsel for Defendants*

I

<u>VERNON S. BRODERICK, United States District Judge</u>:

Plaintiff Jennifer Berkeley Carr ("Plaintiff"), a Black woman employed by Defendant New York City Transit Authority ("TA" or the "Authority"), brings claims against the Authority for race, gender, and age discrimination and retaliation, as well as against her supervisors and superiors at the Authority, Defendants Marva Brown ("Brown") and David Chan ("Chan") (collectively, "Defendants").  Plaintiff asserts eleven total claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 ("Title VII"); and 42 U.S.C. §§ 1981 ("§ 1981").[1]

Currently pending before me is Defendants' motion for summary judgment on all of Plaintiff's claims on the grounds that no evidence in the record would allow a reasonable juror to find that (1) Defendants violated anti-discrimination law in failing to promote Plaintiff to specific positions within TA; and (2) Plaintiff suffered retaliatory discrimination within the meaning of the relevant anti-discrimination law.  Because I find that no reasonable trier of fact could find in favor of Plaintiff on her discrimination and retaliation claims, Defendants' motion for summary judgment is GRANTED.

---

[1] *See infra* note 13.

## I.   <u>Factual Background</u>[2]

### A.   *The Parties*

Plaintiff is an "African-American female of Caribbean descent" born in 1955.  (Def. 56.1 ¶ 4.)[3]  Since 2000, she has worked for TA, the public benefit corporation that operates the subway system in the City of New York.  (*Id.* ¶¶ 3–4.)  Since 2004, Plaintiff has worked in TA's Capital Programs division ("Capital Programs"), which handles capital improvements to the subway system.  (*Id.* ¶¶ 5, 19.)  She works within Capital Programs' Telecommunications & Systems department, which the parties often refer to as "Communications."  (Carr. Decl. ¶ 3; Def. 56.1 ¶ 109; Thompson Decl. Ex. O, at 3; *Id.* Ex. P, at 2.)[4]

Defendant Brown is an "African-American female of Caribbean descent" born in 1959, who has served as Vice President and Chief Officer of Capital Programs since August 1, 2011.

---

[2] This section is drawn from the various submissions of both parties in order to provide background and context for Defendants' motion and is not intended as a recitation of all material undisputed facts.  Unless otherwise indicated, the facts set forth in this section are undisputed.

Although Plaintiff purports to dispute many of the facts recited in Defendants' Local Rule 56.1 statement, many of these so-called disputes do not concern whether Defendants properly establish the facts for the purposes of their summary judgment motion.  Rather, Plaintiff makes arguments about the veracity or implication of those facts.  (*See, e.g.*, Doc. 62 ¶ 154 ("Admit this is what Amy Kaufman wrote in her Declaration, but DISPUTE the truth of the matter" because, "it appears that Kaufman's opinion of Plaintiff changed because of outside considerations, not Plaintiff's job performance."); *id.* ¶ 155 ("Plaintiff cannot admit or deny this statement because there are credibility issues here with David Chan's testimony and his self-serving written statements on file.").)  Additionally, Plaintiff uses her response to Defendants' Local Rule 56.1 statement to add in facts unrelated to those raised by Defendants in their numbered paragraphs, rather than including additional paragraphs containing a separate, short and concise statement of additional material facts as to which Defendants contend that there exists a genuine issue to be tried.  Both of these actions are improper under Local Rule 56.1, and I disregard the improper assertions.  *See LG Capital Funding, LLC v. PositiveID Corp.*, No. 17-CV-1297-NGG-SJB, 2019 WL 3437973, at *2 (E.D.N.Y. July 29, 2019) ("The Court can . . . disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement.") (internal quotation marks omitted); *Crump v. Fluid Handling, LLC.*, No. 17-CV-45, 2019 WL 2145929, at *2 (W.D.N.Y. Mar. 29, 2019) ("Rather than scrutinize a Rule 56.1 statement line by line, a court may simply disregard any improper assertions or inadmissible evidence."); Local Civ. R. 56.1(b) ("The papers opposing a motion for summary judgment shall include a corresponding numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.").

[3] "Def. 56.1" refers to Defendants' Rule 56.1 Statement.  (Doc. 48.)

[4] "Carr Decl." refers to the Declaration of Jennifer Berkeley Carr.  (Doc. 55.)  "Thompson Decl." refers to the Declaration of Mariel A. Thompson, (Doc. 50), and the exhibits thereto.

(Def. 56.1 ¶¶ 6–7.)  Defendant Chan "was born in 1963 and is a 55[-]year-old Asian male, currently in the title of Senior Director, Program Management & Analysis ('PMA') in Capital Programs."  (*Id.* ¶ 8.)  He has worked as TA since 1987.  (*Id.* ¶ 9.)

  **B.**  ***Plaintiff's Job Since 2011***

  In July 2011, the "Senior Director" of Communications left TA, which led Plaintiff to take on his former responsibilities.  (Smith Aff. Ex. 12, at 6.) [5]  Brown consolidated various roles following the Senior Director's departure, and, in part owing to Plaintiff's having already taken on the relevant responsibilities, Brown effectively gave Plaintiff an "in-place promotion." (Smith Aff. Ex. 8, at 88:1–2; Def. 56.1 ¶ 24.)  Plaintiff was given the newly-created position of Director, Telecommunications & Systems, which came with a roughly 12% salary increase and the "Grade Level" of "C"—TA uses a letter-grade system for categorizing the ranks of its employees, and Plaintiff previously had the lower letter grade of "E."  (Def. 56.1 ¶¶ 24–27; Smith Aff. Ex. 9, at 204:5–24.)

  In her new position, Plaintiff was "primarily responsible for the overall coordination of" Communications within "Capital Programs."  (Smith Aff. Ex. 41, at 3.)  A large part of the job was to "ensure[] that Subways receives the highest level of funding resources to rebuild and expand its assets and infrastructure" as well as to "oversee[] some of the most complex communications projects and [to] anticipate[] long range plans for inclusion of new technologies within" "Capital Programs[s]."  (*Id.*)  According to her performance reviews, through the end of 2013, Plaintiff consistently received the "Overall Rating" of "Excellent," the highest of the four possible marks in TA's performance review system.  (*Id.* Ex. 12, at 6–8.)  Brown was the ultimate decisionmaker for at least Plaintiff's 2012 evaluation.  (*See id.* at 6.)

---

[5] "Smith Aff." refers to the Affirmation of Gregory G. Smith, (Doc. 63), and the exhibits thereto.

### C.   *Plaintiff Seeks Two Promotions, Does Not Receive Them, and "Clashes" With Other TA Employees*

In October of 2013, Plaintiff applied for a Senior Director position in Capital Programs' Program Management & Oversight department (the "PMO position").  (Def. 56.1 ¶ 36.)  Although Plaintiff was one of the top four candidates who interviewed for the position, she was passed over in favor of non-party Joseph DiLorenzo, a 51-year-old white man who started working for TA in 1989.  (*See id.* ¶¶ 11, 53, 61.)  Brown determined who received the PMO position.  (*Id.* ¶ 51.)  On February 3, 2014, Brown told Plaintiff she would not be promoted to the PMO position.  (*Id.* ¶ 59.)  Brown told Plaintiff that "the position is not the right fit for you" but did not explain why.  (Carr. Decl. ¶ 12.)  During her deposition, Brown stated that DiLorenzo's "technical background," as well as his "experience" with TA and "his interview" for the PMO position made him, in Brown's estimation, "the best candidate for the job."  (Def. 56.1 ¶ 57.)  "Plaintiff does not have a technical background."  (Pl. 56.1 ¶ 56.)[6]

Beginning in 2014, Plaintiff began having disputes at work and experiencing certain workplace slights.  For example, in March of 2014, Plaintiff "clashed" with Amy Kaufman, who served as a Senior Director above her, regarding whether Plaintiff would be allowed to take time off from work.  (Def. 56.1 ¶¶ 41, 71–73.)  According to the emails, Kaufman refused Plaintiff's request for time off because, among other reasons, Kaufman herself would be away on vacation at that time, and because Plaintiff did not make her request soon enough.  (Thompson Decl. Ex. T, at 2.)  Plaintiff responded by saying that Kaufman never informed her about Kaufman's own planned vacation time.  (*Id.*)  Plaintiff added she would have to miss work because she had "a

---

[6] "Pl. 56.1" refers to Plaintiff's Response to Statement of Material Facts Pursuant to Rule 56.1.  (Doc. 62.)  The numbering of the paragraphs of Plaintiff's 56.1 statement contains certain typographical errors:  there are two paragraphs 4, followed by paragraphs numbered 7 through 9, then a paragraph 6, and then paragraph 11.  The numbering regularizes after that point.  (*See id.* at 2–4.)

family emergency[:]" her "daughter [wa]s scheduled for surgery" that could "[]not be scheduled in advance." (*Id.*) Kaufman also submitted a declaration in which she states that she found Plaintiff "[i]ncreasingly [c]hallenging" over the course of 2014. (Doc. 53 ¶¶ 32–44.)

In April 2014, Brown ordered Plaintiff to "vacate [the] office" she had occupied for "two years" to turn it over to DiLorenzo, which in turn forced Plaintiff to relocate "into a cubicle." (Carr Decl. ¶ 13.) This made Plaintiff "the only C Level Director in the Division of Capital Programs at the time not to occupy an office," which she says was a "humiliation" that prompted "co-workers outside of [her] division [to ask] about why [she] was demoted." (*Id.*)

Kaufman left TA in May of 2014, which left an opening for her former role as Director of Program Management & Analysis within Capital Programs (the "PMA Position"). (Def. 56.1 ¶ 80.) Plaintiff applied for the PMA Position, was deemed qualified, and interviewed for it on or around July 30, 2014. (*Id.* ¶ 85.) The interview panel consisted of three TA employees: Brown, Deborah Chin ("Chin"), and Jennifer Franceschini. (*Id.* ¶ 82.) Defendant Chan was among the other candidates who interviewed for the PMA Position. (*See id.* ¶ 86.)

Although the panel scored Plaintiff and Chan (as well as 13 other employees) just as highly in a preliminary evaluation, (Thompson Decl. Ex. Y, at 4), after conducting interviews of nine employees, (*id.* at 2), Brown chose to give the PMA position to Chan over Plaintiff and the other candidates, (Def. 56.1 ¶ 97 (citing Thompson Decl. Ex. Y)).[7] In a hiring justification memorandum dated August 21, 2014, Brown wrote that Chan was promoted into the PMA position because of his "experience at [TA] and his educational background." (Thompson Decl. Ex. Y, at 2.) Chan had been at TA since 1987—approximately thirteen years longer than Plaintiff—and had a background in electrical engineering and business administration. (*Id.* Ex.

---

[7] Neither party identified the race or ages of any of the other candidates.

N).  In June of 2014, during an interview with employees from TA's Office of Equal

Employment Opportunity ("EEO"),[8] Brown said she chose Chan for his "broad experience" and

"technical background."  (*Id.* Ex. G, at 12.)  The job posting for the PMA position states a

preference for candidates with "'a baccalaureate degree from an accredited college majoring in

the field of Engineering, Business Administration or Economics,' and 'development and/or

background in electrical engineering.'"  (*Id.* Ex. G, at 12 & n.9 (quoting Thompson Decl. Ex. W,

at 2).)  Brown and Chin also both thought Chan interviewed notably well.  (Def. 56.1 ¶ 98; Chin

Decl. ¶ 20 ("Chan performed very well in his interview.").)[9]

By contrast, according to Chin, Plaintiff "display[ed] a sense of entitlement to the" PMA

position in her interview, and "was openly hostile towards [Brown]."  (Chin Decl. ¶¶ 17, 19.)

Brown said she promoted Chan over Plaintiff because, among other reasons, she thought

Plaintiff's "people skills 'fall short,'" and that Plaintiff "stayed to herself and never connect[ed]

with peers or tried to understand the rest of the organization.  (Def. 56.1 ¶ 101; Thompson Decl.

Ex. G, at 12.)

Around August 20, 2014, Brown told Plaintiff she would not be promoted to the PMA

position "because [Brown] want[ed] to take Communications in another direction."  (Thompson

Decl. Ex. A ¶ 26.)  In response, Plaintiff spoke to Brown's boss, Joe Leader, to ask for a transfer

out of Communications.  (*See id.* Ex. C, at 74:5–20.)  Following this, Brown and Plaintiff had a

conversation in which Brown told Plaintiff that "going to [Brown's] boss is not going to change

---

[8] EEO conducted this interview because of a May 2, 2014 "anonymous age discrimination complaint" it received about DiLorenzo's promotion.  (Thompson Decl. Ex. G, at 3.)

[9] "Chin Decl." refers to the Declaration of Deborah Chin.  (Doc. 52.)  Defendants also cite to a declaration from the other PMA position panel interviewer, Jennifer Franceschini, (*see, e.g.*, Def. 56.1 ¶ 82); however, Defendants failed to file this declaration.  The docket entry listed as Ms. Franceschini's declaration, when opened, is a declaration from Amy Kaufman.  (*See* Doc. 51.)  Because of this, I have disregarded these citations and anything Defendants say about the contents of Ms. Franceschini's declaration.

[Brown's] mind." (*Id.* at 74:21–75:8.)  Around this same date, Brown helped Plaintiff to apply to the New York City Leadership Institute, a program which helps prepare city mid-level agency officials for higher positions, by providing Plaintiff a letter of recommendation.  (*Id.* Ex. AA; Def. 56.1 ¶¶ 112–14.)  Brown told Plaintiff "that they should work on a development plan for [Plaintiff]," which Plaintiff refused.  (Thompson Decl. Ex. G, at 13; Pl. 56.1 ¶ 113.)

> **D.**    *Plaintiff's EEO Complaint and Defendant Chan Begins Supervising Plaintiff*

On September 2, 2014, Plaintiff began the process of filing a complaint against Brown with EEO for not promoting her to either the PMO or PMA positions, in which Plaintiff alleged "age discrimination, unfair promotions [sic] and hiring practices, and abuse of power."  (*See* Thompson Decl. Ex. F, at 4.)  Around September 8, 2014, Chan met Plaintiff at a workplace meeting and introduced himself to her as her new boss.  (Def. 56.1 ¶ 120.)  This meeting was the first time that Brown learned that Chan, a "younger Asian male," had received the PMA position instead of her.  (*See* Smith Aff. Ex. 15, at 4.)

On October 8, 2014, Plaintiff attended a meeting at which "Brown announced that[] '[a] new Senior Director will be starting on Monday,'" which appears to be a reference to Chan.  (Thompson Decl. Ex. CC, at 3.)  The next day, Plaintiff wrote to EEO to ask if they had "approved [Chan's] promotion" and to say that she "view[ed] . . . Brown's cryptic announcement yesterday as retaliatory."  (*Id.*)  In response, on Monday, October 13, 2014, someone from EEO wrote back to say, among other things, that Plaintiff's EEO complaint had no bearing on when someone would be starting in the PMA position.  (*Id.* at 2.)

Chan was appointed to the PMA position on October 13, 2014.  (Def. 56.1 ¶ 124.)  Chan started in the PMA position "part-time."  (Thompson Decl. Ex. DD, at 2.)  In a phone call with EEO on October 14, Plaintiff said that she viewed the fact that Chan was starting as a Senior

7

Director part-time, something that no prior Senior Director to Plaintiff's knowledge had ever been allowed, to be another instance of "retaliation for filing [her] EEO complaint and for requesting a lateral transfer from Joe Leader." (*Id.* at 2–3.) In an October 15 follow-up email, Plaintiff added that she also thought Brown had retaliated against her by announcing that "[Plaintiff] will be reporting to [Chan]," and that she was "working in an environment that [she] believe[d] could only get worst [sic];" she also said, "I feel isolated and I am not sure how long I can continue to work in this environment." (*Id.* at 2.)

In mid-February of 2015, Plaintiff communicated to EEO that she thought "Chan has 'harassed' and 'retaliated against [her], in that he . . . 'talks down' to [her] and has communicated . . . both verbally and via email in a disrespectful manner . . . ." (*Id.* Ex. EE, at 2.) EEO responded by telling Plaintiff she had "not provided sufficient information to establish a potential violation of [TA's governing] policies" regarding Chan. (*Id.*)

On April 24, 2015, EEO issued a formal memorandum detailing that it had not found "reasonable cause" to believe that Brown had discriminated against Plaintiff in violation of TA policies. (Def. 56.1 ¶ 140 (citing Thompson Decl. Ex. G).)

### E.   *Plaintiff's "Good" Performance Reviews for 2014 and 2015*

On May 20, 2015, Plaintiff received her annual performance review for 2014, which gave her an overall evaluation of "Good." (Def. 56.1 ¶ 150.) Prior to this, Plaintiff received the higher overall rating of "Excellent" in every year from 2008 to 2013; she was last scored "Good" overall in 2006. (Smith Aff. Ex. 12, at 3–9.) Chan drafted Plaintiff's 2014 review with input from Amy Kaufman, (Def. 56.1 ¶¶ 153–56), and he had Brown review a draft of the evaluation once he had finished it, (*id.* ¶¶ 157–58).[10] Plaintiff's 2014 performance review says that

---

[10] Brown suggested revisions to parts of the evaluation, including to some of the qualitative language, but she did

"[Plaintiff] is not functioning at the level of her current position" and that Chan would "continue to work with [Plaintiff] to further develop her management skills." (Thompson Decl. Ex. FF.) Plaintiff refused to sign this evaluation. (*Id*.)

Around a week later, Plaintiff emailed Brown's boss, Joe Leader, and complained that, "[a]mong various things," the performance review rating of "Good" "was retaliation against her for filing a discrimination complaint against . . . Brown with the . . . EEO." (Thompson Decl. Ex. II, at 2.) Soon after, in early June of 2015, Plaintiff began a process to appeal Chan's 2014 performance review of her. (*Id.* Ex. JJ.) Plaintiff withdrew this appeal on June 8, 2015. (Def. 56.1 ¶ 174.)

Plaintiff's performance review for 2015, the final draft of which is dated April 1, 2016, also ranks her overall performance as "Good." (Thompson Decl. Ex. OO, at 2.) In a memorandum, Plaintiff disputed the review, saying that it "neglect[s] to provide one concrete example that would warrant" a "rating" below Excellent. (*See* Smith Aff. Ex. 12, at 19.) However, at least from May of 2015 through January of 2016, Chan and Plaintiff exchanged several emails and workplace memoranda in which Chan took issue with how Plaintiff was doing her job. (Thompson Decl. Ex. PP, 2–29.) For example, after Plaintiff circulated meeting notes to a number of TA employees on November 23, 2015, Chan sent her an email asking her "why [she] didn't . . . discuss with [Chan] what [she] w[as] going to send out," provided a mark-up identifying what Chan saw as errors, and concluded, "[w]ith all due respect, this document really shouldn't have gone out this way." (*Id.* at 12.)

---

not change the overall rating of "Good" that Chan had given to Plaintiff. (*Id.* ¶¶ 158–62.)

F.      *Plaintiff's "Needs Improvement" Performance Reviews*

For the 2016 year, through a performance review purportedly "discuss[ed]" on April 11, 2017, Plaintiff was given an overall rating of "Needs Improvement," which was the lowest rating available in the performance review system in place for that year.  (*See id.* Ex. SS, at 2, 7.)  On May 10, 2016, Brown contacted EEO over the "progressively worse[ning]" work relationship between Plaintiff and Chan, Plaintiff's failure to perform her job at the expected level, and about her own perceptions of Plaintiff's "hostil[ity]."  (Def. 56.1 ¶¶ 189–90.)  On May 31, 2016, Chan wrote a memorandum to Brown concerning Plaintiff's "poor work performance and offensive defaming accusations."  (*Id.* ¶ 191.)  Chan also referenced Plaintiff's workplace issues in a remedial letter to her dated February 27, 2017, in which he said Plaintiff "fail[ed] to properly and timely complete assignments" and made "inappropriate comments."  (*Id.* 200 (citing Thompson Decl. Ex. TT).)

As a result of the poor 2016 performance review, Plaintiff did not qualify for a wage increase in 2017.  (Pl. 56.1 ¶ 199.)

For her 2017 performance review, which was administered on or about January 17, 2018, Plaintiff once more received a rating of "Needs Improvement," which disqualified her for a wage increase in 2018.  (Def. 56.1 ¶¶ 207–12.)

II.     **Procedural History**

Plaintiff commenced this action by filing a complaint against TA, Brown, and Chan on December 27, 2016.  (Doc. 1.)  She filed her Amended Complaint on January 1, 2017.  (Doc. 6 ("Am. Compl.").)  In it, Plaintiff asserts eleven causes of action.  The First through the Third Causes of Action are asserted under the ADEA for, respectively, discrimination, retaliation, and hostile work environment.  (Am. Compl. ¶¶ 63–81.)  The Fourth and Fifth Causes of Action are

asserted under Title VII for discrimination and retaliation. (*Id.* ¶¶ 82–93.) The Sixth through Eleventh Causes of Action are asserted under "42 U.S.C. 1981 et seq." for: race discrimination against all Defendants (*id.* ¶¶ 94–101); retaliation against all Defendants (*id.* ¶¶ 102–105); and two causes of action each against both Brown and Chan for race discrimination and retaliation (*id.* ¶¶ 106–129).

Defendants answered the Amended Complaint on March 3, 2017, (Doc. 14), and the case was referred to mediation on March 6, 2017, (Doc. 15). After failing to reach a resolution through mediation, the parties engaged in discovery, which closed on March 2, 2018. (Doc. 30.) On January 23, 2019, the parties filed pre-motion letters, (*see* Docs. 41–45), and Defendants received permission to move for summary judgment from Judge Batts, who was initially assigned to this case, (*see* Doc. 46).[11]

On March 7, 2019, Defendants moved for summary judgment and filed their Rule 56.1 Statement, supporting declarations with exhibits, and a memorandum of law. (Docs. 47–54.) On April 20, 2019, Plaintiff filed her own papers opposing summary judgment. (Docs. 55–64.) On May 2, 2019, Defendants filed a reply brief. (Doc. 65.)

### III.   <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[11] On February 20, 2020, the case was reassigned to me.

(1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). "'The principles governing admissibility of evidence do not change on a motion for summary judgment' and district courts need only consider admissible evidence in ruling on a motion for summary judgment.'"  *I.M. v. United States*, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting *Raskin v. Wyatt Company*, 125 F.3d 55, 66 (2d Cir. 1997)).

In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—

including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ.

P. 56(e)(2), (3); *see also* Fed. R. Civ. P. 56(c)(1)(a) ("A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by . . . citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials."); Local Rule 56.1(d) ("Each statement by the movant

or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any

statement of material fact, must be followed by citation to evidence which would be admissible,

set forth as required by Fed. R. Civ. P. 56(c).").  However, "where the movant 'fails to fulfill its

initial burden' of providing admissible evidence of the material facts entitling it to summary

judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is

presented,' for the non-movant is not required to rebut an insufficient showing."  *Giannullo v.

City of N.Y.*, 322 F.3d 139, 140–41 (2d Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 160 (1970)).  "Moreover, in determining whether the moving party has met this burden

of showing the absence of a genuine issue for trial, the district court may not rely solely on the

statement of undisputed facts contained in the moving party's Rule 56.1 statement.  It must be

satisfied that the citation to evidence in the record supports the assertion."  *Vt. Teddy Bear Co. v.

1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

Courts must exercise "an extra measure of caution" in determining whether to grant

summary judgment in employment discrimination cases "because direct evidence of

discriminatory intent is rare and such intent often must be inferred from circumstantial

evidence."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal

quotation marks omitted).  Nevertheless, "a plaintiff must provide more than conclusory

allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

## IV.   <u>Discussion</u>

In her brief opposing summary judgment, Plaintiff argues two legal theories for denying Defendants' motion. First, she argues that Defendants did not promote her in violation of relevant anti-discrimination statutes. (SJ Opp. 10–17.)[12] Second, she argues that Defendants retaliated against her for engaging in protected activity to "protest or oppose statutorily prohibited discrimination." (*Id.* 18–25.) I will analyze each of these legal theories in turn.[13]

### A.   *Failure to Promote Based on Discrimination*

Plaintiff argues that Defendants did not promote her to the PMA position because of discrimination in violation of Title VII and the ADEA, and that Defendants did not promote her to the PMO or PMA positions due to discrimination in violation of § 1981. (SJ Opp. 10.) "Accordingly, [the] *McDonnell Douglas* analytical framework applies in all three discriminatory claims herein." (*Id.*)

---

[12] "SJ Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. (Doc. 64.)

[13] To the extent Plaintiff sought relief in her Amended Complaint on any other basis, "[t]he circumstances and papers here fairly support[] an inference" that Plaintiff has "abandon[ed]" them. *Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) ("Even 'where abandonment by a counseled party is not explicit,' a court may infer abandonment 'from the papers and circumstances viewed as a whole.'" (quoting *Jackson v. Federal Express*, 766 F.3d 189, 196 (2d Cir. 2014))); *see also, e.g.*, *Quintero v. Rite Aid of New York, Inc.*, No. 09 Civ. 6084(JLC), 2012 WL 10401, at *2 (S.D.N.Y. Jan. 3, 2012) ("Quintero's failure to specifically address her claims under the NYSHRL, given Rite Aid's motion for summary judgment as to the entirety of Quintero's Complaint and her burden to establish a prima facie case, therefore constituted abandonment of her state law claims."). Here, although Plaintiff's Amended Complaint states that she alleges claims under both sections "1981 and 1983," (Am. Compl. ¶ 1), her opposition brief states that she "brings claims under Title VII, the ADEA, and Section 1981" and argues that "[a]ll three statutes" are at issue. (SJ Opp. 16–17.) Plaintiff has thus abandoned any § 1983 claim she may have asserted in her Amended Complaint. *See Camarda*, 673 F. App'x at 30. Moreover, because any § 1983 claims Plaintiff may have meant to pursue are analyzed under the same relevant framework as are the claims Plaintiff actually pursues in her filings, *see Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (citing *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010)), the disposition would be substantially the same, even if I were to address § 1983 separately.

### 1.   Applicable Law

"Discrimination claims under Title VII, the ADEA, and [§ 1981] are analyzed using the

three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973)."  *Braunstein v. Sahara Plaza, LLC*, 16-CV-8879 (VSB), 2021 WL 2650369, at

*8 (S.D.N.Y. June 28, 2021) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir.

2014)); *Littlejohn*, 795 F.3d at 312 (2d Cir. 2015) (discussing § 1981 claims).  First, the

employee bears the burden of setting forth a prima facie case of discrimination.  *See McDonnell

Douglas*, 411 U.S. at 802.  To set forth a prima facie case of discrimination, a plaintiff must

show "(1) she belongs to a protected class; (2) she was qualified for the position at issue; (3) she

suffered an adverse employment action; and (4) the adverse employment action occurred under

circumstances giving rise to an inference of discrimination."  *Tubo v. Orange Reg'l Med. Ctr.*,

690 F. App'x 736, 738 (2d Cir. 2017) (citing *McDonnell Douglas*, 411 U.S. at 802).  The Second

Circuit has emphasized that the "burden of establishing a *prima facie* case is *de minimis*."  *Abdu-*

*Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (collecting cases).

An adverse employment action is "a 'materially adverse change' in the terms and

conditions of employment."  *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir.

2004).  "Employment actions that [the Second Circuit has] 'deemed sufficiently disadvantageous

to constitute an adverse employment action include a termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices unique to a particular

situation.'"  *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Williams v. R.H.*

*Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).  Courts in the Second Circuit have held that

"threats of disciplinary action and excessive scrutiny," without additional negative consequences,

do not rise to the level of adverse employment actions. *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) (collecting cases and noting that "[w]hile plaintiff may have been reprimanded repeatedly for his lateness, nothing came of these reprimands"); *see also Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."). Claims for failure to promote are also well-recognized. *See, e.g.*, *Mirasol v. Gutierrez*, No. 05 CIV. 6368(DC), 2006 WL 871028, at *4 (S.D.N.Y. Apr. 5, 2006) ("[A] single failure to promote is actionable even if no other discriminatory act has occurred." (citing *Nat'l R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113–15 (2002)).

"An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted); *see also Graham*, 230 F.3d at 39 ("A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group.").

If a plaintiff successfully presents a prima facie case of discrimination, the burden shifts to the defendant to proffer "legitimate and non-discriminatory reasons for the adverse employment action." *Abdu-Brisson*, 239 F.3d at 468. The defendant's burden at this stage is "light." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). This burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Once a defendant proffers a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, either that the proffered reason is a pretext for discrimination, *see Holcomb*, 521 F.3d at 141, or that "the employer's proffered reasons were . . . not the only reasons and that the prohibited factor was at least one of the motivating factors," *Holcomb*, 521 F.3d at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see also Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("[A] plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus."). "A plaintiff may demonstrate pretext by showing 'weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.'" *Gokhberg v. PNC Bank, Nat'l Ass'n*, 17-cv-00276 (DLI)(VMS), 2021 WL 421993, at *7 (E.D.N.Y. Jan. 6, 2021) (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

To defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trs. of Columbia Univ. in the City of N.Y.*, 131 F.3d 305, 312 (2d Cir. 1997). "To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks omitted), *cert. denied*, 540 U.S. 811 (2003); *see also Schnabel v. Abramson*, 232 F.3d 83, 90–91 (2d Cir. 2000) (affirming summary judgment in favor of defendant where plaintiff failed to present evidence upon which a

reasonable jury could conclude that age was a "determinative factor" in adverse employment action).

## 2. Application

Plaintiff passes the first step of the *McDonnell Douglas* burden-shifting framework because she is a Black woman who was born in 1955, (Def. 56.1 ¶ 4), which places her within relevant protected categories under Title VII, the ADEA, and § 1981. She was qualified for both the PMA and PMO positions. (*See, e.g.*, Pl. 56.1 ¶ 32 (noting "plaintiff was deemed qualified for the position"); Smith Decl. Ex. 45, at 3 (grading Plaintiff with an "A" and stating this indicates she was "qual[ified]").) She bases her relevant claims on a "discriminatory failure to promote[, which] falls within the core activities encompassed by the term 'adverse actions.'" *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).

With regard to the PMO position, instead of promoting Plaintiff, the Authority promoted Chan, a man of Asian descent who is approximately eight years younger than Plaintiff, (Pl. 56.1 ¶ 8), and, as is relevant for § 1981 only, the Authority promoted DiLorenzo, a white man, over Plaintiff, (Def. 56.1 ¶ 61). The eight-year age difference between Plaintiff and Chan is enough here to give rise to an inference of discrimination to make out a prima facie case under the ADEA. *D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir. 2007) ("[O]ne of the individuals who was offered a position was eight years younger than [plaintiff]. This difference in age—though not large—is significant enough to support an inference in [plaintiff]'s favor." (internal citation omitted)). Plaintiff's gender and racial differences are enough for the "*de minimis* standard for a *prima facie* case on her failure to promote claim" for Title VII purposes. *Thomas v. City of New York*, 953 F. Supp. 2d 444, 453 (E.D.N.Y. 2013) (finding that prima face

case had been established where, as here, defendant's main argument about why a person of Asian descent was promoted over a Black person was that the Asian person "was eminently more qualified in every respect").[14]

At this juncture, with regard to step two of the *McDonnel Douglas* framework, "the burden shifts to [Defendants] to proffer legitimate, non-discriminatory reasons for the adverse employment action." *Braunstein*, 2021 WL 2650369, at *8 (S.D.N.Y. June 28, 2021) (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468–69 (2d Cir. 2001)). Defendants argue that Chan and DiLorenzo were the more qualified and experienced candidates for the promotions they received over Plaintiff. (SJ Br. 8–9.) Although "an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision . . . 'the court must respect the employer's unfettered discretion to choose among qualified candidates.'" *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

Defendants sufficiently demonstrate non-discriminatory reasons for not promoting Plaintiff and thus pass step two of the framework. Chan and DiLorenzo were both qualified for

---

[14] Whether Plaintiff has identified facts that establish an inference of discrimination is a close call in this case. Plaintiff does not cite to evidence that Defendants criticized her performance in ethnically degrading terms; or made invidious comments about others in her protected group; or caused or engaged in a sequence of events leading to the plaintiff's discharge. Plaintiff claims that Chan and DiLorenzo, as individuals outside of her protected class, were treated more favorably. However, based upon the record before me, Plaintiff may not have been "similarly situated" to Chan and DiLorenzo. *See Graham*, 230 F.3d at 39. Chan had been at TA for around thirteen years longer than Plaintiff; had a different educational background; and was promoted from a different department within TA than the one in which Plaintiff was working. (*See* Thompson Decl. Exs. N & Y.) DiLorenzo had eleven years' more experience at the Authority than Plaintiff did, and he had a "technical background" that Plaintiff did not have. (Def. 56.1 ¶¶ 52–56.) However, Defendants do not argue that either Chan or DiLorenzo and Plaintiff are not comparable for the purposes of assessing the inference of discrimination, and Defendants concede that Plaintiff was considered "qualified" for both PMA and PMO positions, even if she was not "the best candidate" in their stated estimation, (*id.* ¶ 97). Given the standard on summary judgment, I thus find that Plaintiff has established an inference of discrimination.

the positions they received.  Chan had thirteen more years of experience working at the

Authority than Plaintiff; had a background in electrical engineering that the PMA position's

interviewing panel thought useful; and had a "strong performance[] at [his] interview[]."  (Def.

56.1 ¶ 87; Thompson Decl. Exs. N & Y.)  Indeed, based on contemporaneous evidence from the

time Defendants promoted Chan to the PMA position, a reasonable juror could infer that Chan

was promoted because "[h]is experience at [TA] and his educational background make him an

ideal candidate."  (Thompson Decl. Ex. Y, at 2.)[15]  Similarly, DiLorenzo had eleven years' more

experience at the Authority than Plaintiff.  (*Compare* Def. 56.1 ¶ 53 ("DiLorenzo had been with

the TA since 1989") *with id.* ¶ 5 ("Plaintiff has been with the [Authority] since 2000")).)  Brown

said in her deposition that she promoted DiLorenzo to the PMO position over Plaintiff because

she thought "the combination of" his "experience, and his technical background . . . made him

the best candidate for the job."  (*Id.* ¶¶ 55–57.)

  Plaintiff does not argue either Chan or DiLorenzo were unqualified.  She only notes that

both Chan and DiLorenzo were promoted from divisions of TA outside of Capital Programs, but

she does not explain why this fact is relevant.  (SJ Opp. 12).  The undisputed facts demonstrate

that both men were qualified, and, at step two of the framework, I must respect Defendants'

decision as to the "qualified candidates" they chose.  *Byrnie*, 243 F.3d at 103.

  I next turn to the third step, where "[t]he burden . . . shifts back to the plaintiff to

demonstrate by a preponderance of the evidence that the employer took the adverse employment

---

[15] Although Plaintiff objects to the memorandum regarding the reasons for promoting Chan as inadmissible hearsay, (Pl. 56.1 ¶ 88)—and even if the hearsay exception for records of a regularly conducted business activity did not apply, which it does, *see* FRE 803(6)—the memorandum would still be "admissible for the purposes of demonstrating" what information Defendants "relied on" in promoting Chan, if not "to establish the truth" of that information.  *See Braunstein*, 2021 WL 2650369, at *13 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  In other words, without considering whether or not the statements in the memorandum were accurate, the statements are nonetheless admissible to demonstrate that Defendants relied on them.

action motivated 'in whole or in part' by discrimination." *Braunstein*, 2021 WL 2650369, at *9

(citing *Holcomb*, 521 F.3d at 137).  This means, "without the aid of" "the presumption of

discrimination raised by the prima facie case," Plaintiff must point to "sufficient evidence upon

which a reasonable jury could conclude" that it is more likely than not that the decision not to

promote her "was based, at least in part, on" her protected characteristics.  *Holcomb*, 521 F.3d at

141; *see also Mandell v. County of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003) (applying this same

standard in a case concerning "denials of promotions").

Here, Plaintiff argues that Defendants' decisions not to promote her were a "pretext"—

she argues that "Defendants [sic] reasons for the failure to promote are non-truthful and non-

consistent."  (SJ Opp. 13).  However, Plaintiff has not identified facts that support a finding that

Defendants' decisions were pretextual or evidence from which a "reasonable juror could find

that the denial of" the promotions to Plaintiff "w[ere] based on her race or sex" or age.  *Kellman

v. MTA*, 8 F. Supp. 3d 351, 373 (S.D.N.Y. 2014) (citing *Kwan,* 737 F.3d at 846–47).  The so-

called inconsistencies Plaintiff highlights in support of her pretext argument are not actually

inconsistencies, much less ones suggesting that Defendants ever considered race or gender or age

in not promoting Plaintiff.  For example, Plaintiff argues that Brown "told Plaintiff she was not

getting the promotion given to DiLorenzo because the position was not the right fit for her, but

stated in her deposition she was looking for a technical person."  (SJ Opp. 13 (internal citations

omitted).)  There is nothing inconsistent about these statements:  Brown could have thought

Plaintiff was not the right fit precisely because she lacked a technical background.  *Cf. Kwan*,

737 F.3d at 846 (finding inconsistent explanation where one person testified that plaintiff was

terminated due to a change in the employer's business model, while another person testified the

change in business model was irrelevant to the termination).  Neither Plaintiff's argument nor

anything else I could find in the record would sustain her burden here, which is to offer evidence

tending to show that Defendants' stated reasons were not the only reasons and that race or some

other legally-relevant characteristic made a difference in Defendants' promotion decision.  *See*

*Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) ("[T]he plaintiff is not

required to prove that the employer's proffered reasons are false but only that they were not the

only reasons and that race made a difference.").

    At most, Plaintiff has offered evidence from which a reasonable juror could find that

Defendants personally preferred Chan and DiLorenzo and disliked Plaintiff.  However, that does

not suggest that a protected trait was "at least one of the motivating factors" in Defendants'

decision not to promote Plaintiff, or that Defendants acted with relevant "discriminatory animus"

in not promoting Plaintiff.  *See Braunstein*, 2021 WL 2650369, at *13–14.  For example, Chin,

who was one of the interviewers for the PMA promotion, was "concern[ed]" about "negative

elements to [Plaintiff]'s working and communication style"—this interviewer found Plaintiff

"difficult to work with" in ways she believed ill-suited to the PMA position's duties of "regularly

interfacing with stakeholders" at the Authority to "gain consensus from different stakeholders."

(Chin Decl. ¶¶ 22–23.)  In response, Plaintiff does not argue that Chin's account is a veil for

discrimination.  Instead, she only says she was never "openly hostile" and that Chin "holds no

position to offer the amount of criticism she directed toward me . . . regarding my work product

and performance."  (Carr Decl. ¶¶ 44–45.)  Plaintiff's objections to Chin's account are irrelevant

since they do not support the notion that Defendants' decisions not to promote Plaintiff were a

pretext for discrimination.  *See Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 417 (2d Cir.

2011) ("[T]he possibility that [an employer's decision] may have been erroneous does not,

without evidence that it was a pretext for discrimination, satisfy [a plaintiff's] burden

under *McDonnell Douglas*.").  Likewise, Plaintiff fails to point to any facts in the record from which an inference could be drawn the Defendants' decisions were pretextual.

"In sum," even if Plaintiff "suspects that her race" or some other protected characteristic "played a role in her" not being promoted, she "cannot rely on speculation alone to prove her discrimination claim" at the summary judgment stage.  *See Johnson v. L'oréal USA*, 18 Civ. 9786 (JPC), 2021 WL 4482167, at *14 (S.D.N.Y. Sept. 30, 2021).  Accordingly, Plaintiff's first, fourth, sixth, eighth, and ninth causes of action from her Amended Complaint—all of which are premised on discrimination in Defendants' not promoting her—must be dismissed, and Defendants' motion for summary judgment on these causes of action is GRANTED.

### B.    *Retaliation Claims*

Plaintiff argues that Defendants retaliated against her by, among other things, "creat[ing] a retaliatory hostile work environment."  (SJ Opp. 18.)  She nowhere argues a basis by which the hostile work environment claims asserted in her Amended Complaint can proceed alone. Plaintiff has thus abandoned any standalone hostile work environment claims she may have previously asserted, *Camarda*, 673 F. App'x at 30, so I only analyze hostile work environment as it pertains to the retaliation argument.

### 1.   Applicable Law

As with discrimination claims for failure to promote, ADEA, Title VII, and § 1981 retaliation claims are governed by "the *McDonnell-Douglas* burden-shifting framework."  *Reiss v. Hernandez*, 852 F. App'x 620, 622 (2d Cir. 2021) (ADEA) (citing *Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199, 204 (2d Cir. 2006)); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 220 (E.D.N.Y. 2014) (Title VII and § 1981).  "In order to show a *prima facie* case of retaliation in response to a motion for summary judgment, a plaintiff must

submit sufficient admissible evidence to allow a trier of fact to find:  (i) conduct by the plaintiff

that is protected activity . . . ; (ii) of which the employer was aware; (iii) followed by an adverse

employment action of a nature that would deter a reasonable employee from making or

supporting a discrimination claim; (iv) that was causally connected to the protected

activity."  *Cox v. Onondaga County Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir.

2014); *accord Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 309 (2d Cir. 2017).

 To establish that she engaged in protected activity under the first prong, Plaintiff "need

not establish that the conduct she opposed was actually a violation of Title VII" or other relevant

anti-discrimination law, "but only that she possessed a good faith, reasonable belief that the

underlying employment practice was unlawful under that statute."  *Galdieri–Ambrosini v. Nat'l*

*Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (internal quotation marks omitted).

"Neither must the plaintiff formally oppose the alleged discriminatory behavior."  *Hubbard v.*

*Total Commc'ns, Inc.*, 347 F. App'x 679, 681 (2d Cir. 2009).  Rather, "informal protests of

discriminatory employment practices, including making complaints to management, writing

critical letters to customers, protesting against discrimination by industry or by society in

general, and expressing support of co-workers who have filed formal charges" are also protected

under Title VII and the other relevant statutes.  *See id*. (internal quotation marks omitted).

 On "the third element, the proper inquiry is 'whether the alleged adverse action to which

the plaintiff was subjected could well have dissuaded a reasonable employee in his position from

complaining of unlawful discrimination.'"  *Reiss*, 852 F. App'x at 622 (quoting *Davis-Garett v.*

*Urb. Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019)).  This encompasses a broader range of

conduct than the standard for discrimination claims and "is not limited to discriminatory actions

that affect the terms and conditions of employment."  *Vega v. Hempstead Union Free Sch. Dist.*,

801 F.3d 72, 90 (2d Cir. 2015).

With respect to the fourth prong, a plaintiff can establish a causal connection to support a retaliation claim "either:  (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Direct evidence is "evidence tending to show, without resort to inference, the existence of a fact in question."  *Smith*, 440 F. Supp. 3d at 341 (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992)).  This kind of evidence "'would be an admission by the decisionmaker' that he or she made a decision by relying on an improper consideration, *e.g.*, 'I fired him because he was too old.'"  *Id.* at 341–42 (quoting *Tyler,* 958 F.2d at 1185).  Direct evidence is often unavailable, as "employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law."  *Ramseur*, 865 F.2d at 464–65 (internal quotation marks omitted).

To establish a causal connection on the basis of temporal proximity alone, the "adverse action" must be "very close" in time to the protected activity.  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted).  Some courts have taken "[t]he passage of even two or three months [to be] sufficient to negate any inference of causation when no other basis to infer retaliation is alleged."  *Williams v. City of New York*, No. 11 Civ. 9679(CM), 2012 WL 3245448, at *11 (S.D.N.Y. Aug. 8, 2012); *see also Breeden*, 532 U.S. at 273–74 (citing with approval cases holding that three- and four-month gaps between protected activity and adverse action were insufficient to establish a causal connection).  However, there is

25

no "bright line [that] define[s] the outer limits beyond which a temporal relationship is too

attenuated to establish a causal relationship" sufficient for this element of the claim.  *Summa v.*

*Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (quoting *Espinal v. Goord*, 558 F.3d 119, 129

(2d Cir. 2009)).  A reviewing court is to look at the record evidence to evaluate "the permissible

inferences that can be drawn from temporal proximity in the context of particular cases."  *Id.*

("In *Espinal,* we concluded that 'the passage of only six months between the dismissal of

Espinal's lawsuit and an allegedly retaliatory beating by officers, one of whom was a defendant

in the prior lawsuit, was sufficient to support an inference of a causal connection.'"  (quoting

*Espinal*, 558 F.3d at 129)).

A decisionmaker's lack of awareness of the protected activity can also help demonstrate a

lack of a causal connection.  *See Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05 Civ. 6496(PGG),

2010 WL 1326779, at *25 (S.D.N.Y. Mar. 31, 2010), *aff'd*, 417 F. App'x 81 (2d Cir. 2011)

(collecting cases); *Laurin v. Pokoik*, No. 02 Civ. 1938(LMM), 2005 WL 911429, at *5 (S.D.N.Y.

Apr. 18, 2005) ("[Plaintiff] must demonstrate not only that [employer corporation] as an entity

knew of her engagement in the protected activities, but also that the actual decisionmaker(s)

knew about her protected activities as well."); *Philippeaux v. Fashion Inst. of Tech.*, No. 93 CIV

4438 (SAS), 1996 WL 164462, at *6 (S.D.N.Y. Apr. 9, 1996), *aff'd*, 104 F.3d 356 (2d Cir. 1996)

(same); *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 271 (S.D.N.Y. 2007)

("[D]istrict courts have consistently held that, with regard to the causation prong of the *prima*

*facie* standard, absent any evidence to support an inference that the decisionmakers knew of

plaintiffs['] complaints, plaintiff cannot rely on circumstantial evidence of knowledge as

evidence of causation."  (internal quotation marks omitted)).  "A jury, however, can find

retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for

example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge." *Gordon*, 232 F.3d at 117.

"Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001).  If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish that the "retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor in the employer's decision." *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)). But-for causation does not "require proof that retaliation was the only cause of the employer's action—it is enough that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.*  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action" such that "a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Kwan*, 737 F.3d at 846.

## 2.  Application

Plaintiff has made out the first three elements of the prima facie case.  Plaintiff's filing her EEO complaints regarding the allegedly-discriminatory failure to promote her counts as protected activity.  The EEO spoke with Brown in June of 2014 about alleged discrimination in promoting DiLorenzo over Plaintiff, (Thompson Decl. Ex. G, at 7), and as of June of 2015, Chan knew that Plaintiff had filed an EEO complaint regarding his 2014 performance review of her

because Plaintiff emailed him about it, (*id.* Ex. JJ).  Plaintiff's receipt of the "Needs Improvement" scores on her 2016 and 2017 annual performance reviews count as adverse, even under the now-abrogated harsher standard of material adversity,[16] because they disqualified her from receiving wage increases.  (Thompson Decl. Ex. C, at 188:11–189:6; Def. 56.1 ¶¶ 194–99; 207–13.)  While mere dissatisfaction with performance reviews is not enough to make a performance review materially adverse, a performance review that results in loss of a wage increase Plaintiff would have otherwise received does count as materially adverse.  *Salas v. N.Y.C. Dep't of Investigation*, 298 F. Supp. 3d 676, 685 (S.D.N.Y. 2018) ("The denial of a raise, like other cuts in pay, amounts to an adverse employment action."); *Kolakowski v. Consol. Edison Co.*, No. 98 Civ. 6001(RPP), 2000 WL 231086, at *4 (S.D.N.Y. Feb. 29, 2000) (finding a "negative performance review" to be "an adverse employment action, because the review adversely affected the possibility of a promotion"); *cf. Davis-Garrett*, 921 F.3d at 43 (holding that a "materially adverse change" in the retaliation context is anything that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (internal quotation marks and emphases omitted)).

Plaintiff only argues she satisfies the proof of causation element through "temporal proximity."  Specifically, she argues that the evidence shows that Chan knew of the EEO charge Plaintiff "filed on May 11, 2015," and that and Plaintiff "received her [2014 performance review] on May 20, 2015," which "began the creation of [a] retaliatory hostile work environment."  (SJ Opp. 22.)

Plaintiff's theory of causation fails.  First, she points to no record evidence to support her

---

[16] The Second Circuit has held that, "[a]fter [*Burlington Northern and Santa Fe Railway Co. v.*] *White*, [548 U.S. 53 (2006),] . . . the harm element of a retaliation claim" is only "whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination."  *Davis-Garett*, 921 F.3d at 43–44 (citations omitted).

claim that Chan knew of her EEO charge when he drafted her 2014 evaluation.  Plaintiff's EEO

charge is dated May 18, 2015, (Thompson Decl. Ex. K), but the record shows that Chan did not

complete a draft of the 2014 evaluation until May 15, 2015, (*id.* Ex. GG (email from Chan to his

assistant asking her to "print[] out a copy" of the evaluation)).  Second, to the extent that Plaintiff

argues that Defendants retaliated against her by "creat[ing] a retaliatory hostile work

environment," (SJ Opp. 18), Plaintiff fails to establish any legally-cognizable retaliatory hostile

work environment.  "In order to establish a retaliatory hostile work environment, a plaintiff must

satisfy the same standard that is applied generally to hostile work environment claims regarding

the severity of the alleged conduct."  *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 438

(E.D.N.Y. 2009) (citing, among others, *Rasco v. BT Radianz*, No. 05 Civ. 7147(BSJ), 2009 WL

690986, at *15 (S.D.N.Y. Mar. 17, 2009)).  This means "a plaintiff must produce evidence that

'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of the victim's employment.'"  *Cruz v.*

*Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.,* 510

U.S. 17, 21 (1993)).  Plaintiff does not make any argument about how the 2014 performance

review—or indeed how anything in the record—could allow a reasonable juror to infer the

existence of "severe or pervasive" "discrimination."

        Even upon an independent examination of the record, and "[v]iewing the evidence in the

light most favorable to the plaintiff," as I must, *Kwan*, 737 F.3d at 847, I cannot find any

reasonable temporal proximity between Plaintiff's protected activity and an adverse employment

action.  The best case that can be drawn is from June 4, 2015, when Plaintiff informed Chan of

the status of an EEO complaint she had made, (Def. 56.1 ¶ 166), and the 2016 performance

review she received in April of 2017, which is the first adverse action she suffered thereafter—

the record shows this review caused Plaintiff not to receive a wage increase in 2017, (*id.* ¶¶ 194–99).[17]  These events are around a year and ten months apart from each other—any "temporal relationship" between them "is too attenuated to establish a causal relationship."  *See Summa*, 708 F.3d at 114 (internal quotation marks omitted).

Moreover, even if I were to find that Plaintiff had met her prima facie case, I would hold that Defendants "articulate[d] . . . legitimate, non-discriminatory reason[s] for [the] adverse employment action[s]" that Plaintiff may have suffered.  *Villar v. City of New York*, 135 F. Supp. 3d 105, 136 (S.D.N.Y. 2015) (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n.6 (2d Cir. 2011)).  There is ample record evidence to support Defendants' stated belief that Plaintiff was not doing her job adequately and was unpleasant and difficult to work with, thus warranting the negative performance reviews.  (*See* Thompson Decl. Ex. PP, at 2–12 (memoranda exchanged by Chan and Plaintiff); *id.* Ex. TT (Letter of Reinstruction from Chan to Plaintiff "documenting [Plaintiff]'s failure to properly and timely complete assignments and [her] inappropriate conduct.").)

Because Defendants have met their burden, "the presumption of retaliation dissipates," *Hicks*, 593 F.3d at 164 (citation omitted), and Plaintiff must show that "the adverse action would not have occurred in the absence of the retaliatory motive."  *Kwan*, 737 F.3d at 846.   Plaintiff fails to do this.  She argues that she has shown "pretext," (SJ Opp. 24–25), but she has not done so for the same reasons already articulated *supra* Pt.IV.A.2.  For example, Plaintiff argues that

---

[17] Plaintiff says that she suffered adverse action in "February 2015" when Brown denied her a "Civil Service designation."  (SJ Opp. 20.)  However, Plaintiff neither offers record evidence nor even explains how not receiving the designation comes with "an attendant negative result" to render this materially adverse to her employment. *Cf. Davis v. CUNY*, No. 94 CIV. 7277 (SHS), 1996 WL 243256, at *8 (S.D.N.Y. May 9, 1996) (rejecting argument that a status change removing plaintiff from a tenure-track job, thereby adding "inconvenience and anxiety," was sufficient to meet the adverse action element of the prima facie case).  Moreover, there is no evidence in the record about what a "Civil Service designation" means.  Defendants attempt to explain it by citing to a declaration they did not actually file, (*see* Def. 56.1 ¶¶ 143–47), and Plaintiff did not put in her own evidence about it; she merely notes that Defendants failed to file their declaration, (*see* Pl. 56.1 ¶¶ 143–147).

"[p]retext is shown here" because "Brown attempted to appease Plaintiff by recommending her for the NYC Leadership Institute," (*id.*), but there is no explanation of how this amounts to an even "somewhat inconsistent explanation[]" of Defendants' actions, *see Kwan*, 737 F.3d at 846. Indeed, rather than demonstrating pretext, Brown's recommendation could be seen as her effort to help Plaintiff get the experience necessary to advance in the Authority.  Plaintiff also argues one can infer "the animus Brown has toward Plaintiff for [Plaintiff's] complaining to" Brown's boss "about not being promoted and wanting a transfer out of Capital Programs."  (SJ Opp. 25.) However, even if Brown was upset with Plaintiff over this when it happened on August 20, 2014, (Def. 56.1 ¶¶ 110–12), Plaintiff offers no reason to think that Brown harbored "retaliatory animus" for the roughly three years it took for Plaintiff to next suffer an adverse employment action, "let alone that retaliation was a but-for cause of [any] adverse employment actions." *Abromavage v. Deutsche Bank Sec. Inc.*, 18-CV-6621, 2021 WL 1061596, at *15 (S.D.N.Y. Mar. 19, 2021).

## V.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the open motion at docket 47 and to close this case.

SO ORDERED.

Dated: March 18, 2022
        New York, New York

Vernon S. Broderick
United States District Judge